**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **CICI ENTERPRISES, LP,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 3:23-CV-2155** |
| **HSB SPECIALTY INSURANCE** | § | |
| **COMPANY** | § | |
| **Defendant.** | § | |
| | § | |

**PLAINTIFF CICI ENTERPRISES, LP'S
ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff CICI ENTERPRISES, LP ("CiCi") files this Original Complaint for Declaratory Judgment and Other Relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* and Federal Rule of Civil Procedure 57, seeking a declaration that Defendant owes Plaintiff the full amount of its Claim under a Cyber Insurance policy issued by Defendant HSB to Plaintiff CiCi. CiCi also seeks monetary relief of more than $1,000,000.00. CiCi shows the following in support:

**I.**

**NATURE OF THE CASE**

1.1     This is a declaratory judgment action filed to determine coverage and the limits available under a Cyber Insurance policy for a claim involving an extortion threat. The Cyber Insurance policy was issued to Plaintiff by Defendant HSB. Plaintiff also asserts causes of action against Defendant for breach of contract and violations of the Texas Insurance Code based on Defendant's failure to pay the full amount of Plaintiff's claim pursuant to an incorrect assertion by

Defendant that Plaintiff's claim for Cyber Extortion and an Extortion Threat is subject to the Ransomware Event Sub-Limit Endorsement.

1.2    HSB issued a Cyber Insurance policy to Plaintiff with effective dates of October 16, 2021 through October 16, 2022.  CiCi filed a claim arising from an extortion threat with HSB seeking coverage under its Cyber Insurance policy for loss incurred from an extortion threat.

1.3    HSB acknowledged coverage, but has refused to pay the full amount of CiCi's claim.  Instead, HSB argues that the entirety of CiCi's claim falls within the Ransomware Event Sub-Limit Endorsement, which caps HSB's maximum liability for any single Ransomware Event to $250,000.00.  If the Sub-Limit Endorsement does not apply, the Policy contains $3,000,000.00 in limits.

## II.

## PARTIES

2.1    Plaintiff CiCi Enterprises, LP ("CiCi") is a foreign limited partnership organized under the laws of Delaware with its principal place of business in Dallas, Texas.  CiCi's sole limited partner is Smiley Slice, LLC, which is a foreign limited liability company formed under the laws of Delaware with a principal place of business in Dallas, Texas.  Smiley Slice, LLC is member managed and the members are the Sunil D. Dharod Revocable Trust ("Sunil Trust"), a Texas trust; GCP Cicis, LLC, a Delaware limited liability company with a principal place of business in Dallas, Texas; Jeff Hetsel, an individual, who is a citizen of Texas and resides in Collin County, Texas; Business Trust for Chris Dharod, a Nevada trust, and Business Trust for Puja Dharod, a Nevada trust.  CiCi's general partner is Top Caps, LLC, which is a foreign limited liability company formed under the laws of Delaware, with a principal place of business in Dallas, Texas.  Top Caps, LLC is manager owned and the manager is OnWin, LLC, which is a foreign

limited liability company formed under the laws of Delaware, with a principal place of business in Dallas, Texas. OnWin, LLC is manager managed and the manager is Sunil Dharod, who is a citizen of Texas and resides in Collin County, Texas. No manager, member, or partner of CiCi Enterprises, LP, Top Caps, LLC, Smiley Slice, LLC, or OnWin, LLC is a resident of, incorporated in, or maintains a principal place of business in Connecticut.

2.2    Defendant HSB Specialty Insurance Company ("HSB") is a surplus lines insurance company licensed to transact business in the state of Texas and is engaged in the business of insurance in Texas. HSB is organized under the laws of Connecticut with a principal place of business in Hartford, Connecticut. Defendant HSB has no registered agent in the State of Texas and can, therefore, be served with process by serving the **Commissioner of the Texas Department of Insurance at Chief Clerk Office, Mail Code GC-CCO, P.O. Box 12030, Austin, Texas 78711-2030**, and the Commissioner can then forward process to **Jean Cohn, the Senior Vice President, General Counsel, and Corporate Secretary, at One State Street, Hartford, CT 06102**. Plaintiff hereby requests issuance of Citation for Defendant HSB Specialty Insurance Company via the Commissioner of Insurance.

## III.

## JURISDICTION

3.1    The Court has jurisdiction over this matter under the Declaratory Judgment Act, 28 U.S.C. § 2201, and upon complete diversity of citizenship pursuant to 28 U.S.C. § 1332. This is a civil action and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Jurisdiction is also proper because the issues presented in this suit are ripe for adjudication.

## IV.

## VENUE

4.1     Venue is proper in the Northern District of Texas, Dallas Division, under 28 U.S.C. §§1391(b)(2) because this is the district and division in which a substantial part of the events or omissions giving rise to the claim occurred.

## V.

## FACTS

5.1     On or about May 21, 2022, an extortion threat was delivered to CiCi after ransomware was discovered on CiCi's computer system. The threat actor encrypted CiCi's system and then threatened to publish exfiltrated data if the amount demanded was not paid.  In other words, CiCi was the receiving party of an extortion threat.  With HSB's approval, CiCi hired a law firm and advisor to provide incident response services, including an investigation into the security breach and to initiate negotiations with the threat actor.  The threat actor was identified to be LV. After negotiations, CiCi ultimately had to pay $400,000.00 to the threat actor.  CiCi additionally paid $386,604.00 in IT support, $131,312.00 in incremental labor, $377.00 in employee expense and equipment, and $1,536.00 in other expenses that were all incurred to respond to the extortion threat.

5.2     CiCi timely notified At-Bay Insurance Services, LLC of the claim, which is the entity and location that the Cyber policy directs all Notices of Claim or Cyber Events to be made.

5.3     On June 10, 2022, HSB issued its coverage letter ("Coverage Letter") to CiCi, advising that "based upon our review of the information provided to date, we are pleased to advise this mater triggers the initial scope of coverage under the **Policy** as outlined below." *A copy of the Coverage Letter is attached hereto as Exhibit 1.*

5.4     The Coverage Letter indicated that CiCi's claim triggered coverage under "Insuring Agreement A – Information Privacy, A.3 Event Response and Management, . . . [and] provides

coverage for **Technical Response Loss**, **Legal Services**, **Public Relations Loss**, **Notification Loss**, **Reward Expenses Loss**, and **Credit Monitoring Loss** incurred by CiCi as a result of an **Information Privacy Event** first discovered during the **Policy Period**."

5.5    HSB's Coverage Letter additionally advised that the claim had triggered coverage under "Insuring Agreement B. – Network Security, B.2 – Event Response and Recovery . . .[which] provides coverage for **Technical Response Loss**, **Public Relations Loss**, **Data Recovery Loss**, and **System Restoration Loss** incurred by CiCi as a result of a **Network Security Event** first discovered during the **Policy Period**."

5.6    HSB's Coverage Letter additionally advised CiCi that "[t]his event also constitutes an **Extortion Threat** under Insuring Agreement D. Cyber Extortion."  HSB further advised that "coverage is available for the **Extortion Loss** incurred by CiCi as a direct result of an **Extortion Threat** first discovered during the **Policy Period**."

5.7    HSB's Coverage Letter also acknowledged coverage for a **"System Disruption"** and noted that "this matter triggers the initial scope of coverage under Insuring Agreement C.1. Business Interruption."

5.8    Despite acknowledging that coverage was triggered under various insuring agreements, HSB's Coverage Letter indicates that all coverage available to CiCi under the Cyber Insurance policy for its claim falls into the Ransomware Event Sub-Limit Endorsement, which greatly reduces the policy limits available to CiCi from $3,000,000.00 to only $250,000.00.

5.9    HSB's position that all available coverage to CiCi as a result of the claim falls within the Ransomware Event Sub-Limit Endorsement is incorrect and contradicts the plain language of the Ransomware Event Sub-Limit Endorsement. In the alternative, the terms of the

Ransomware Event Sub-Limit Endorsement are ambiguous, and as such, the Endorsement should be construed against HSB and in favor of CiCi.

5.10    HSB has continued to represent, incorrectly, that all of CiCi's claim is subject to the Ransomware Event Sub-Limit Endorsement, and has refused to cover any portion of CiCi's claim over and above the Endorsement's $250,000.00 sub-limit.  Due to HSB's misrepresentations and failure to pay CiCi's claim, CiCi asserts causes of action against HSB for breach of contract and violations of Chapter 542 and 541 of the Texas Insurance Code.

## VI.

## THE CYBER INSURANCE POLICY

6.1    HSB issued to CiCi a Cyber Insurance policy, number 6613789-01, with effective dates of October 16, 2021 through October 16, 2022 ("the Policy").  *A copy of the Policy is attached hereto as Exhibit 2.*

6.2    The Policy contains the following relevant insuring agreements:

A. INFORMATION PRIVACY

1.    Information Privacy Liability

We shall pay on behalf of the **Insured**, all **Claim Expenses** and **Damages** resulting from a **Claim** first made against any **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for an **Information Privacy Wrongful Act**.

.        .        .        .

3.    Event Response and Management

We shall pay the **Insured Organization** for **Technical Response Loss**, **Legal Services Loss**, **Public Relations Loss**, **Notification Loss**, **Reward Expense Loss**, and **Credit Monitoring Loss** incurred by the **Insured Organization** as a result of an **Information Privacy Event** first discovered during the **Policy Period**.

.       .       .       .

B.    NETWORK SECURITY

1.    Network Security Liability

We shall pay on behalf of the **Insured**, all **Claim Expenses** and **Damages** resulting from a **Claim** first made against any **Insured** during the **Policy Period** or, if exercised, the Extended Reporting Period, for a **Network Security Wrongful Act**.

2.    Event Response and Recovery

We shall pay the **Insured Organization** for **Technical Response Loss**, **Public Relations Loss**, **Data Recovery Loss**, **Reward Expense Loss,** and **System Restoration Loss** incurred by the **Insured Organization** as a result of a **Network Security Event** first discovered during the **Policy Period**.

C.    BUSINESS INTERRUPTION

1.    Direct Business Interruption

We shall pay the **Insured Organization** for **Business Interruption Loss, Extra Expense, Reward Expense Loss,** and **Public Relations Loss** incurred by the **Insured Organization** as a direct result of a **System Disruption** which first occurs during the **Policy Period**.

2.    Contingent Business Interruption

We shall pay the **Insured Organization** for **Contingent Business Interruption Loss, Extra Expense, Reward Expense Loss,** and **Public Relations Loss** incurred by the **Insured Organization** as a direct result of a **System Disruption** which first occurs during the **Policy Period**.

D.    CYBER EXTORTION

1.    Cyber Extortion

We shall pay the **Insured Organization** for **Extortion Loss, Reward Expense Loss,** and **Public Relations Loss** incurred by the **Insured Organization** as a direct result of an **Extortion Threat** first discovered during the **Policy Period**.

.     .     .     .

6.3    The Policy additionally contains the following relevant definitions:

.     .     .     .

4.    **Business Interruption Loss** means the following amounts incurred by an **Insured Organization** during the **Period of Restoration**:

    a.    net profit before income taxes that would have been earned had no **System Disruption** of **Insured Computer Systems** occurred;

    b.    net loss before income taxes that would have been avoided had no **System Disruption** of **Insured Computer Systems** occurred;

    c.    the **Insured Organization's** continuing normal operating and payroll expenses; and

    d.    costs to retain the services of a third party forensic accounting firm to determine the amounts of **Business Interruption Loss** described in paragraphs V.4.a.–V.4.c. above, subject to our prior consent.

.     .     .     .

6.    **Claim** means any:

    a.    written demand, request, or assertion seeking monetary damages, or non-monetary or injunctive relief;

    b.    civil proceeding, investigation, or suit commenced by service of a complaint, notice, request for information, or similar proceeding seeking monetary damages or non-monetary or injunctive relief;

    c.    arbitration, mediation, or similar alternative dispute resolution proceeding commenced by the receipt of a complaint, written demand, or similar proceeding seeking monetary damages or non-monetary or injunctive relief;

    d.    criminal proceeding commenced by the filing of charges, arrest or detainment, or a return of an indictment or similar document;

    e.       request to toll or waive a statute of limitations applicable to a **Claim** referenced in paragraphs V.6.a.-V.6.d. above;

    f.       formal appeal of a **Claim** referenced in paragraphs V.6.a.-V.6.d. above;

    g.       with respect to Insuring Agreement I.A.2., any **Claim** referenced in paragraphs V.6.a.–V.6.f. above which is a **Regulatory Claim**; or

    h.       with respect to Insuring Agreement I.A.4., any **Claim** referenced in paragraphs V.6.a.–V.6.f. above which is a **PCI-DSS Claim**.

7.     **Claim Expenses** means reasonable and necessary:

    a.       attorneys' fees, mediation and arbitration expenses, expert witness and consultant fees and attendance expenses, and other fees and costs incurred by us, or by an **Insured** with our prior written consent, in the investigation and defense of a **Claim**; and

    b.       premiums for any appeal bond, injunction bond, attachment bond, or any similar bond, although we shall have no obligation to furnish such bond.

    **Claim Expenses** shall not include salaries, wages, or other compensation of any **Insured Person**; except to the extent that such **Claim Expenses** are expenses incurred to secure and obtain a member of the **Control Group's** attendance at any mediation, arbitration, hearing, depositions, or trial in connection to the investigation and defense of a **Claim**.

.      .      .      .

15.    **Cyber Event** means an **Information Privacy Event**, **Network Security Event, Extortion Threat**, **Fraudulent Inducement Instructions**, **Computer Crimes**, **System Disruption**, and, with respect to Insuring Agreement I.F.2. only, a **Media Wrongful Act**.

.      .      .      .

17.    **Damages** means any amounts an **Insured** becomes legally obligated to pay on account of any **Claim**, including:

    a.       compensatory damages, settlements, and judgments;

    b.       awards of prejudgment and post-judgment interest;

c.      sums for deposit in a consumer redress fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement;

d.      punitive, exemplary, or multiplied damages and awards; provided, however, that punitive, exemplary, or multiplied damages and awards shall only be included as **Damages** to the extent insurable under the applicable laws of any jurisdiction which most favors coverage and which has a substantial relationship to an **Insured**, us, this **Policy**, or the **Claim** giving rise to such **Damages**;

e.      with respect to a **PCI-DSS Claim** under Insuring Agreement I.A.4., any **PCI-DSS Penalties** and **PCI-DSS Response Expenses**; and

f.      with respect to a **Regulatory Claim** under Insuring Agreement I.A.2., any **Regulatory Penalties**, **GDPR Penalties**, and **Regulatory Assessments and Expenses**.

**Damages** shall not include:

g.      fines, penalties, taxes, or sanctions imposed against an **Insured**; except to the extent such fines, penalties, taxes, or sanctions are insurable under the applicable laws of any jurisdiction which most favors coverage and which has a substantial relationship to an **Insured**, us, this **Policy**, or the **Claim** giving rise to such **Damages**, are **PCI-DSS Penalties** otherwise covered under Insuring Agreement I.A.4., or **Regulatory Penalties**, **GDPR Penalties**, or **Regulatory Assessments and Expenses** otherwise covered under Insuring Agreement I.A.2. of this **Policy**;

h.      costs to comply with any injunctive, remedial, preventative, or other non-monetary or declaratory relief; or

i.      any matters deemed uninsurable under the laws pursuant to which this **Policy** is construed.

18.     **Data Recovery Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

a.      replace and restore corrupted, destroyed, lost, or stolen software;

b.      re-create and recover corrupted, destroyed, lost, or stolen data in electronic form which is, or was, stored on a **Computer System**;

c.      re-create and recover corrupted, destroyed, lost, or stolen data in non-electronic form for which there is no electronic source available; and

   d.  to retain the services of a **Cyber Response Firm** to provide consultative and professional services related to **Data Recovery Loss** described in paragraphs V.18.a.–V.18.c. above.

.  .  .  .

21.  **Extortion Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

   a.  make payment of any funds, digital currencies ("crypto-currencies"), marketable goods, services, or other assets to the person or group which is believed to be responsible for, and to have made, such **Extortion Threat**;

   b.  reduce or mitigate the severity of **Extortion Loss** described in paragraph V.21.a. above; and

   c.  retain the services of a **Cyber Response Firm** to provide consultative and professional services related to **Extortion Loss** described in paragraphs V.21.a. and V.21.b. above.

22.  **Extortion Threat** means any credible threat or series of related threats made to an **Insured** by a third party person or group, or by a rogue **Employee** who is not a member of the **Control Group** and who is acting in a manner not authorized by the **Insured Organization**, which threatens to take any of the following actions unless an **Insured** pays such group or person the funds demanded, or meet some other non-monetary demand, in exchange for the mitigation or removal of such threat:

   a.  cause an **Information Privacy Event** or **Network Security Event**;

   b.  alter, corrupt, damage, manipulate, misappropriate, encrypt, delete, or destroy any **Computer System**, **Corporate Data**, or **Protected Personal Information**;

   c.  restrict or inhibit access to a **Computer System**; or

   d.  any action connected to the continuation or furthering of any already commenced action referenced in paragraphs V.22.a.-V.22.c. above.

23.  **Extra Expense** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

   a.  reduce the **Period of Restoration**;

   b.  mitigate or reduce expenses resulting from the **System Disruption** of a **Computer System**;

    c.      secure **Computer Systems** such that a similar **System Disruption** is avoided in the future; and

    d.      retain the services of a **Cyber Response Firm** to provide consultative and professional services related to **Extra Expense** described in paragraphs V.23.a.–V.23.c. above.

.    .    .    .

30.      **Information Privacy Event** means any actual or reasonably suspected:

    a.      failure to prevent unauthorized access to **Protected Personal Information**;

    b.      failure to properly manage, handle, store, protect, disclose, destroy, control, or collect **Protected Personal Information**;

    c.      violation of any **Privacy Regulations**, including, but not limited to, the wrongful collection or disclosure of **Protected Personal Information**;

    d.      failure to comply with those portions of a **Privacy Policy** which govern the collection, dissemination, confidentiality, integrity, accuracy, disclosure, sale, access, or availability of **Protected Personal Information**;

    e.      failure to provide natural persons whose **Protected Personal Information** an **Insured** stores or maintains to access, delete, or amend their **Protected Personal Information** as required by any **Privacy Regulation**, including, but not limited to, the "Right to be Forgotten" or "Right to Erasure" as described in the General Data Protection Regulation Standard, as amended;

    f.      failure to provide notification of any **Information Privacy Event** as required by any **Privacy Regulation**; or

    g.      failure to disclose an actual or potential **Information Privacy Event** as required by any **Privacy Regulation**.

31.      **Information Privacy Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, breach of duty, or other offense committed or attempted by an **Insured**, based upon or resulting in an **Information Privacy Event**.

.    .    .    .

36.      **Legal Services Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

a.     determine the applicability of any notifications, communications, actions, or other services required or necessary for the **Insured Organization** to comply with applicable **Privacy Regulations**;

b.     draft and develop letters, documents, or other materials to properly notify the natural persons whose **Protected Personal Information** was, or may have been, wrongfully disclosed, accessed, acquired, or otherwise compromised or impacted as a result of the applicable **Information Privacy Event**;

c.     provide any legally required communications and reporting services to any regulatory, administrative, or supervisory authority; and

d.     retain the services of a **Cyber Response Firm** to provide legal, consultative, and professional services related to **Legal Services Loss** described in paragraphs V.36.a.–V.36.c. above.

**Legal Services Loss** includes costs and expenses incurred in order to comply with applicable **Privacy Regulations** and shall follow the law of the applicable jurisdiction which most favors coverage for such costs and expenses. Those costs and expenses not required to comply with any applicable **Privacy Regulations** require our prior consent.

37.     **Loss** means:

a.     **Reward Expense Loss, Technical Response Loss, Public Relations Loss, Legal Services Loss, Notification Loss, Credit Monitoring Loss, Data Recovery Loss, System Restoration Loss, Business Interruption Loss, Contingent Business Interruption Loss, Extra Expense, Extortion Loss, Fraudulent Inducement Loss**, and **Computer Crimes Loss**.

**Loss** shall not include:

h.     salaries, benefits or other compensation payable to **Insured Persons**, except to the extent covered under Insuring Agreement(s) I.C.1. and I.C.2.;

i.     an **Insured Organization's** internal operating costs, expenses, or fees, except to the extent covered under Insuring Agreement(s) I.C.1. and I.C.2.;

j.     taxes, fines, penalties, or amounts for injunctive relief or sanctions;

b.     **Funds or Securities** in the care, custody, or control of an **Insured**, except to the extent covered under Insuring Agreement(s) I.D.1., I.E.1., and I.E.2.; or

k.   costs or expenses incurred to update, improve, enhance, or replace privacy or network security controls, policies or procedures, or **Computer Systems** to a level beyond that which existed prior to the applicable **Cyber Event**, except to the extent we have recommended and provided prior consent to incur such costs or expenses, including:

    i.   claim avoidance related costs or expenses anticipated under **Extra Expense**; and

    ii.   incremental improvement costs or expenses anticipated under **System Restoration Loss**.

.        .        .        .

42.   **Network Security Event** means any actual or reasonably suspected:

a.   propagation of **Malicious Code** from a **Computer System**;

b.   attack by **Malicious Code** which infects a **Computer System**;

c.   denial of service attack:

    i.   originating from a **Computer System**; or

    ii.   made against a **Computer System**;

d.   gaining of access or use of a **Computer System** by:

    i.   an unauthorized person; or

    ii.   an authorized person for purposes not authorized by an **Insured Organization**;

e.   acquisition, access, loss, or disclosure of **Corporate Information** not authorized by an **Insured Organization**;

f.   theft of a password or access code by electronic or non-electronic means from a **Computer System**, the **Insured Organization's** premises, or directly from an **Insured Person**;

g.   the failure to provide any authorized user access to the **Insured Organization's** website or **Computer System** due to the failure or violation of the security of a **Computer Systems**; or

h.   the failure to protect **Computer Systems** which results in, or is based upon, a **Network Security Event** referenced in paragraphs V.42.a.-V.42.g. above.

**Network Security Event** includes any of the foregoing, regardless of whether such **Network Security Event** is a specifically targeted attack or a generally distributed attack.

43.    **Network Security Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, breach of duty, or other offense committed or attempted by an **Insured**, based upon or resulting in a **Network Security Event**.

.        .        .        .

65.    **System Disruption** means the measurable interruption, suspension, degradation, or failure in the service of:

a.    with respect to Insuring Agreement I.C.1., **Insured Computer Systems**; or

b.    with respect to Insuring Agreement I.C.2., **External Computer Systems**;

directly caused by a **Network Security Event** or **Information Privacy Event**.

66.    **System Restoration Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

a.    restore **Computer Systems**, including replacing or reinstalling software programs contained therein, to their level of functionality immediately prior to the applicable **Network Security Event**:

b.    remove any **Malicious Code** from **Computer Systems** resulting from the applicable **Network Security Event**;

c.    restore the configuration of **Computer Systems** to an adequacy at or higher to that which was present immediately prior to the applicable **Network Security Event**; and

d.    retain the services of a **Cyber Response Firm** to provide consultative and professional services related to **System Restoration Loss** described in paragraphs V.66.a.–V.66.c. above.

67.    **Technical Response Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

a.    investigate and determine the cause of the applicable **Information Privacy Event** or **Network Security Event**;

    b.    mitigate or contain an ongoing **Information Privacy Event** or **Network Security Event**;

    c.    identify and catalog natural persons whose **Protected Personal Information** was wrongfully disclosed, accessed, acquired, or otherwise compromised or impacted as a result of an applicable **Information Privacy Event**;

    d.    identify and catalog organizations whose **Corporate Information** was wrongfully disclosed, accessed, acquired, or otherwise compromised or impacted as a result of an applicable **Network Security Event**; and

    e.    retain the services of a **Cyber Response Firm** to provide consultative and professional services related to **Technical Response Loss** described in paragraphs V.67.a.–V.67.d. above.

.    .    .    .

69.    **Wrongful Act** means any **Information Privacy Wrongful Act**, **Network Security Wrongful Act**, or **Media Wrongful Act**.

6.4    The Policy additionally contains certain applicable endorsements, which change or modify the terms and conditions of the Policy. For example, the Policy contains the AmWins Amendatory Endorsement, which provides in relevant part:

1) Section I. Insuring Agreements, A. Information Privacy, item 3. Event Response and Management, is deleted and replaced with the following:

3. Event Response and Management

We shall pay the **Insured Organization** for, or pay on behalf of the **Insured Organization**, all **Technical Response Loss**, **Legal Services Loss**, **Public Relations Loss**, **Notification Loss**, **Reward Expense Loss**, and **Credit Monitoring Loss** incurred by the **Insured Organization** as a result of an **Information Privacy Event** first discovered during the **Policy Period**.

.    .    .    .

3) Section I. Insuring Agreements, B. Network Security, item 2. Event Response and Recovery, is deleted and replaced with the following:

2. Event Response and Recovery

We shall pay the **Insured Organization** for, or pay on behalf of the **Insured Organization**, all **Technical Response Loss**, **Public Relations Loss**, **Data Recovery Loss**, **Reward Expense Loss**, and **System Restoration Loss** incurred by the **Insured Organization** as a result of a **Network Security Event** first discovered during the **Policy Period**.

4) Section I. Insuring Agreements, D. Cyber Extortion, item 1. Cyber Extortion, is deleted and replaced with the following:

1. Cyber Extortion

We shall pay the **Insured Organization** for, or pay on behalf of the **Insured Organization**, all **Extortion Loss**, **Reward Expense Loss**, and **Public Relations Loss** incurred by the **Insured Organization** as a direct result of an **Extortion Threat** first discovered during the **Policy Period**.

.    .    .    .

8) The following is added to section V. Definitions, 6. **Claim**:

solely with respect to Insuring Agreements I.A.1. Information Privacy Liability, and I.B.1. Network Security Liability, **Claim** also includes an **Insured Organization's** obligation under a written contract to indemnify a third party for **Third Party Event Response Expenses**.

.    .    .    .

23) The following is added to section V. Definitions, 65. **System Disruption**:

Subject to our prior consent, which will not be unreasonably withheld, **System Disruption** includes a measurable interruption, suspension, degradation, or failure in the service of:

a)    with respect to Insuring Agreement I.C.1. Direct Business Interruption, **Insured Computer Systems**; and

b)    with respect to Insuring Agreement I.C.2. Contingent Business Interruption, **External Computer Systems**: directly caused by a **Voluntary Shutdown**.

.    .    .    .

24) Section V. Definitions, 66. **System Restoration Loss**, paragraph a., is deleted and replaced with the following:

      a.   restore **Computer Systems** to their level of functionality immediately prior to the applicable **Network Security Event**, including:

          i.   replacing or reinstalling software programs contained therein; and

          ii.   replacing or reinstalling computer hardware contained therein; provided, however, that this paragraph V.66.a.ii. is subject to:

              (a)   section V. Definitions, 37. **Loss**, paragraph f.ii.; and

              (b)   our determination that the replacement or reinstallation of computer hardware is essential to or will reduce the cost of the restoration effort of **Computer Systems** described in paragraph V.66.a. above;

25) Section V. Definitions, 67. **Technical Response Loss**, item d., is deleted and replaced with the following:

    d.  identify, catalog, and notify those organizations whose **Corporate Information** was wrongfully disclosed, accessed, acquired, or otherwise compromised or impacted as a result of an applicable **Network Security Event**; and

.      .      .      .

    6.5    Finally, the Policy contains a Ransomware Event Sub-Limit Endorsement, which

provides as follows:

**Ransomware Event Sub-Limit Endorsement**

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1)    The following is added to section II. Limits of Insurance:

Solely with respect to the coverage afforded under this endorsement, our maximum liability, and the most we shall pay for all **Loss**, **Damages**, and **Claims Expenses** incurred by the **Insured Organization** resulting from any single **Ransomware Event** shall be:

a) 250000.

Furthermore, the amount set forth directly above, in item 1)a) of this endorsement, will in no way serve to increase our liability under this **Policy** and shall be part of, and not in addition to, the **Aggregate Limit of Insurance**.

2)      The following is added to section V. Definitions:

**Ransomware Event** means the **Insured Organization's** receipt of a credible threat or series of related threats first discovered during the **Policy Period**, and such threats are made by a third party through the use of any malicious software or computer code, which threatens to take any of the following actions unless an **Insured** pays such third party the funds demanded, or meet some other non-monetary demand, in exchange for the mitigation or removal of such threat:

a)      cause an **Information Privacy Event** or **Network Security Event**;

b)      alter, corrupt, damage, manipulate, misappropriate, encrypt, delete, or destroy any **Computer System**, **Corporate Data**, or **Protected Personal Information**;

c)      restrict or inhibit access to a **Computer System**; or

d)      any action connected to the continuation or furthering of any already commenced action referenced in paragraphs 2)a)-c) above.

**Ransomware Event** includes any related **Information Privacy Event**, **Information Privacy Wrongful Act**, **Network Security Event**, **Network Security Wrongful Act**, or **System Disruption** resulting from such threat or series of threats described above. However, **Ransomware Event** shall not include and this endorsement shall not apply to any **Ransomware Event** that originates solely from a malicious attack against a third party owner or operator of **External Computer Systems**.

3)      Section V. Definitions. 15. **Cyber Event**, is deleted and replaced with the following:

**Cyber Event** means an **Information Privacy Event**, **Network Security Event**, **Extortion Threat**, **Fraudulent Inducement Instructions**, **Computer Crimes**, **System Disruption**, **Ransomware Event**, and, with respect to Insuring Agreement I.F.2. only, a **Media Wrongful Act**.

## VII.

## CONDITIONS PRECEDENT

7.1     Plaintiff incorporates all prior paragraphs as if fully restated herein.

7.2     CiCi timely notified Defendant of its claims pursuant to the Texas Deceptive Trade

Practices Act ("DTPA"), Section 17.505 of the Texas Business and Commerce Code, and Chapters

541 and 542 of the Texas Insurance Code by letter dated April 7, 2023. Plaintiff CiCi has complied with all conditions precedent to the filing of this suit and discovery of additional damages and attorney's fees.

## VIII.

## CLAIMS FOR RELIEF - FIRST CAUSE OF ACTION

## (DECLARATORY RELIEF)

8.1    Plaintiff incorporates all prior paragraphs as if fully restated herein.

8.2    Although it has acknowledged coverage, Defendant HSB has refused to cover CiCi's claim up to the $3,000,000.00 policy limits, and instead, argues that all of CiCi's claim is limited to the $250,000.00 sub-limit contained within the Ransomware Event Sub-Limit Endorsement.

8.3    CiCi seeks a declaration that the Ransomware Event Sub-Limit Endorsement ("Endorsement") does not modify coverage for Cyber Extortion or Extortion Threat by the plain terms of the Endorsement because the Endorsement does not specify that it applies to a Cyber Extortion or Extortion Threat.

8.4    As such, the Endorsement does not apply to CiCi's Cyber Extortion claim or the Extortion Threat, and the $3,000,000.00 policy limits are available to cover CiCi's Cyber Extortion claim, Extortion Threat, and CiCi's Extortion Loss, Reward Expense Loss, and Public Relations Loss incurred as a direct result of the Extortion Threat.

8.5    In the alternative, CiCi seeks a declaration that the Endorsement is ambiguous, and as such, should be construed in favor of coverage and in the light most favorable to CiCi.

8.6    In this regard, the Court should declare that the Policy's $3,000,000.00 policy limits are available for the payment of CiCi's Cyber Extortion claim, the Extortion Threat, and CiCi's

Extortion Loss, Reward Expense Loss, and Public Relations Loss incurred as a direct result of the Extortion Threat.

8.7    An actual controversy, therefore, exists between the parties hereto pursuant to 28 U.S.C. §2201 *et seq*., Chapter 37 of the Texas Civil Practice and Remedies Code, and Rule 57 of the Federal Rules of Civil Procedure, and this Court is vested with the power in the instant case to declare and adjudicate the rights and other legal relationships of the parties to this action with reference to issues raised by this Complaint.

## IX.

## SECOND CAUSE OF ACTION

## (BREACH OF CONTRACT)

9.1    Plaintiff incorporates all prior paragraphs as if fully restated herein.

9.2    Defendant had the duty to investigate and pay Plaintiff policy benefits for claims made for damages that are covered under the Policy.  Plaintiff's Cyber Extortion claim and/or claim for Loss resulting from the Extortion Threat is covered under the Policy.  Plaintiff fully performed under its contract with Defendant HSB and paid all premiums for the promised coverage.  Despite such performance, Defendant breached its contractual obligations and the Cyber Insurance policy at issue in this case by failing to pay Plaintiff's full claim and asserting that the entire claim is subject to the Ransomware Event Sub-Limit Endorsement.  In this regard, Defendant has breached its contractual obligations to timely investigate, adjust, and pay Plaintiff's insurance claim.  As a result of these breaches of contract, Plaintiff has suffered damages that are described in this Petition, which total nearly $1,000,000.00.

## X.

## THIRD CAUSE OF ACTION

## (VIOLATIONS OF CHAPTER 542 OF THE TEXAS INSURANCE CODE)

10.1     Plaintiff incorporates all prior paragraphs as if fully restated herein.

10.2     Defendant's conduct that is described in this Complaint violates Chapter 542 of the Texas Insurance Code.   In particular, Defendant violated Section 542.003 by (1) knowingly misrepresenting to a claimant pertinent facts or policy provisions relating to coverage at issue in that HSB misrepresented to CiCi that the entirety of CiCi's claim was subject to the Ransomware Event Sub-Limit Endorsement, which is false; (2) not attempting in good faith to effect a prompt, fair, and equitable settlement of a claim submitted in which liability has become reasonably clear by refusing to cover Plaintiff's full claim and, instead, assert that the entirety of Plaintiff's claim is subject to the $250,000.00 sub-limit contained within the Ransomware Event Sub-Limit Endorsement; and (3) compelling a policyholder to institute a suit to recover an amount due under a policy by offering substantially less than the amount ultimately recovered in a suit brought by the policyholder.   Defendant compelled Plaintiff CiCi to institute this suit by offering only $250,000.00 on CiCi's claim that totaled nearly $1,000,000.00.   CiCi will ultimately recover the nearly $1,000,000.00 of its claim through this suit.

10.3     Defendant has additionally violated Section 542.058 by delaying in the payment of CiCi's full claim after HSB received all items, statements, and forms reasonably requested and required.   To date, Defendant has not paid the full amount of CiCi's claim.   As a result of these violations, Plaintiff has suffered damages that are described in this Petition, which total nearly $1,000,000.00.

10.4    According to Section 542.060, because Defendant is not in compliance with Sections 542.003 or 542.058 of the Texas Insurance Code, Defendant is liable to pay CiCi the full amount of the claim, interest on the amount of the claim at 18% a year as damages, together with reasonable and necessary attorney's fees.  Plaintiff also seeks pre and post judgment interest and court costs.

10.5    Defendant has violated these provisions by knowingly misrepresenting that all of Plaintiff's claim was subject to the Ransomware Event Sub-Limit Endorsement, which has only $250,000.00 in policy limits compared to the Policy's $3,000,000.00 policy limits.  By refusing to cover Plaintiff's claim up to the $3,000,000.00 available policy limits, Defendant has compelled CiCi to institute this suit to recover the amounts due under its policy.

10.6    The violations of Chapter 542.003 have caused Plaintiff to suffer damages that are described in this Petition, which total nearly $1,000,000.00.

## XI.

## FOURTH CAUSE OF ACTION

### (VIOLATIONS OF CHAPTER 541 OF THE TEXAS INSURANCE CODE)

11.1    Plaintiff incorporates all prior paragraphs as if fully restated herein.

11.2    Plaintiff has met all conditions precedent to bringing this cause of action against Defendant.  Specifically, Defendant's violations of Chapter 541, section 541.060 include, without limitation, the following:

(1)     misrepresenting to Plaintiff a material fact or policy provision relating to coverage at issue by asserting that the entirety of Plaintiff's claim is subject to the Ransomware Event Sub-Limit Endorsement and limited to only $250,000.00 in policy limits, which is false;

(2)    failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear by refusing to cover Plaintiff's claim up to the full $3,000,000.00 policy limits and instead, asserting that Plaintiff is limited to recovering only $250,000.00 pursuant to the Ransomware Event Sub-Limit Endorsement, which is false.

(3)    failing to promptly provide to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or offer of a compromise settlement of a claim by failing to provide a detailed explanation of why Plaintiff's Cyber Extortion claim was being limited by the Ransomware Event Sub-Limit Endorsement.  Defendant further violated Chapter 541 by failing to explain what provision in the Policy provides that Cyber Extortion or an Extortion Threat falls within the Ransomware Event Sub-Limit Endorsement when the Endorsement does not state that it applies to such.

(4)    refusing to pay a claim without conducting a reasonable investigation with respect to the claim.  Defendant did not conduct a reasonable investigation into all of the relevant coverages, types of losses at issue, and the particular Ransomware Event Sub-Limit Endorsement or it would have determined that Cyber Extortion and Extortion Threat are not subject to the Ransomware Event Sub-Limit Endorsement.

11.3    Defendant also violated Section 541.061 by (1) making an untrue statement of material fact, which was that the Cyber Extortion claim and Extortion Threat were subject to the Ransomware Event Sub-Limit Endorsement; (2) failing to state a material fact necessary to make other statements made not misleading, considering the circumstances under which the statements were made by failing to point out to Plaintiff CiCi that the Ransomware Event Sub-Limit Endorsement does not state that it applies to Cyber Extortion or an Extortion Threat; and (3)

making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of material fact by representing that Cyber Extortion and Extortion Threat are subject to the Ransomware Event Sub-Limit Endorsement, which is false.

11.4    Due to its violations of Chapter 541, Plaintiff is entitled to its actual damages, plus court costs, and reasonable and necessary attorney's fees.

11.5    Moreover, Defendant's violations and actions were committed knowingly, and specifically were done to limit Plaintiff's claim to the Ransomware Event Sub-Limit of only $250,000.00, when Defendant knew that Plaintiff's losses were nearly $1,000,000.00.  Defendant knowingly misrepresented that the Sub-Limit applied to Plaintiff's Cyber Extortion claim and Extortion Threat, when the endorsement does not apply to Cyber Extortion or an Extortion Threat. Due to Defendant's knowing violations, Plaintiff is entitled to three times the amount of its actual damages.

## XII.

## <u>CONCLUSION</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff CiCi Enterprises, LP prays for judgment as follows:

That the Court adjudicates and declares that (1) the Ransomware Event Sub-Limit Endorsement ("Endorsement") does not modify coverage for Cyber Extortion or Extortion Threat by the plain terms of the Endorsement because the Endorsement does not specify that it applies to Cyber Extortion or Extortion Threat; (2) the $3,000,000.00 policy limits are available to cover CiCi's Cyber Extortion claim, Extortion Threat, and CiCi's Extortion Loss, Reward Expense Loss, and Public Relations Loss incurred as a direct result of the Extortion Threat; (3) in the alternative, the Court adjudicates and declares that the Endorsement is ambiguous, and as such, should be

construed in favor of coverage and in the light most favorable to CiCi.  In this regard, the full $3,000,000 policy limits are available to cover CiCi's Cyber Extortion claim, Extortion Threat, and CiCi's Extortion Loss, Reward Expense Loss, and Public Relations Loss incurred as a direct result of the Extortion Threat

Plaintiff additionally demands that Defendant be cited to appear and Answer and that after the final hearing in this case, the Court award Plaintiff a judgment against Defendant for the following:

1. Actual damages, economic, and additional damages in an amount within the jurisdictional limits of the Court, as described herein;

2. Reasonable and necessary attorney's fees through trial and appeal;

3. 18% per annum interest on the amount of Plaintiff's claim as damages pursuant to Chapter 542 of the Texas Insurance Code;

4. Treble damages due to Defendant's knowing violations of Chapter 541 of the Texas Insurance Code;

5. Pre-judgment and post-judgment interest as provided by law;

6. Costs of court; and

7. Such other and further relief to which Plaintiff may be justly entitled and will ever pray.

Respectfully submitted,

By:    */s/ R. Brent Cooper*
       **R. BRENT COOPER**
       Texas State Bar No. 04783250
       Email:  Brent.Cooper@cooperscully.com
       **JULIE A. SHEHANE**
       Texas State Bar No. 24048794
       Email:  Julie.Shehane@cooperscully.com

**COOPER & SCULLY, P.C.**
Founders Square
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone:  (214) 712-9500
Telecopy:  (214) 712-9540

**ATTORNEYS FOR PLAINTIFF**
**CICI ENTERPRISES, LP**