# EXHIBIT

# A-1



**Cyber Insurance Policy**

AB-CYB-POL-COV  11/2019  © 2019

HSB_000001

Appx. 000003

at
— bay


HSB
A Munich Re company

## Notice to Policyholders - Texas

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

To our Texas Policyholders:

**Important Notice to Policyholders**

---

**THIS CYBER RISK COVERAGE IS WRITTEN ON A CLAIMS-MADE BASIS.**

**PLEASE NOTE THAT DEFENSE COSTS ARE SUBJECT TO THE APPLICABLE LIMIT AND DEDUCTIBLE. SPECIFICALLY, DEFENSE COSTS ARE SUBJECT TO THE NETWORK SECURITY LIABILITY LIMIT SET FORTH IN THE DECLARATIONS.  THIS MEANS THAT THE NETWORK SECURITY LIABILITY LIMIT SPECIFIED IN THIS CYBER RISK COVERAGE FORM MAY BE COMPLETELY EXHAUSTED BY DEFENSE COSTS.  IN THE EVENT THAT THE NETWORK SECURITY LIABILITY LIMIT IS EXHAUSTED, THE INSURER SHALL NOT BE LIABLE FOR ADDITIONAL DEFENSE COSTS. THE NETWORK SECURITY LIABILITY LIMIT APPLIES ON AN ANNUAL AGGREGATE BASIS.**

**PLEASE READ YOUR ENTIRE POLICY CAREFULLY.**

---

**Have a complaint or need help?**

If you have a problem with a claim or your premium, call your insurance company or HMO first. If you can't work out the issue, the Texas Department of Insurance may be able to help.

Even if you file a complaint with the Texas Department of Insurance, you should also file a complaint or appeal through your insurance company or HMO. If you don't, you may lose your right to appeal.

**The Hartford Steam Boiler Inspection and Insurance Company**

To get information or file a complaint with your insurance company or HMO:

>  **Call:** Customer Solutions Center
>  **Toll-Free:** 1-800-472-1866
>  Email: customer_solution_center@hsb.com
>  Mail: P.O. Box 61509, King of Prussia, PA 19406-0909

---

HSB_000002

Appx. 000004

 

**The Texas Department of insurance**

To get help with an insurance question or file a complaint with the state:

      Call with a question: 1-800-252-3439
      File a complaint: www.tdi.texas.gov
      Email: ConsumerProtection@tdi.texas.gov
      Mail: MC 111-1A, P.O. Box 149091, Austin, TX 78714-9091

HSB_000003





# Cyber Insurance Policy Declarations

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

This Cyber Insurance **Policy** is issued and delivered as surplus lines coverage pursuant to applicable surplus lines statutes. The surplus lines broker responsible for placement of this coverage is responsible for compliance with applicable surplus lines laws and regulations including completion of any declarations/affidavits and payment of any taxes.

This **Policy** contains one or more Insuring Agreements, some of which provide liability for **Claims** first made against any **Insured** during the **Policy Period**, or any applicable Extended Reporting Period, and reported to us pursuant to the terms of this **Policy**. **Claim Expenses** shall reduce the applicable **Aggregate Limit of Insurance** and Sub-Limits of Insurance and are subject to the applicable **Retentions**. Please read the entire **Policy** carefully.

| | |
|---|---|
| **Policy** Number: | 6613789-01 |
| **Policy** Issue Date: | 12/14/2021 |
| Home State: | TX |
| Licensed Surplus Lines Producer: | AmWINS Brokerage of Florida |
| | 1227 South Patrick Drive, Suite 101 |
| | Satellite Beach, FL 32937 |

This Declaration is attached to and forms part of the **Policy**.

ITEM 1: **Named Insured**:                          Cici Enterprises, LP
            DBA:                                    Not Applicable
                                                    5601 Executive Drive
                                                    Irving, TX 75038

ITEM 2: **Policy Period**:
            Effective Date:          10/16/2021 at 12:01 AM local time of the **Named Insured**
            Expiration Date:         10/16/2022 at 12:01 AM local time of the **Named Insured**

ITEM 3: **Policy** Premium:            $48,396.00

ITEM 4: **Aggregate Limit of Insurance**:    $3,000,000.

ITEM 5: Notice of **Claim** or **Cyber Event**:    claims@at-bay.com
                                                    At-Bay Insurance Services, LLC
                                                    196 Castro Street, Suite A
                                                    Mountain View, CA 94041

HSB_000004

Appx. 000006

at bay                                                                                    
HSB.
A Munich Re company

ITEM 6: Insuring Agreements, Sub-Limits of Insurance, and **Retentions** included:

| Insuring Agreements: | Inclusion: | Sub-Limits of Insurance: | Retentions: |
|---|---|---|---|
| A. Information Privacy | | | |
| A.1. Information Privacy Liability | Included | $3,000,000. | $50,000. |
| A.2. Regulatory Liability | Included | $3,000,000. | $50,000. |
| A.3. Event Response and Management | Included | $3,000,000. | $50,000. |
| A.4. PCI-DSS Liability | Included | $3,000,000. | $50,000. |
| B. Network Security | | | |
| B.1. Network Security Liability | Included | $3,000,000. | $50,000. |
| B.2. Event Response and Recovery | Included | $3,000,000. | $50,000. |
| C. Business Interruption | | | |
| C.1. Direct Business Interruption | Included | $3,000,000. | $50,000. |
| C.2. Contingent Business Interruption | Included | $3,000,000. | $50,000. |
| D. Cyber Extortion | | | |
| D.1. Cyber Extortion | Included | $3,000,000. | $50,000. |
| E. Financial Fraud | | | |
| E.1. Social Engineering | Included | $250,000. | $50,000. |
| E.2. Computer Fraud | Included | $250,000. | $50,000. |
| F. Media Content | | | |
| F.1. Media Liability | Included | $3,000,000. | $50,000. |
| F.2. Media Event Response | Included | $3,000,000. | $50,000. |

If any Inclusion field for an Insuring Agreement is displayed as "Not Included," there is no coverage for such Insuring Agreement.

HSB_000005

Appx. 000007





ITEM 6: Continued

| Insuring Agreement: | Inclusion: | Sub-Limit of Insurance: | Retention: |
|---|---|---|---|
| G. Reputational Harm | | | |
| G.1. Reputational Harm | Included | $3,000,000. | $50,000. |

If, in ITEM 6 Continued, the Inclusion field for the G.1. Reputational Harm Insuring Agreement is displayed as "Not Included," there is no coverage for such Insuring Agreement.

| Reputational Harm Indemnity Period: |
|---|
| 180 days. |

System Failure Enhancement to Business Interruption Insuring Agreements I.C.1. and I.C.2.

| System Failure Policy Form: | Inclusion: |
|---|---|
| Contingent and Direct System Failure: | Included |
| System Failure Coverage Details: | Value: |
| Direct System Failure Limit: | $3,000,000. |
| Contingent System Failure Limit: | $3,000,000. |
| System Failure Waiting Period: | 10 hours. |

If the Inclusion field for the Contingent and Direct System Failure Policy Form is displayed as "Not Included," it is not included as part of this Policy.

HSB_000006

Appx. 000008

at bay 

ITEM 7: Claims Made Dates:

| Claims Made Dates: | Date: |
|---|---|
| Retroactive Date: | Not Applicable |
| Continuity Date: | 10/16/2021 |
| Prior and Pending Litigation Date: | 10/16/2021 |

ITEM 8: **Policy** Forms:

| Form Title: | Form Identification: | Form Edition Date: |
|---|---|---|
| Cyber Insurance Policy Declarations | AB-CYB-004 | 08/2021 |
| Cyber Insurance Policy | AB-CYB-001 | 08/2018 |
| Terrorism Risk Insurance Act Disclosure | AB-CYB-002 | 08/2020 |
| Service of Process Endorsement | AB-CYB-029 | 08/2018 |
| Reputational Harm Insuring Agreement | AB-CYB-034 | 02/2019 |
| AmWINS Amendatory Endorsement | AB-CYB-AMWINS-001 | 03/2020 |
| PCI-DSS Betterment Coverage ($25,000) | AB-CYB-081 | 03/2020 |
| Contingent Bodily Injury Coverage (Sub-Limit) | AB-CYB-068 | 10/2019 |
| Invoice Manipulation Coverage | AB-CYB-059 | 04/2019 |
| Funds Transfer Fraud Coverage | AB-CYB-061 | 09/2019 |
| CryptoJacking & Utility Coverage (Full Limits) | AB-CYB-067 | 10/2019 |
| Breach Costs Outside (Additional Limit) | AB-CYB-069 | 10/2019 |
| OFAC Exclusion Endorsement | AB-CYB-095 | 07/2021 |
| Government Action & Licensing Exclusion | AB-CYB-096 | 07/2021 |
| Amendment to Pollution and Nuclear, Biological, and Chemical Contamination Exclusions Endorsement | AB-CYB-097 | 07/2021 |

HSB  000007

Appx. 000009

at
bay

HSB.
A Munich Re company

| Biometric Privacy Violation Exclusion | AB-CYB-098 | 07/2021 |
|---|---|---|
| Business Interruption Waiting Period Endorsement | AB-CYB-084 | 07/2020 |
| Contingent and Direct System Failure (for use with Business Interruption Waiting Period Endorsement) | AB-CYB-085 | 11/2020 |
| Ransomware Event Sub-Limit Endorsement | AB-CYB-092 | 11/2020 |

HSB_000008

Appx. 000010

at
—bay



Authorized Signature: HSB Specialty Insurance Company

| David P. Mercier — President | Jean A. Cohn — Corporate Secretary |
|---|---|
| | |

In witness whereof, HSB Specialty Insurance Company has caused this **Policy** to be signed by its authorized officers.

HSB_000009

Appx. 000011

# Cyber Insurance Policy

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

Considerations:

Wherever appearing throughout this **Policy**, the words "we," "us," and "our" refer to the insurer providing this insurance and "Declaration" and "Declarations" refer to the Cyber Insurance Policy Declarations. Terms which appear in bold face type shall have the meanings set forth in Section V. Definitions.

In consideration of payment of the premium, in reliance upon all information provided to us within the **Application**, and pursuant to the terms, conditions, exclusions, limitations, restrictions, and applicable **Retentions** of this **Policy**, we and the **Insureds** agree as follows:

HSB_000010

Appx. 000012

at bay



# I. Insuring Agreements

Coverage is afforded pursuant to those Insuring Agreements included under this **Policy**, displayed as "Included" in ITEM 6 of the Declarations, and for **Claims** and **Cyber Events** reported to us pursuant to the terms of this **Policy**:

## A. INFORMATION PRIVACY

1. Information Privacy Liability

   We shall pay on behalf of the **Insured**, all **Claim Expenses** and **Damages** resulting from a **Claim** first made against any **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for an **Information Privacy Wrongful Act**.

2. Regulatory Liability

   We shall pay on behalf of the **Insured**, all **Claim Expenses**, **Damages**, including **GDPR Penalties**, **Regulatory Penalties**, and **Regulatory Assessments and Expenses** resulting from a **Regulatory Claim** first made against any **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for an **Information Privacy Wrongful Act**.

3. Event Response and Management

   We shall pay the **Insured Organization** for **Technical Response Loss**, **Legal Services Loss**, **Public Relations Loss**, **Notification Loss**, **Reward Expense Loss**, and **Credit Monitoring Loss** incurred by the **Insured Organization** as a result of an **Information Privacy Event** first discovered during the **Policy Period**.

4. PCI-DSS Liability

   We shall pay the **Insured Organization**, all **PCI-DSS Penalties**, **PCI-DSS Response Expenses**, and **Claim Expenses** resulting from a **PCI-DSS Claim** first made against the **Insured Organization** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for an **Information Privacy Wrongful Act**.

## B. NETWORK SECURITY

1. Network Security Liability

   We shall pay on behalf of the **Insured**, all **Claim Expenses** and **Damages** resulting from a **Claim** first made against any **Insured** during the **Policy Period** or, if exercised, the Extended Reporting Period, for a **Network Security Wrongful Act**.

2. Event Response and Recovery

   We shall pay the **Insured Organization** for **Technical Response Loss**, **Public Relations Loss**, **Data Recovery Loss**, **Reward Expense Loss,** and **System Restoration Loss** incurred by the **Insured Organization** as a result of a **Network Security Event** first discovered during the **Policy Period**.

HSB_000011

Appx. 000013

at
bay

HSB.
A Munich Re company

## C. BUSINESS INTERRUPTION

1. **Direct** Business Interruption

    We shall pay the **Insured Organization** for **Business Interruption Loss, Extra Expense, Reward Expense Loss,** and **Public Relations Loss** incurred by the **Insured Organization** as a direct result of a **System Disruption** which first occurs during the **Policy Period**.

2. Contingent Business Interruption

    We shall pay the **Insured Organization** for **Contingent Business Interruption Loss, Extra Expense, Reward Expense Loss,** and **Public Relations Loss** incurred by the **Insured Organization** as a direct result of a **System Disruption** which first occurs during the **Policy Period**.

## D. CYBER EXTORTION

1. Cyber Extortion

    We shall pay the **Insured Organization** for **Extortion Loss, Reward Expense Loss,** and **Public Relations Loss** incurred by the **Insured Organization** as a direct result of an **Extortion Threat** first discovered during the **Policy Period**.

## E. FINANCIAL FRAUD

1. Social Engineering

    We shall pay the **Insured Organization** for **Fraudulent Inducement Loss** and **Reward Expense Loss** incurred by the **Insured Organization** as a direct result of **Fraudulent Inducement Instructions** it receives and accepts and which are first discovered during the **Policy Period**.

2. Computer Fraud

    We shall pay the **Insured Organization** for **Computer Crimes Loss** and **Reward Expense Loss** incurred by the **Insured Organization** as a direct result of **Computer Crimes** first discovered during the **Policy Period**.

## F. MEDIA CONTENT

1. Media Liability

    We shall pay on behalf of the **Insured**, all **Claim Expenses** and **Damages** resulting from a **Claim** first made against any **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Media Wrongful Act**.

2. Media Event Response

    We shall pay the **Insured Organization** for **Public Relations Loss** and **Reward Expense Loss** incurred by the **Insured Organization** as a result of a **Media Wrongful Act** first discovered during the **Policy Period**.

HSB_000012

Appx. 000014

at
bay


HSB.
A Munich Re company

# II. Limits of Insurance

Regardless of the number of **Claims** first made, **Cyber Events** first discovered, or number of Insuring Agreements purchased under this **Policy**:

## A. AGGREGATE LIMIT OF INSURANCE

1.  The **Aggregate Limit of Insurance** is our maximum liability under this **Policy** for the duration of the **Policy Period** or, if exercised, the Extended Reporting Period.

2.  We shall have no further obligations or liability under this **Policy** upon exhaustion of the **Aggregate Limit of Insurance**, including the continuation of payment of **Loss**, **Damages**, or **Claims Expenses** or the duty to defend or investigate any **Claim**.

## B. SUB-LIMITS OF INSURANCE

1.  The amounts stated as Sub-Limits of Insurance in ITEM 6 of the Declarations, which are part of and not in addition to the **Aggregate Limit of Insurance**, are the most we shall pay for all **Loss**, **Damages**, and **Claims Expenses** with respect to the Insuring Agreement to which each such Sub-Limit of Insurance applies, and we shall not be responsible to pay any **Loss**, **Damages**, or **Claims Expenses** under such Insuring Agreement upon exhaustion of such Sub-Limit of Insurance.

2.  Subject to II.A.1., II.A.2., and II.B.1. above, the most we shall pay for all **Loss**, **Damages**, and **Claim Expenses** shall be:

    a.  with respect to any **Cyber Events** or **Claims** which are covered under more than one Insuring Agreement, the sum of the Sub-Limits of Insurance available under the Insuring Agreements to which such **Cyber Events** or **Claims** apply; and

    b.  with respect to any **Related Incidents**, the sum of the Sub-Limits of Insurance available under the Insuring Agreements to which such **Related Incidents** apply.

HSB_000013

Appx. 000015

at bay



# III. Retention

1. Our liability shall apply only to that portion of **Loss**, **Damages**, and **Claims Expenses** arising from each **Claim** or **Cyber Event** which exceeds the **Retention** applicable to the Insuring Agreement affording coverage to such **Claim** or **Cyber Event**. Payment of such **Retention** is the **Named Insured's** responsibility and remains uninsured under this **Policy**.

2. If a **Claim** is covered under more than one **Third Party Coverage**, each **Retention** shall apply separately but the sum of such **Retentions** shall not exceed the largest applicable **Retention**.

3. If a **Cyber Event** is covered under more than one **First Party Coverage**, each **Retention** shall apply separately but the sum of such **Retentions** shall not exceed the largest applicable **Retention**.

4. The largest applicable **Retention** amount shall apply as a single **Retention** for all **Claims** or **Cyber Events** resulting from **Related Incidents** covered under more than one **Third Party Coverage** or **First Party Coverage**.

5. Solely with respect to **Third Party Coverage** and **Insured Persons**, the **Retention** shall not apply to an **Insured Person** if the **Insured Organization** is:

   a. not legally permitted to provide indemnification to such **Insured Person**; or

   b. unable to provide indemnification solely by reason of its financial insolvency, including such **Insured Organization** becoming a debtor in possession under Chapter 11 of the United States Bankruptcy Code, as amended, or the foreign equivalent of such; provided, however, that the applicable **Insured Organization** agrees to repay us any **Retention** amounts we pay on its behalf, as described in this paragraph III.5.b., at the time such **Insured Organization** emerges from financial insolvency or bankruptcy.

at
—
bay

HSB.
A Munich Re company

# IV. Defense & Settlement of Claims

## A. DEFENSE

1. We shall have the right and duty to defend any **Claim** covered by a **Third Party Coverage** even if the allegations are groundless, false, or fraudulent.

2. We shall consult and attempt to reach an agreement with the **Insureds** regarding the appointment of counsel in the investigation and defense of any **Claim**, but we retain the right to appoint counsel and to investigate and defend any **Claim** as we deem necessary.

## B. SETTLEMENT

1. We shall not settle any **Claim** without the written consent of the **Insured**. In the event the **Insured** refuses to consent to a settlement recommended by us and acceptable to the claimant(s), then:

   a. we shall pay the sum of all **Damages** for which the **Claim** could have settled plus all **Claim Expenses** incurred up to the time we made our recommendation to the **Insured**; and

   b. we shall pay and maintain responsibility for eighty percent (80%) of all **Claim Expenses** and **Damages** that are in excess of the amount referenced in paragraph IV.B.1.a. above.

   This condition, IV.B. Settlement, shall not apply if the total incurred **Damages** and **Claim Expenses** do not exceed the applicable **Retention** amount.

## C. ALLOCATION

1. If a **Claim** includes both covered and uncovered matters, then coverage shall apply as follows:

   a. One hundred percent (100%) of **Claim Expenses** incurred by the **Insureds** who are afforded coverage for such **Claim** shall be considered covered; and

   b. All remaining **Damages** incurred by such **Insureds** from such **Claim** shall be allocated between covered **Damages** and uncovered damages based upon the relative legal and financial exposures and benefits of the parties to such matters.

HSB_000015

Appx. 000017

at
bay

HSB.
A Munich Re company

# V. Definitions

Wherever appearing throughout this **Policy**, the following terms appearing in bold face type, whether used in their singular or plural form, shall have the meanings set forth in this Section V. Definitions:

1. **Aggregate Limit of Insurance** means the amount stated in ITEM 4 of the Declarations.

2. **Application** means all applications, including any information and statements attached thereto, submitted to us by, or on behalf of, any **Insured** in connection with the underwriting and issuance of this **Policy**. All such applications, attachments, information, and materials are deemed attached to and incorporated into this **Policy**.

   With respect to publicly held companies, **Application** also means each and every public filing made with the Securities Exchange Commission by or on behalf of any **Insured**, including but not limited to any **Insured Organization's** Annual Report(s), 10-Ks, 8-Ks, and proxy statements, provided that such public filing was filed during the period of time:

   a. beginning at the start of the twelve (12) month period immediately preceding the first submission to us in connection with the underwriting of this **Policy**; and

   b. ending at the effective date of the **Policy Period**.

3. **Bodily Injury** means physical injury, sickness, or disease and any resulting mental anguish, mental injury, shock, humiliation, or death.

4. **Business Interruption Loss** means the following amounts incurred by an **Insured Organization** during the **Period of Restoration**:

   a. net profit before income taxes that would have been earned had no **System Disruption** of **Insured Computer Systems** occurred;

   b. net loss before income taxes that would have been avoided had no **System Disruption** of **Insured Computer Systems** occurred;

   c. the **Insured Organization's** continuing normal operating and payroll expenses; and

   d. costs to retain the services of a third party forensic accounting firm to determine the amounts of **Business Interruption Loss** described in paragraphs V.4.a.–V.4.c. above, subject to our prior consent.

5. **Change of Control** means:

   a. the acquisition by another person, entity, or group of person or entities acting together, of more than fifty percent (50%) of the outstanding securities, or ownership interests representing the majority and present right to control, elect, appoint or designate the Board of Directors, Board of Trustees, Board of Managers, or functional equivalent thereof, of the **Named Insured**;

   b. the acquisition by another person, entity, or group of person or entities acting together of all, or substantially all, of the **Named Insured's** assets such that the **Named insured** is not the surviving entity; or

**at bay**                                                                                    **HSB**
                                                                                              A Munich Re company

c.  the merger or consolidation of the **Named Insured** into or with another entity or group of entities acting together such that the **Named Insured** is not the surviving entity.

6.  **Claim** means any:

a.  written demand, request, or assertion seeking monetary damages, or non-monetary or injunctive relief;

b.  civil proceeding, investigation, or suit commenced by service of a complaint, notice, request for information, or similar proceeding seeking monetary damages or non-monetary or injunctive relief;

c.  arbitration, mediation, or similar alternative dispute resolution proceeding commenced by the receipt of a complaint, written demand, or similar proceeding seeking monetary damages or non-monetary or injunctive relief;

d.  criminal proceeding commenced by the filing of charges, arrest or detainment, or a return of an indictment or similar document;

e.  request to toll or waive a statute of limitations applicable to a **Claim** referenced in paragraphs V.6.a.-V.6.d. above;

f.  formal appeal of a **Claim** referenced in paragraphs V.6.a.-V.6.d. above;

g.  with respect to Insuring Agreement I.A.2., any **Claim** referenced in paragraphs V.6.a.–V.6.f. above which is a **Regulatory Claim**; or

h.  with respect to Insuring Agreement I.A.4., any **Claim** referenced in paragraphs V.6.a.–V.6.f. above which is a **PCI-DSS Claim**.

7.  **Claim Expenses** means reasonable and necessary:

a.  attorneys' fees, mediation and arbitration expenses, expert witness and consultant fees and attendance expenses, and other fees and costs incurred by us, or by an **Insured** with our prior written consent, in the investigation and defense of a **Claim**; and

b.  premiums for any appeal bond, injunction bond, attachment bond, or any similar bond, although we shall have no obligation to furnish such bond.

**Claim Expenses** shall not include salaries, wages, or other compensation of any **Insured Person**; except to the extent that such **Claim Expenses** are expenses incurred to secure and obtain a member of the **Control Group's** attendance at any mediation, arbitration, hearing, depositions, or trial in connection to the investigation and defense of a **Claim**.

8.  **Computer Crimes** means the intentional, fraudulent, or unauthorized input, destruction, or modification of electronic data or computer instructions into **Computer Systems** by any entity which is not an **Insured Organization** or person who is not an **Insured Person**, provided that such **Computer Crimes** cause:

a.  **Funds or Securities** to be transferred, paid, or delivered; or

b.  an account of the **Insured Organization**, or of its customer, to be added, deleted, debited, or credited.

9.  **Computer Crime Loss** means the **Insured Organization's** loss of **Funds or Securities**.

10. **Computer System** means **Insured Computer Systems** and **External Computer Systems**.

HSB_000017

Appx. 000019

**at
bay**

HSB.
A Munich Re company

11. **Contingent Business Interruption Loss** means the following amounts incurred by an **Insured Organization** during the **Period of Restoration**:

    a. net profit before income taxes that would have been earned had no **System Disruption** of **External Computer Systems** occurred;

    b. net loss before income taxes that would have been avoided had no **System Disruption** of **External Computer Systems** occurred;

    c. the **Insured Organization's** continuing normal operating and payroll expenses; and

    d. costs to retain the services of a third party forensic accounting firm to determine the amounts of **Contingent Business Interruption Loss** described in paragraphs V.11.a.–V.11.c. above, subject to our prior consent.

12. **Control Group** means an **Insured Organization's** Chief Executive Officer, Chief Financial Officer, Chief Security Officer, Chief Technology Officer, Chief Information Officer, Risk Manager, General Counsel, or any functionally equivalent positions, regardless of title.

13. **Corporate Information** means any confidential or proprietary information of an entity, other than an **Insured Organization**, which:

    a. an **Insured Organization** is contractually or legally required to hold or maintain in confidence; or

    b. is not known or accessible by the general public.

    **Corporate Information** does not include **Protected Personal Information**.

14. **Credit Monitoring Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

    a. establish and maintain call center services to be used by natural persons whose **Protected Personal Information** was impacted in an **Information Privacy Event**;

    b. provide credit monitoring, freezing, or thawing services to natural persons whose **Protected Personal Information** was impacted in an **Information Privacy Event**;

    c. provide identity theft identification and restoration services to those natural persons whose **Protected Personal Information** was impacted in an **Information Privacy Event**; and

    d. retain the services of a **Cyber Response Firm** to provide consultative and professional services related to **Credit Monitoring Loss** described in paragraphs V.14.a.–V.14.c. above.

    **Credit Monitoring Loss** includes costs and expenses incurred in order to comply with applicable **Privacy Regulations** and shall follow the law of the applicable jurisdiction which most favors coverage for such costs and expenses. Those costs and expenses not required to comply with **Privacy Regulations** require our prior consent.

15. **Cyber Event** means an **Information Privacy Event**, **Network Security Event**, **Extortion Threat**, **Fraudulent Inducement Instructions**, **Computer Crimes**, **System Disruption**, and, with respect to Insuring Agreement I.F.2. only, a **Media Wrongful Act**.

16. **Cyber Response Firm** means:

    a. any firm listed on our pre-approved response provider list, available upon request from us; or

    b. a firm not part of paragraph V.16.a. above, but only with our prior written consent.

HSB_000018

Appx. 000020

at
bay

HSB.
A Munich Re company

17. **Damages** means any amounts an **Insured** becomes legally obligated to pay on account of any **Claim**, including:

    a.  compensatory damages, settlements, and judgments;

    b.  awards of prejudgment and post-judgment interest;

    c.  sums for deposit in a consumer redress fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement;

    d.  punitive, exemplary, or multiplied damages and awards; provided, however, that punitive, exemplary, or multiplied damages and awards shall only be included as **Damages** to the extent insurable under the applicable laws of any jurisdiction which most favors coverage and which has a substantial relationship to an **Insured**, us, this **Policy**, or the **Claim** giving rise to such **Damages**;

    e.  with respect to a **PCI-DSS Claim** under Insuring Agreement I.A.4., any **PCI-DSS Penalties** and **PCI-DSS Response Expenses**; and

    f.  with respect to a **Regulatory Claim** under Insuring Agreement I.A.2., any **Regulatory Penalties**, **GDPR Penalties**, and **Regulatory Assessments and Expenses**.

    **Damages** shall not include:

    g.  fines, penalties, taxes, or sanctions imposed against an **Insured**; except to the extent such fines, penalties, taxes, or sanctions are insurable under the applicable laws of any jurisdiction which most favors coverage and which has a substantial relationship to an **Insured**, us, this **Policy**, or the **Claim** giving rise to such **Damages,** are **PCI-DSS Penalties** otherwise covered under Insuring Agreement I.A.4., or **Regulatory Penalties**, **GDPR Penalties**, or **Regulatory Assessments and Expenses** otherwise covered under Insuring Agreement I.A.2. of this **Policy**;

    h.  costs to comply with any injunctive, remedial, preventative, or other non-monetary or declaratory relief; or

    i.  any matters deemed uninsurable under the laws pursuant to which this **Policy** is construed.

18. **Data Recovery Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

    a.  replace and restore corrupted, destroyed, lost, or stolen software;

    b.  re-create and recover corrupted, destroyed, lost, or stolen data in electronic form which is, or was, stored on a **Computer System**;

    c.  re-create and recover corrupted, destroyed, lost, or stolen data in non-electronic form for which there is no electronic source available; and

    d.  to retain the services of a **Cyber Response Firm** to provide consultative and professional services related to **Data Recovery Loss** described in paragraphs V.18.a.–V.18.c. above.

19. **Employee** means any natural person whose work or service is or was guided and engaged by an **Insured Organization**, including full-time or part-time laborers, interns, volunteers, seasonal or temporary laborers, or laborers whose service or work is or was leased by or to an **Insured Organization**.

HSB_000019

Appx. 000021

at
bay

HSB

20. **External Computer Systems** means any computer hardware, software, firmware, wireless device, voice based telecommunication system, operating system, virtual machine, as well as any data stored thereon, and:

 a. associated input, output, processing, data storage, and mobile devices, networks, operating systems, application software, networking equipment, storage area networks, and other electronic data storage or backup facilities;

 b. includes, but is not limited to, associated telephone systems (including "PBX", "CBX," "Merlin," or "VoIP"), remote access systems (including "DISA"), peripheral communication equipment and systems, industrial control systems (including "SCADA"), Internet of things (commonly referred to as "IoT"), media libraries, extranets, and offline electronic data storage facilities; and

 c. includes, but is not limited to, associated application hosting, cloud services, cloud computing platforms, data hosting, data storage, co-location, data back-up, data processing, and infrastructure as a service;

which are operated for an **Insured's** benefit by a third party under written contract between such third party and **Insured**.

21. **Extortion Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

 a. make payment of any funds, digital currencies ("crypto-currencies"), marketable goods, services, or other assets to the person or group which is believed to be responsible for, and to have made, such **Extortion Threat**;

 b. reduce or mitigate the severity of **Extortion Loss** described in paragraph V.21.a. above; and

 c. retain the services of a **Cyber Response Firm** to provide consultative and professional services related to **Extortion Loss** described in paragraphs V.21.a. and V.21.b. above.

22. **Extortion Threat** means any credible threat or series of related threats made to an **Insured** by a third party person or group, or by a rogue **Employee** who is not a member of the **Control Group** and who is acting in a manner not authorized by the **Insured Organization**, which threatens to take any of the following actions unless an **Insured** pays such group or person the funds demanded, or meet some other non-monetary demand, in exchange for the mitigation or removal of such threat:

 a. cause an **Information Privacy Event** or **Network Security Event**;

 b. alter, corrupt, damage, manipulate, misappropriate, encrypt, delete, or destroy any **Computer System**, **Corporate Data**, or **Protected Personal Information**;

 c. restrict or inhibit access to a **Computer System**; or

 d. any action connected to the continuation or furthering of any already commenced action referenced in paragraphs V.22.a.-V.22.c. above.

23. **Extra Expense** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

 a. reduce the **Period of Restoration**;

 b. mitigate or reduce expenses resulting from the **System Disruption** of a **Computer System**;

 c. secure **Computer Systems** such that a similar **System Disruption** is avoided in the future; and

 d. retain the services of a **Cyber Response Firm** to provide consultative and professional services related to **Extra Expense** described in paragraphs V.23.a.–V.23.c. above.

**at bay**

HSB.
A Munich Re company

24. **First Party Coverage** means Insuring Agreement(s) I.A.3., I.B.2., I.C.1., I.C.2., I.D.1., I.E.1., I.E.2., and I.F.2..

25. **Fraudulent Inducement Instructions** means the misrepresentation of one or more facts by a third-party person or entity via email or other means of electronic communication with the intent of misleading an **Insured** into transferring **Funds or Securities**.

26. **Fraudulent Inducement Loss** means an **Insured Organization's** loss of **Funds or Securities**.

27. **Funds or Securities** means any medium of exchange, including any written negotiable or non-negotiable instruments representative of such, which is authorized or adopted by a foreign or domestic government and in current use, including bank notes, travelers' checks, registered check, money orders, currency, bullion, and coins.

    **Funds or Securities** does not include any crypto-currencies or crypto-assets.

28. **GDPR Penalties** means **Regulatory Penalties** an **Insured** becomes legally obligated to pay as a result of a **Regulatory Claim** for such **Insured's** actual, alleged or reasonably suspected non-compliance with the General Data Protection Regulation Standard, as amended.

29. **Independent Contractor** means any natural person, agent, or single person entity who is not an **Employee** but performs work for an **Insured Organization** pursuant to a written contract or agreement.

30. **Information Privacy Event** means any actual or reasonably suspected:

    a.  failure to prevent unauthorized access to **Protected Personal Information**;

    b.  failure to properly manage, handle, store, protect, disclose, destroy, control, or collect **Protected Personal Information**;

    c.  violation of any **Privacy Regulations**, including, but not limited to, the wrongful collection or disclosure of **Protected Personal Information**;

    d.  failure to comply with those portions of a **Privacy Policy** which govern the collection, dissemination, confidentiality, integrity, accuracy, disclosure, sale, access, or availability of **Protected Personal Information**;

    e.  failure to provide natural persons whose **Protected Personal Information** an **Insured** stores or maintains to access, delete, or amend their **Protected Personal Information** as required by any **Privacy Regulation**, including, but not limited to, the "Right to be Forgotten" or "Right to Erasure" as described in the General Data Protection Regulation Standard, as amended;

    f.  failure to provide notification of any **Information Privacy Event** as required by any **Privacy Regulation**; or

    g.  failure to disclose an actual or potential **Information Privacy Event** as required by any **Privacy Regulation**.

31. **Information Privacy Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, breach of duty, or other offense committed or attempted by an **Insured**, based upon or resulting in an **Information Privacy Event**.

32. **Insured** means the **Insured Organization** and any **Insured Person**.

at
bay

HSB.
A Munich Re company

33. **Insured Computer Systems** means any computer hardware, software, firmware, wireless device, voice based telecommunication system, operating system, virtual machine, as well as any data stored thereon, and:

   a. associated input, output, processing, data storage, and mobile devices, networks, operating systems, application software, networking equipment, storage area networks, and other electronic data storage or backup facilities; and

   b. includes, but is not limited to, associated telephone systems (including "PBX", "CBX," "Merlin," or "VoIP"), remote access systems (including "DISA"), peripheral communication equipment and systems, industrial control systems (including "SCADA"), Internet of things (commonly referred to as "IOT"), media libraries, extranets, and offline electronic data storage facilities;

   which are rented, leased, owned, or operated by an **Insured** or which are operated solely for an **Insured's** benefit by a third party under written contract between such third party and **Insured**.

34. **Insured Organization** means the **Named Insured** and any **Subsidiaries**.

   **Insured Organization** also means any entity as a debtor in possession or the bankruptcy estate of such **Insured Organization** under the United States bankruptcy law, or foreign equivalent.

35. **Insured Person** means any past, current or future natural person:

   a. **Employee**, director, officer, trustee, partner, general partner, managing partner, managing member, LLC member, or principal of an **Insured Organization**, but only with respect to a **Wrongful Act** or **Cyber Event** committed within the scope of such natural person's duties performed on behalf of such **Insured Organization**; or

   b. **Independent Contractor**, but only with respect to a **Wrongful Act** or **Cyber Event** committed within the scope of such **Independent Contractor's** duties performed on behalf of the **Insured Organization** and only if the **Insured Organization** indemnifies such **Independent Contractor**.

36. **Legal Services Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

   a. determine the applicability of any notifications, communications, actions, or other services required or necessary for the **Insured Organization** to comply with applicable **Privacy Regulations**;

   b. draft and develop letters, documents, or other materials to properly notify the natural persons whose **Protected Personal Information** was, or may have been, wrongfully disclosed, accessed, acquired, or otherwise compromised or impacted as a result of the applicable **Information Privacy Event**;

   c. provide any legally required communications and reporting services to any regulatory, administrative, or supervisory authority; and

   d. retain the services of a **Cyber Response Firm** to provide legal, consultative, and professional services related to **Legal Services Loss** described in paragraphs V.36.a.–V.36.c. above.

   **Legal Services Loss** includes costs and expenses incurred in order to comply with applicable **Privacy Regulations** and shall follow the law of the applicable jurisdiction which most favors coverage for such costs and expenses. Those costs and expenses not required to comply with any applicable **Privacy Regulations** require our prior consent.

HSB_000022

Appx. 000024

at
bay

HSB.
A Munich Re company

37. **Loss** means:

 a. **Reward Expense Loss, Technical Response Loss**, **Public Relations Loss**, **Legal Services Loss**, **Notification Loss**, **Credit Monitoring Loss**, **Data Recovery Loss**, **System Restoration Loss**, **Business Interruption Loss**, **Contingent Business Interruption Loss**, **Extra Expense**, **Extortion Loss**, **Fraudulent Inducement Loss**, and **Computer Crimes Loss**.

 **Loss** shall not include:

 b. salaries, benefits or other compensation payable to **Insured Persons**, except to the extent covered under Insuring Agreement(s) I.C.1. and I.C.2.;

 c. an **Insured Organization's** internal operating costs, expenses, or fees, except to the extent covered under Insuring Agreement(s) I.C.1. and I.C.2.;

 d. taxes, fines, penalties, or amounts for injunctive relief or sanctions;

 e. **Funds or Securities** in the care, custody, or control of an **Insured**, except to the extent covered under Insuring Agreement(s) I.D.1., I.E.1., and I.E.2.; or

 f. costs or expenses incurred to update, improve, enhance, or replace privacy or network security controls, policies or procedures, or **Computer Systems** to a level beyond that which existed prior to the applicable **Cyber Event**, except to the extent we have recommended and provided prior consent to incur such costs or expenses, including:

   i. claim avoidance related costs or expenses anticipated under **Extra Expense**; and

   ii. incremental improvement costs or expenses anticipated under **System Restoration Loss**.

38. **Malicious Code** means any software or computer program that is:

 a. purposefully designed to adversely affect, intentionally harm, or dishonestly monetize any computer hardware, software, firmware, wireless device, operating system, virtual machine, and the data stored thereon or any components thereof, including, but not limited to, industrial control systems (SCADA), IoT, VoIP telephone systems, media libraries, extranets, offline storage facilities (to the extent electronic data is held), mobile devices, input and output devices, data storage devices, networking equipment, and electronic data backup facilities or networks; or

 b. capable of affecting that which is referenced in paragraph V.38.a. above by inserting itself by a variety of forms, causing damage, possessing the ability to replicate itself, or possessing the capability of spreading copies of itself.

 **Malicious Code** includes, but is not limited to, auto-reproduction programs, computer viruses, worms, Trojan horses, spyware, dishonest adware, crime-ware, mine-ware, script or any other software program, computer program, or virus that is functionally equivalent to **Malicious Code** described in paragraphs V.38.a.and V.38.b. above.

39. **Media Content** means data, text, images, graphics, music, sounds, photographs, advertisements, video, streaming content, webcasts, podcasts, blog posts, and online forum posts.

 **Media Content** does not include computer software, software technology, or the actual goods, products, or services described, illustrated, or displayed in such **Media Content**.

at
bay

HSB.
A Munich Re company

40. **Media Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, breach of duty, or other offense committed or attempted by an **Insured**, or by any third party entity or natural person for whom the **Insured** is legally responsible, in the public dissemination, posting, or display of **Media Content**, by or on behalf of an **Insured**, on a voice or video based communication medium, including radio, internet streaming, satellite, cable, television, or any similar communications broadcast, or on an **Insured's** website, printed material, social media site, or anywhere else on the internet, which results in the following:

 a. defamation, libel, slander, or other tort related to disparagement or harm to the character, reputation or feelings of any person or organization, including product disparagement, trade libel, infliction of emotional distress, malicious falsehood, outrage, or outrageous conduct;

 b. infringement or dilution of title, slogan, logo, trademark, trade name, metatag, domain name, trade dress, service mark, or service name;

 c. copyright infringement, passing off, plagiarism, piracy, or other misappropriation of intellectual property rights;

 d. invasion, infringement, or interference with rights of privacy or publicity, including public disclosure of private facts, breach of confidence, intrusion, false light, and commercial appropriation of name or likeness;

 e. false detention or arrest, harassment, trespass, wrongful entry or eviction, eavesdropping, or other invasion of the right of private occupancy;

 f. improper deep framing or linking; or

 g. unfair trade practices or competition, including misrepresentations in advertising, but solely when alleged in conjunction with the alleged conduct referenced in paragraphs V.40.a.–V.40.f. above.

41. **Named Insured** means the entity displayed in ITEM 1 of the Declarations.

42. **Network Security Event** means any actual or reasonably suspected:

 a. propagation of **Malicious Code** from a **Computer System**;

 b. attack by **Malicious Code** which infects a **Computer System**;

 c. denial of service attack:

   i. originating from a **Computer System**; or

   ii. made against a **Computer System**;

 d. gaining of access or use of a **Computer System** by:

   i. an unauthorized person; or

   ii. an authorized person for purposes not authorized by an **Insured Organization**;

 e. acquisition, access, loss, or disclosure of **Corporate Information** not authorized by an **Insured Organization**;

 f. theft of a password or access code by electronic or non-electronic means from a **Computer System**, the **Insured Organization's** premises, or directly from an **Insured Person**;

 g. the failure to provide any authorized user access to the **Insured Organization's** website or **Computer System** due to the failure or violation of the security of a **Computer Systems**; or

HSB_000024

Appx. 000026

**at bay**

HSB
A Munich Re company

h.  the failure to protect **Computer Systems** which results in, or is based upon, a **Network Security Event** referenced in paragraphs V.42.a.-V.42.g. above.

**Network Security Event** includes any of the foregoing, regardless of whether such **Network Security Event** is a specifically targeted attack or a generally distributed attack.

43. **Network Security Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, breach of duty, or other offense committed or attempted by an **Insured**, based upon or resulting in a **Network Security Event**.

44. **Notification Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

a.  provide any legally required notification services to those natural persons whose **Protected Personal Information** was wrongfully disclosed, accessed, acquired, or otherwise compromised or impacted as a result of the applicable **Information Privacy Event**;

b.  complete mailing or other communications duties to notify those natural persons whose **Protected Personal Information** was wrongfully disclosed, accessed, acquired, or otherwise compromised or impacted as a result of the applicable **Information Privacy Event**;

c.  provide information on the availability of any related services or resources to those natural persons whose **Protected Personal Information** was wrongfully disclosed, accessed, acquired, or otherwise compromised or impacted as a result of the applicable **Information Privacy Event**; and

d.  retain the services of a **Cyber Response Firm** to provide consultative and professional services related to **Notification Loss** described in paragraphs V.44.a.-V.44.c. above.

**Notification Loss** includes costs and expenses incurred in order to comply with applicable **Privacy Regulations** and shall follow the law of the applicable jurisdiction which most favors coverage for such costs and expenses. Those voluntary costs and expenses not required to comply with any applicable **Privacy Regulations** require our prior consent.

45. **PCI Data Security Standards** means generally accepted and published rules, regulations, standards, or guidelines which relate to data security and the safeguarding, disclosure, and handling of **Protected Personal Information** and which are adopted or required by the Payment Card Industry Data Security Standards Council or any payment provider whose payment method is accepted for processing.

46. **PCI-DSS Claim** means any **Claim,** brought by or on behalf of a Payment Card Association or entity processing or providing payment card transactions, based upon an **Insured Organization's** actual, alleged, or potential non-compliance with **PCI Data Security Standards**, including but not limited to:

a.  failure to properly protect, handle, manage, store, destroy, or control payment account or payment card data, including applicable **Protected Personal Information**; or

b.  non-compliance with EMV specifications or mobile payment security requirements.

**PCI-DSS Claim** includes an investigation into a potential violation of **PCI Data Security Standards**, which may reasonably be expected to give rise to a **PCI-DSS Claim**.

at
bay

HSB.
A Munich Re company

47. **PCI-DSS Penalties** means monetary assessments, fines, penalties, chargebacks, reimbursements, and fraud recoveries, including card reissuance costs, the **Insured Organization** is legally obligated to pay due to a **PCI-DSS Claim** and its non-compliance under a payment card processing agreement or merchant services agreement pertaining to **PCI Data Security Standards**.

48. **PCI-DSS Response Expenses** means reasonable and necessary costs and expenses to retain the services of:

   a. a third party forensic firm that is a qualified Payment Card Industry Forensic Investigator, to determine the cause and scope of the **Information Privacy Event** which led to a **PCI-DSS Claim**; and

   b. a Qualified Security Assessor (QSA) to validate an **Insured Organization's** adherence to **PCI Data Security Standards** following a **PCI-DSS Claim**.

49. **Period of Restoration** means the continuous period of time that:

   a. begins with the earliest date a **System Disruption** first occurred; and

   b. ends on the date when **Insured Computer Systems** or **External Computer Systems** are, or could have been, repaired or restored with reasonable speed to the same functionality and level of service which existed prior to the **System Disruption**.

   A **Period of Restoration** shall not exceed one hundred eighty (180) days from the date the applicable **System Disruption** first occurred; provided, however, that the end of the **Policy Period** shall not cut short the **Period of Restoration**.

50. **Policy** means, collectively, the Declarations, **Application**, each included Insuring Agreement, and all forms and endorsements, stated in ITEM 8 of the Declarations, which are attached to and form part of this **Policy**.

51. **Policy Period** means the period of time from the Effective Date to the Expiration Date, as set forth in ITEM 2 of the Declarations, or the effective date of termination of this **Policy**, whichever is earlier.

52. **Pollution** means any liquid, gaseous, solid or thermal irritant or contaminant, including vapor, smoke, fumes, acids, chemicals and material to be recycled, reconditioned or reclaimed.

53. **Privacy Policy** means an **Insured Organization's** written or electronic policies which govern the collection, dissemination, confidentiality, integrity, accuracy, disclosure, sale, access, or availability of **Protected Personal Information**.

54. **Privacy Regulations** means any local, state, federal, or foreign identity theft or privacy protection laws, statutes, legislation, or regulations which require commercial entities which collect, process, or maintain **Protected Personal Information** to post privacy policies, adopt specific privacy or security controls, or notify individuals in the event that **Protected Personal Information** has potentially or actually been compromised, accessed, or acquired without their authorization.

   **Privacy Regulations** explicitly include, but are not limited to, the Gramm-Leach Bliley Act of 1999, Health Insurance Portability and Accountability Act of 1996, California Database Breach Act, Minnesota Plastic Card Security Act, and General Data Protection Regulation Standard, and regulations issued pursuant to such Acts or Standards, as amended if applicable.

55. **Property Damage** means damage to, loss of use of, or destruction of any tangible property other than electronic or non-electronic data or **Protected Personal Information**.

HSB_000026

Appx. 000028

at
bay

HSB.
A Munich Re company

56. **Protected Personal Information** means any of the following information or data, regardless of whether such data or information is in electronic, non-electronic, or any other format:

   a. any natural person's social security number, name, e-mail address, driver's license or state identification number, address, and telephone number;

   b. any natural person's personally identifiable pictures or videos, internet browsing history, security access codes, or passwords, and account histories;

   c. any natural person's medical or healthcare data, biometric records, or any other protected health information ("PHI");

   d. any natural person's credit card or debit card number, account number, or any other protected financial information; or

   e. any other non-public personal information or data of a natural person as specified in any **Privacy Regulations**.

   **Protected Personal Information** does not include **Corporate Information**.

57. **Public Relations Loss** means reasonable and necessary public relations related costs and expenses incurred or paid by an **Insured Organization** to:

   a. protect or restore the **Insured Organization's** reputation;

   b. mitigate financial harm to the **Insured Organization's** business; and

   c. retain the services of a **Cyber Response Firm** to provide public relations or crisis communications consultative and professional services related to **Public Relations Loss** described in paragraphs V.57.a. and V.57.b. above.

58. **Regulatory Assessments and Expenses** means reasonable and necessary costs and expenses an **Insured** becomes legally obligated to pay on account and as a direct result of a **Regulatory Claim** to retain the services of a **Cyber Response Firm** to perform a legally required audit or assessment, including related consultative and professional services, of the **Insured Organization's** privacy practices or **Computer Systems**.

   **Regulatory Assessments and Expenses** includes costs and expenses incurred in order to comply with applicable **Privacy Regulations** and shall follow the law of the applicable jurisdiction which most favors coverage for such costs and expenses. Those costs and expenses not required to comply with any applicable **Privacy Regulations** require our prior consent.

59. **Regulatory Claim** means any **Claim** brought by, or on behalf of, the Federal Trade Commission, the Federal Communications Commission, any supervisory authority enforcing the General Data Protection Regulation Standard, or any state attorney general, government licensing entity, regulatory authority, or any federal, state, local, or foreign governmental entity in such entity's official capacity.

   **Regulatory Claim** includes an investigation into a potential violation of **Privacy Regulations**, which may reasonably be expected to give rise to a **Regulatory Claim**.

60. **Regulatory Penalties** means civil fines or penalties resulting from a **Regulatory Claim**, including **GDPR Penalties**, imposed against an **Insured** by the Federal Trade Commission, the Federal Communications Commission, any supervisory authority enforcing the General Data Protection Regulation Standard, or any

HSB_000027

Appx. 000029

**at bay**

**HSB.**
A Munich Re company

state attorney general, government licensing entity, regulatory authority, or any federal, state, local, or foreign governmental entity in such entity's official capacity.

61. **Related Incident** means all **Wrongful Acts** and **Cyber Events** which share as a common nexus any act, fact, circumstance, situation, event, transaction, cause, or series of related acts, facts, circumstances, situations, events, transactions, or causes, and all:

   a. **Cyber Events** arising out of any **Related Incident** shall be considered one single **Cyber Event**, and such **Cyber Event** shall be considered first discovered on the date the earliest of such **Cyber Events** is first discovered, regardless of whether such date is before or during the **Policy Period**; and

   b. **Claims** arising out of all **Related Incidents** shall be considered one single **Claim**, and such **Claim** shall be considered first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

62. **Retention** means the amounts stated as **Retention** in ITEM 6 of the Declarations with respect to the Insuring Agreement to which each such stated **Retention** amount applies.

63. **Reward Expense Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to an informant for information not otherwise available which leads to the arrest and conviction of a natural person or an entity responsible for the **Cyber Event** which resulted in a covered **Loss** under this **Policy**.

   **Reward Expense Loss** requires our prior consent.

64. **Subsidiary** means:

   a. any corporation, partnership, limited liability company or other entity in which the **Named Insured** owns, directly or indirectly through one or more **Subsidiaries**, more than fifty percent (50%) of such entity's outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent;

   b. any entity operated as a joint venture in which the **Named Insured** owns, directly or indirectly through one or more **Subsidiaries**, exactly fifty percent (50%) of the issued and outstanding voting stock and whose management and operation an **Insured Organization** solely controls, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock; or

   c. any non-profit entity over which the **Named Insured**, directly or indirectly through one or more **Subsidiaries**, exercises management control.

65. **System Disruption** means the measurable interruption, suspension, degradation, or failure in the service of:

   a. with respect to Insuring Agreement I.C.1., **Insured Computer Systems**; or

   b. with respect to Insuring Agreement I.C.2., **External Computer Systems**;

   directly caused by a **Network Security Event** or **Information Privacy Event**.

at
bay



66. **System Restoration Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

   a.  restore **Computer Systems**, including replacing or reinstalling software programs contained therein, to their level of functionality immediately prior to the applicable **Network Security Event**:

   b.  remove any **Malicious Code** from **Computer Systems** resulting from the applicable **Network Security Event**;

   c.  restore the configuration of **Computer Systems** to an adequacy at or higher to that which was present immediately prior to the applicable **Network Security Event**; and

   d.  retain the services of a **Cyber Response Firm** to provide consultative and professional services related to **System Restoration Loss** described in paragraphs V.66.a.–V.66.c. above.

67. **Technical Response Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

   a.  investigate and determine the cause of the applicable **Information Privacy Event** or **Network Security Event**;

   b.  mitigate or contain an ongoing **Information Privacy Event** or **Network Security Event**;

   c.  identify and catalog natural persons whose **Protected Personal Information** was wrongfully disclosed, accessed, acquired, or otherwise compromised or impacted as a result of an applicable **Information Privacy Event**;

   d.  identify and catalog organizations whose **Corporate Information** was wrongfully disclosed, accessed, acquired, or otherwise compromised or impacted as a result of an applicable **Network Security Event**; and

   e.  retain the services of a **Cyber Response Firm** to provide consultative and professional services related to **Technical Response Loss** described in paragraphs V.67.a.–V.67.d. above.

68. **Third Party Coverage** means Insuring Agreement(s) I.A.1., I.A.2., I.A.4., I.B.1., and I.F.1.

69. **Wrongful Act** means any **Information Privacy Wrongful Act**, **Network Security Wrongful Act**, or **Media Wrongful Act**.

at
bay

HSB.
A Munich Re company

# VI. Exclusions

## A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

This **Policy** shall not apply to any **Loss**, **Damages**, or **Claim Expenses** on account of any **Wrongful Act**, any **Cyber Event**, or any **Claim**:

1. Conduct

   based upon, arising out of, or attributable to any **Insured's**:

   a. fraudulent, criminal, or malicious error, act or omission;

   b. intentional or deliberate violation of the law; or

   c. gaining of any profit, remuneration, or advantage to which such **Insured** was not legally entitled.

   However, this exclusion shall not apply to:

   d. **Claim Expenses** or our duty to defend any such **Claim**; or

   e. **Damages** unless a final, non-appealable, adjudication establishes that such **Insured** committed such conduct, act, or violation.

   Provided that:

   f. no such conduct pertaining to any **Insured Person** shall be imputed to any other **Insured Person**;

   g. any such conduct pertaining to past, present, or future members of the **Control Group** shall be imputed to the **Insured Organization**; provided, however, if such member of the **Control Group** acted deliberately outside his or her capacity as such then such conduct shall not be imputed to the **Insured Organization**; and

   h. for **First Party Coverage** only, this exclusion shall not apply to an intentionally dishonest or fraudulent act or omission, willful violation of any statute, rule of law, or gaining any profit, remuneration, or advantage by an **Employee**.

2. Contract

   for breach of any express, implied, actual or constructive contract, warranty, or guarantee.

   However, this exclusion shall not apply to:

   a. liability assumed by an **Insured**, but only to the extent that such assumed liability would have attached to the **Insured** in the absence of such contract, warranty, or guarantee;

   b. an **Insured's** contractual obligation to maintain the confidentiality or security of **Protected Personal Information**;

   c. an **Insured's** obligation under an implied or statutory standard of care obligation to prevent an **Information Privacy Event** or **Network Security Event**;

   d. with respect to Insuring Agreement I.A.1., an unintentional violation by an **Insured** to comply with an **Insured Organization's Privacy Policy**;

   e. solely with respect to Insuring Agreement I.A.4., a **PCI-DSS Claim**;

Appx. 000032

at
bay

HSB
A Munich Re company

f.  solely with respect to Insuring Agreement I.F.1., any actual or alleged misappropriation of idea under implied contract; or

g.  solely with respect to Insuring Agreement I.A.1., an **Insured's** unintentional breach of contract or agreement with a business associate, as defined in the U.S. Health Insurance Portability and Accountability Act (HIPAA), as amended, or the Health Information Technology for Economic and Clinical Health Act (HITECH), as amended.

3.  Bodily Injury

for any actual or alleged **Bodily Injury**.

However, this exclusion shall not apply to:

a.  solely with respect to Insuring Agreement I.F.1., emotional distress, mental anguish, humiliation, or loss of reputation resulting from a **Media Wrongful Act**; or

b.  solely with respect to Insuring Agreement I.A.1., emotional distress, mental anguish, or mental injury resulting from an **Information Privacy Wrongful Act**.

4.  Property Damage

alleging, based upon, arising out of, or attributable to **Property Damage**.

5.  Prior Notice

alleging, based upon, arising out of, or attributable to any fact, circumstance, situation, event, **Cyber Event**, or **Wrongful Act** which was the subject of any notice of claim or potential claim given by or on behalf of any **Insured** under any policy of insurance of which this **Policy** is a direct or indirect renewal or replacement, or which it succeeds in time.

6.  Prior Knowledge

alleging, based upon, arising out of, or attributable to any fact, circumstance, situation, event, **Cyber Event**, or **Wrongful Act** that is, or reasonably would be regarded as, the basis for a **Claim** or **Cyber Event** about which any member of the **Control Group** had knowledge prior to the Continuity Date set forth in ITEM 7 of the Declarations.

7.  Pending or Prior Proceedings

alleging, based upon, arising out of, or attributable to any fact, circumstance, situation, event, **Cyber Event**, or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding or litigation against an **Insured** as of, or prior to, the Prior and Pending Litigation Date set forth in ITEM 7 of the Declarations.



8. Pollution

alleging, based upon, arising out of, or attributable to:

a. the actual, alleged or threatened discharge, release, seepage, migration, or disposal of **Pollution**;

b. any request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize **Pollution**, including any voluntary decision to do so; or

c. any request or requirement brought by or on behalf of any governmental authority relating to testing, monitoring, cleaning, removing, containing, treating, neutralizing, or in any way responding to or assessing the effects of **Pollution**.

9. War

alleging, based upon, arising out of, or attributable to war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war is declared or not), strike, lock-out, riot, civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, or military or usurped power.

10. Nuclear, Biological, and Chemical Contamination

alleging, based upon, arising out of, or attributable to any planning, construction, maintenance, or use of any nuclear reactor, nuclear storage, disposal, waste or radiation site, or any other nuclear facility or site, the transportation of nuclear material, or any nuclear reaction or radiation, or radioactive, biological or chemical contamination, regardless of its cause.

11. Natural Disaster

alleging, based upon, arising out of, or attributable to fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God, nature or any other related physical event.

12. Intellectual Property

alleging, based upon, arising out of, or attributable to any infringement, violation, or misappropriation of, or assertion of any right to, or interest in, any patent, copyright, trademark, trade dress or any other intellectual property right.

However, this exclusion shall not apply to:

a. solely with respect to Insuring Agreement I.F.1., an otherwise covered **Claim** for a **Media Wrongful Act,** except to the extent such **Claim** alleges that **Media Content** consisted of computer software or software technology which infringed upon copyrighted software;

b. solely with respect to Insuring Agreement I.A.1., any **Claim** arising out of any actual, alleged, or reasonably suspected failure by an **Insured** to properly disclose, handle, manage, store, destroy, protect, use or otherwise control **Protected Personal Information** resulting from an **Information Privacy Event**; or

c. solely with respect to Insuring Agreement I.B.1., any **Claim** arising out of the actual or alleged disclosure of **Corporate Information** resulting from a **Network Security Event**.



13. Fees or Chargebacks

alleging, based upon, arising out of, or attributable to any fees, expenses, or costs paid to or charged by an **Insured**, including chargebacks, transfer fees, transaction fees, merchant service fees, or prospective service fees.

However, this exclusion shall not apply to:

a. Solely with respect to Insuring Agreement I.A.4., any **PCI-DSS Claim**.

14. Unsolicited Communications

alleging, based upon, arising out of, or attributable to any violation of the Telephone Consumer Protection Act of 1991, as amended, or any similar federal, state, common, or foreign law relating to the unsolicited electronic dissemination of faxes, e-mails or other communications, or a natural person's or entity's right of seclusion.

However, this exclusion shall not apply to:

a. solely with respect to Insuring Agreements I.A.1. and I.A.2., a **Claim** resulting from any **Insured's** actual, alleged or reasonably suspected violation of any **Privacy Regulation**; or

b. solely with respect to Insuring Agreements I.A.1. and I.A.2., a **Claim** resulting from any **Insured's** actual or alleged failure to adequately protect **Computer Systems** resulting in the release of **Protected Personal Information**.

15. Consumer Protection Laws

alleging, based upon, arising out of, or attributable to any **Insured's** violation of the Truth in Lending Act, Fair Debt Collection Practices Act, Fair Credit Reporting Act, or the Fair and Accurate Credit Transactions Act or any amendments thereto or any rules or regulations promulgated thereunder, or any similar federal, state, common, or foreign law.

However, this exclusion shall not apply to:

a. solely with respect to Insuring Agreement I.A.1., any **Claim** arising out of the actual or alleged disclosure or theft of **Protected Personal Information** resulting from an **Information Privacy Event**.

16. Infrastructure

alleging, based upon, arising out of, or attributable to any electrical or mechanical failures of infrastructure, including an interruption, electrical disturbance, surge, spike, brownout, blackout, or outages to electricity, gas, water, or Internet access service and Domain Name System (DNS) service provided by the service provider that hosts an **Insured Organization's** website, telecommunications, or other infrastructure.

However, this exclusion shall not apply to failures, interruptions, disturbances or outages of telephone, cable or telecommunications systems, networks or infrastructure:

a. under an **Insured's** direct operational control; or

b. solely with respect to Insuring Agreement(s) I.A.1. and I.B.1., which are the result of an actual or alleged **Information Privacy Wrongful Act** or **Network Security Wrongful Act**.

at
—
bay

HSB.
A Munich Re company

## B. EXCLUSIONS APPLICABLE TO PARTICULAR INSURING AGREEMENTS

This **Policy** shall not apply to any **Loss**, **Damages**, or **Claim Expenses** on account of any **Wrongful Act**, any **Cyber Event**, or any **Claim**:

1. Prior Acts

   Exclusively with respect to **Third Party Coverage**, alleging, based upon, arising out of, or attributable to any **Wrongful Act**:

   a. taking place, in whole or in part, prior to the Retroactive Date as stated in ITEM 7 of the Declarations; or

   b. by a **Subsidiary** or any of its **Insured Persons**, occurring at any time during which such entity was not a **Subsidiary**.

2. Insured vs. Insured

   Exclusively with respect to **Third Party Coverage**, brought by or on behalf of any:

   a. **Insured**;

   b. entity, if ten percent (10%) or more of its equity is owned, controlled, operated or managed, directly or indirectly, by any **Insured** at the time the **Wrongful Act** is committed or **Claim** is made; or

   c. successor or assignee of any **Insured**.

   However, this exclusion shall not apply to any **Claim**:

   d. brought by or on behalf of an **Insured Person** for a **Wrongful Act**, but only to the extent such **Insured Person** did not commit or contribute to such **Wrongful Act** or to such extent such **Insured Person** is alleging an **Insured Organization** failed to comply or act in accordance with a **Privacy Regulation**;

   e. brought by or on behalf of an **Employee** alleging employee-related invasion of privacy or employee-related wrongful infliction of emotional distress, but only to the extent that such **Claim** arises out of the loss of **Protected Personal Information** resulting from an **Information Privacy Wrongful Act**; or

   f. brought by or on behalf of any **Insured** which is a third party entity as described in paragraph VII.A.2.a..

3. Securities

   Exclusively with respect to **Third Party Coverage**, alleging, based upon, arising out of, or attributable to any **Insured's**:

   a. purchase, sale, or offer, or solicitation of an offer, to purchase or sell securities; or

   b. violation of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, the Investment Advisors Act, the Organized Crime Control Act of 1970, or any other federal, state or local securities law, and any amendments thereto or any rules or regulations circulated thereunder,  or any similar federal, state or common law.

   However, paragraph VI.B.3.b. of this exclusion shall not apply to:

   c. solely with respect to Insuring Agreement(s) I.A.1., I.A.2., and I.A.4., any **Claim** alleging a failure to disclose an actual, reasonably suspected or potential **Information Privacy Event** if such disclosure is required by any **Privacy Regulations**.

at bay

 HSB
A Munich Re company

4. Governmental Seizure

Exclusively with respect to **First Party Coverage**, alleging, based upon, arising out of, or attributable to any confiscation, nationalization, seizure, or destruction of a **Computer System** or electronic data held or processed by an **Insured** or by order of any governmental or public authority.

5. Employment Practices or Discrimination

Exclusively with respect to **Third Party Coverage**, alleging, based upon, arising out of, or attributable to any employment practices or illegal discrimination of any kind, or any employment relationship, or the nature, terms or conditions of employment, including claims for workplace torts, wrongful termination, dismissal or discharge, or any discrimination, harassment, or breach of employment contract.

However, this exclusion shall not apply to:

a. solely with respect to Insuring Agreement(s) I.A.1., I.A.2., and I.A.4., that portion of any **Claim** alleging **Employee** related invasion of privacy or wrongful infliction of emotional distress, provided that such **Claim** arises out of the actual or alleged disclosure or theft of **Protected Personal Information** resulting from an **Information Privacy Wrongful Act**.

6. Antitrust

Exclusively with respect to **Third Party Coverage**, alleging, based upon, arising out of, or attributable to any unfair competition or restraint of trade, including violations of any local, state, federal, or foreign laws governing the foregoing, whether brought by or on behalf any individuals, entities, the Federal Trade Commission, or any other federal, state, local, or foreign government agency.

However, this exclusion shall not apply to:

a. solely with respect to Insuring Agreement I.A.2., a **Regulatory Claim** resulting directly from a violation of **Privacy Regulations**;

b. solely with respect to Insuring Agreement I.F.1., a **Claim** for a **Media Wrongful Act** as defined in paragraph V.40.g..

7. Advertising & Representations

Exclusively with respect to Insuring Agreement(s) I.F.1. and I.F.2, alleging, based upon, arising out of, or attributable to any inaccurate, inadequate, or incomplete description of the price of goods, products or services, cost guarantees, cost representations, or contract price estimates, the authenticity of any goods, products or services, or the failure of any goods or services to conform with any represented quality of performance.

8. Licensing

Exclusively with respect to Insuring Agreement(s) I.F.1. and I.F.2, alleging, based upon, arising out of, or attributable to any action brought by or on behalf of the Federal Trade Commission, the Federal Communications Commission, or any other federal, state, or local government agency or ASCAP, SESAC, BMI or other licensing or rights entities in such entity's regulatory, quasi-regulatory, or official capacity, function or duty.

HSB_000035

Appx. 000037




9. Contest or Game of Chance

Exclusively with respect to Insuring Agreement(s) I.F.1. and I.F.2., alleging, based upon, arising out of, or attributable to any gambling, contest, game of chance, lottery, or promotional game, including the redemption of coupons or tickets related thereto.

## C. EXCLUSIONS APPLICABLE TO FINANCIAL FRAUD INSURING AGREEMENTS

Exclusively with respect to Insuring Agreement(s) I.E.1. and I.E.2., this **Policy** shall not apply to any **Computer Crimes Loss, Fraudulent Inducement Loss**, or **Reward Expense Loss** on account of any **Computer Crimes** or any **Fraudulent Inducement Instructions**:

1. Financial Fraud of Intellectual Property

for the loss of confidential information, including trade secrets, formulas, patents, customer information, negatives, drawings, manuscripts, prints, and other records of a similar nature, or other confidential information, intellectual property of any kind, data or computer programs.

2. Interest Income

for or applicable to any potential income, including interest and dividends, not realized by the **Insured Organization** or a customer of the **Insured Organization**.

3. Forged or Altered Instruments

resulting directly from forged, altered, or fraudulent negotiable instruments, securities, documents or written instructions or instructions used as source documentation to enter electronic data or send instructions.

at—bay

HSB
A Munich Re company

# VII. Conditions

## A. INSURED EXTENSIONS

**Third Party Coverage** shall extend to apply as follows:

1. Spousal, Domestic Partner, Estates, and Legal Representatives

    a. In the event of an **Insured Person's** death, incapacity, or bankruptcy, any **Claim** made against such **Insured Person's** estate, heirs, executors, administrators, assigns, and legal representatives shall be considered to be a **Claim** made against such **Insured Person**, but only to the extent such **Insured Person** would otherwise be covered under this **Policy**; and

    b. In the event of a **Claim** made against an **Insured Person's** lawful spouse or domestic partner, such **Claim** shall be considered to be a **Claim** made against such **Insured Person**, but only for a **Wrongful Act** actually or allegedly committed by such **Insured Person** other than such spouse or domestic partner.

2. Additional Insureds

    a. If an **Insured Organization** is required by contract, or has explicitly agreed in writing, to add any third party entity as an **Insured** under this **Policy**, then such third party entity shall be considered an **Insured** under this **Policy** but only for **Wrongful Acts** actually or allegedly committed or attempted by an **Insured Organization** other than such third party entity.

## B. SUBSIDIARIES

1. Coverage for Subsidiaries

    With respect to any **Insured Organization** which is a **Subsidiary**, coverage afforded under this **Policy** for such **Subsidiary**, and its **Insured Persons**, shall only apply to:

    a. **Loss** resulting from **Cyber Events** which occurred after the effective date that such entity became a **Subsidiary** and prior to the date that such entity ceased to be a **Subsidiary**; and

    b. **Claims** for **Wrongful Acts** which actually or allegedly occurred after the effective date that such entity became a **Subsidiary** and prior to the date that such entity ceased to be a **Subsidiary**.

    Any entity which ceases to be a **Subsidiary** during the **Policy Period** shall be afforded coverage through the expiration date of the current **Policy Period** but only with respect to **Wrongful Acts** and **Cyber Events** which occurred before the date it ceased to be a **Subsidiary**.



2. Subsidiary Acquisition or Creation

If, during the **Policy Period**, an **Insured Organization** acquires or creates another entity whose gross revenues exceed twenty five percent (25%) of the consolidated gross revenues of the **Insured Organization**, as of the most recent fiscal year prior to the effective date of this **Policy**, and such that the acquired or created entity becomes a **Subsidiary**, then such **Subsidiary** shall only be considered an **Insured Organization** for a period of ninety (90) days following its acquisition or formation unless:

a. the **Named Insured** provides us written notice within sixty (60) days of the full particulars of such entity and agrees to any additional premium and amendments to this **Policy** relating to such entity; and

b. we have ratified our acceptance of such entity as a **Subsidiary** by endorsement to this **Policy**.

## C. CHANGE OF CONTROL & AUTOMATIC RUN-OFF

If a **Change of Control** occurs during the **Policy Period**, then:

1. **Third Party Coverage** under this **Policy** shall:

a. continue in full force and effect until the expiration date of the current **Policy Period** with respect to **Claims** for **Wrongful Acts** committed before such **Change of Control**; and

b. cease with respect to **Claims** for **Wrongful Acts** committed after such **Change of Control;**

2. **First Party Coverage** under this **Policy** shall:

a. continue in full force and effect until the expiration date of the current **Policy Period** with respect to **Loss** for **Cyber Events** which occurred before such **Change of Control**; and

b. cease with respect to **Loss** for **Cyber Events** which occurred after such **Change of Control**;

3. The **Named Insured** shall have the right to give us notice that it desires to purchase an Extended Reporting Period, in accordance to the conditions set forth in section VII.D.2., Extended Reporting Period, of this **Policy**; and

4. This **Policy** may not be canceled by the **Named Insured**, and the entire premium shall be deemed fully earned.

## D. EXTENDED REPORTING PERIOD

1. Automatic Discovery Reporting Period

If this **Policy** does not renew or otherwise terminates for a reason other than failure to pay premium, then following the effective date of such event the **Named Insured** shall have the right, for a period of sixty (60) days following such event, to give us written notice of **Claims** made against any **Insured** during such sixty (60) day period for any **Wrongful Acts** committed prior to the effective date of such **Policy** termination or end of the **Policy Period**, whichever is applicable.

at
bay

HSB.
A Munich Re company

2. Extended Reporting Period

An "Extended Reporting Period," if purchased, means the period of time in which the **Named Insured** may give us written notice of **Claims** first made against any **Insured** under this **Policy**, and shall be extended to apply to **Claims** first made during such Extended Reporting Period but only with respect to;

a. **Claims** for **Wrongful Acts** which occurred prior to the effective date of **Policy** termination, the end of the **Policy Period**, or effective date of **Change of Control** (whichever is applicable); and

b. **Claims** for **Wrongful Acts** made against persons or entities which were **Insureds** as of the effective date of **Policy** termination, the end of the **Policy Period**, or effective date of **Change of Control** (whichever is applicable).

If this **Policy** does not renew or otherwise terminates for a reason other than for failure to pay premium, or upon the occurrence of a **Change of Control**, then upon the effective date of such event:

c. the **Named Insured** shall have the right to give us notice that it desires to purchase an Extended Reporting Period for **Third Party Coverage** at any of the following additional periods and associated premium amounts, which are represented as a percentage of the annualized premium of the **Policy** to which the Extended Reporting Period applies:

   i. one (1) year for seventy five percent (75%); or

   ii. two (2) years for one hundred twenty five percent (125%);

d. the **Named Insured**, or a party acting on its behalf, may send us a request for the purchase of an Extended Reporting Period outside the additional periods and amounts indicated in VII.D.2.c. above, and we may, at our discretion, subsequently provide a quote for such request;

e. any **Claim** made during a purchased Extended Reporting Period shall be deemed to have been made during the **Policy Period** immediately preceding the Extended Reporting Period;

f. the **Aggregate Limit of Insurance** and Sub-Limits of Insurance available for any purchased Extended Reporting Period shall not be increased or renewed, unless we expressly provide such amendment via an endorsement to this **Policy**;

g. the **Named Insured's** right to purchase an Extended Reporting Period shall lapse unless we receive written notice from the **Named Insured**, or a party acting on its behalf, of the election to purchase such Extended Reporting Period within sixty (60) days after this **Policy's** termination or expiration date or, if applicable, the effective date of any **Change of Control**; and

h. the entire premium charged for any purchased Extended Reporting Period is due at the time of purchase and shall be considered fully earned as of the effective date of such Extended Reporting Period.

HSB_000039

Appx. 000041

at
bay

HSB
A Munich Re company

## E. NOTICE

1. Notice of Claims and Cyber Events

   An **Insured** shall, as a condition precedent to our obligations under this **Policy**, give us written notice as soon as practicable after any member of the **Control Group**:

   a. first becomes aware of any **Claim** made against an **Insured**; or

   b. discovers any **Cyber Event**;

   Provided further, and notwithstanding VII.E.1.a. and VII.E.1.b. above:

   c. all such notice of **Claims** made or **Cyber Events** discovered must be noticed to us no later than ninety (90) days after the end of the **Policy Period** or termination of this **Policy**, whichever is earlier; and

   d. if an Extended Reporting Period is purchased pursuant to section VII.D.2., all **Claims** made during such Extended Reporting Period must be reported to us no later than the end of the Extended Reporting Period;

   All such notices described in this clause VII.E.1. must include the following details related to the applicable **Cyber Event** or **Claim**:

   e. all pertinent facts, particulars, and dates, including the nature of such **Cyber Event** and its potential consequences and **Damages**;

   f. the identities of those persons allegedly involved or affected; and

   g. with respect to notices related to **First Party Coverage**, the business operations, **Computer Systems**, or other assets affected.

2. Notice of Circumstances

   If, during the **Policy Period**, any member of the **Control Group** first becomes aware of any circumstances which may reasonably give rise to a **Claim** under this **Policy**, then any **Claim** which arises out of such circumstances shall be deemed to have been first made at the time such written notice was received by us, but only to the extent that such written notice includes the following details and is received by us during the **Policy Period**:

   a. details on why the **Insured** believes a **Claim** may be forthcoming;

   b. all pertinent facts, particulars, and dates, including the nature of such circumstances, why the **Insured** believes a **Claim** may reasonably be forthcoming, and its potential consequences and **Damages**; and

   c. the identities of those persons allegedly involved or affected.

3. Notice Delivery

   All notices described within this condition VII.E., Notice, shall be given to us in writing, either electronically or non-electronically, at the address set forth in ITEM 5 of the Declarations. All such notices shall be effective on the date we receive such notice. If such notice is mailed or transmitted by electronic mail, the date of such mailing or transmission shall constitute the date that such notice was given to us, and proof of mailing or transmission shall be sufficient proof of notice.

HSB_000040

Appx. 000042

**at bay**

**HSB**
A Munich Re company

## F. OBLIGATIONS

In connection with all **Claims** and **Cyber Events** under this **Policy**, the **Insured** agrees to the following:

1. The **Insured** shall cooperate with and assist us in the effort to defend and settle any **Claim**, including:

   a. attending hearings and trials, assisting in securing and giving evidence, obtaining the attendance of witnesses, and enforcing the **Insured's** rights of contribution or indemnity against any person or entity which may be liable to such **Insured** because of an act or omission covered under any **Third Party Coverage**; and

   b. delivering to us copies of all demands, legal papers, other related legal documents and invoices the **Insured** receive, as soon as practicable.

2. The **Insured** shall not settle any **Claim**, incur any **Claim Expenses**, or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without our written consent, which shall not be unreasonably withheld. We shall not be liable for any settlement, **Claim Expenses**, assumed obligation, or admission to which we have not provided such consent.

## G. POLICY TERMINATION

1. We may only cancel this **Policy** prior to the expiration date of the **Policy Period** if the **Named Insured** fails to pay premium prior to its due date. If such cancellation is being considered, we shall deliver a written notice of pending cancellation. Such notice shall be delivered at least twenty (20) days prior to the date that such cancellation is proposed to become effective. If the full premium due is remitted to us prior to the proposed cancellation effective date, then such cancellation shall not go into effect.

2. The **Named Insured** may cancel this **Policy** at any time and for any reason by delivering such instructions to us by mail or electronic mail. Such instructions may be delivered directly by the **Named Insured** or through any person or entity contracted to act on the **Named Insured's** behalf for the placement of this **Policy**.

3. If this **Policy** is canceled for any reason prior to the end of the **Policy Period**, we shall refund the unearned premium computed pro rata. Such premium adjustment shall be made as soon as practicable upon termination of the **Policy**, but payment or tender of any unearned premium by us shall not be a condition precedent to the effectiveness of such termination.

4. We are not required to renew or offer to renew this **Policy** upon the expiry of its **Policy Period**.

## H. LOSS CALCULATIONS FOR BUSINESS INTERRUPTION AND PUBLIC RELATIONS

1. In determining and calculating the amount of **Public Relations Loss** covered under this **Policy**, we shall give due consideration to the prior experience of the **Insured Organization's** public and market perception before the beginning of the applicable **Cyber Event** or **Media Wrongful Act**, and we shall make this assessment at our sole discretion, in good faith, and as we deem reasonable and necessary.





2.  In determining and calculating the amount of **Contingent Business Interruption Loss**, **Business Interruption Loss**, and **Extra Expense** covered under this **Policy**, we shall give due consideration to the prior experience of the **Insured Organization's** business before the beginning of the applicable **System Disruption** and to the probable business such **Insured Organization** could have performed had no **System Disruption** occurred.

## I. REPRESENTATIONS & SEVERABILITY

We have relied upon the representations and statements in the **Application** in granting this **Policy** to the **Insured**, with such representations and statements forming the basis of coverage under this **Policy**. With respect to such representations and statements contained in the **Application**:

1.  no knowledge possessed by an **Insured Person** shall be imputed to any other **Insured Person**, and the **Application** shall be considered to be separate for each **Insured Person**;

2.  in the event the **Application** contains misrepresentations made with the actual intent to deceive or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by us under this **Policy**, then no coverage shall be afforded under this **Policy** based upon, arising from, or in any way attributable to any such misrepresentations with respect to:

    a.  any **Insured Person** who knew of such misrepresentations, regardless of if such **Insured Person** knew such **Application** contained such misrepresentations; and

    b.  an **Insured Organization** if any past or present member of the **Control Group** knew of such misrepresentations, regardless of if such member of the **Control Group** knew such **Application** contained such misrepresentations.

3.  we shall not be entitled under any circumstances to void or rescind this **Policy** with respect to any **Insured.**

at bay



## J. OTHER INSURANCE

1. If any **Loss**, **Damages**, or **Claim Expenses** or other amounts covered under this **Policy** are covered under any other valid and collectible insurance, then this **Policy** shall apply only to the extent that the amount of such **Loss**, **Damages**, or **Claim Expenses** are in excess of the amount of such other insurance whether such other insurance is specified as primary, contributory, excess, contingent or otherwise.

   However, paragraph VII.J.1. above shall not apply if such other insurance is written explicitly to serve as excess insurance over the **Aggregate Limit of Insurance** or Sub-Limits of Insurance provided by this **Policy**.

2. The conditions set forth in VII.D.1., Automatic Discovery Reporting Period,  and VII.E.2., Notice of Circumstances, shall not apply to **Claims** that are covered under any subsequent insurance purchased by an **Insured** or for an **Insured's** benefit, or that would be covered by any subsequent insurance but for the exhaustion of the amount of insurance limits applicable and available under such subsequently placed insurance.

## K. SUBROGATION

1. In the event of any payment by us of **Loss**, **Damages**, or **Claim Expenses** or other amounts under this **Policy**, we are subrogated to the **Insured's** rights of recovery against any person or organization, and the **Insureds** shall execute and deliver instruments, papers, and whatever else is necessary to secure such rights and enable us to effectively bring suit or otherwise pursue subrogation rights in the name of the **Insureds** under this **Policy**.

2. However, we shall not subrogate as described in paragraph VII.K.1. above:

   a. against any **Insured Person,** unless such **Insured Person** was in violation of paragraph VI. A.1.; or

   b. if an **Insured** agreed in writing to waive such **Insured's** right of recovery or subrogation against any person or entity prior to the **Cyber Event** or **Wrongful Act** which gave rise to the **Claim** or **Loss** connected with such subrogation.

## L. RECOVERIES

All recoveries from third parties for payments of **Loss**, **Damages**, or **Claim Expenses** shall be applied in the following order of priority after first deducting the costs and expenses incurred in obtaining such recovery:

1. to us, to reimburse us for any **Retention** we paid on an **Insured's** behalf and for any **Damages**, **Loss**, or **Claims Expenses** we paid under this **Policy**; and

2. to the **Insured**, to reimburse the **Insured** for any **Retention** such **Insured** paid and for any other amounts not covered under this **Policy**.

Provided, that such recoveries shall not include any recovery from insurance, reinsurance, security, or indemnity taken for our benefit, or any portion of a **Retention** we waived.



## M. AUTHORIZATION

The **Named Insured** has the authority to act on behalf of all **Insureds** and is responsible for the payment of premiums and receiving of notices of cancellation, nonrenewal, or any change to coverage provided under this **Policy**. All **Insureds** agree to this authority and have delegated, individually and collectively, all such authority exclusively to the **Named Insured**.

Provided, however, that nothing within this condition, VII.M. Authorization, shall relieve any **Insured** from giving any notice to us that is required under this **Policy**.

## N. ASSIGNMENT

This **Policy**, including any rights or duties herein, may not be transferred or assigned to another party unless we have provided our prior written consent to such transfer or assignment.

## O. ACTION AGAINST US

No action shall lie against us unless, as a condition precedent thereto, the **Insured** has been in full compliance with all terms of this **Policy**. No person or entity shall have any rights under this **Policy** to join us as a party to any action against any **Insured** to determine such **Insured's** liability, nor shall we be impleaded by such **Insured** or the legal representatives of such **Insured**.

## P. DISPUTES & RESOLUTIONS

This condition, VII.P. Disputes & Resolutions, provides the terms and conditions applicable to disputes which may arise between us and any **Insured** or amongst various **Insureds**. If any limitation in this section is deemed to be inconsistent with applicable law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

1. If any dispute persists between us and any **Insured** as it relates to this **Policy,** or any term or condition herein, we and such **Insureds** agree to make a determined effort to solve such dispute via alternative dispute mediation or through a third-party mediator. The costs to procure such mediation shall be paid by us, if applicable, but our payments of such costs shall not persist past a single alternative dispute mediation effort.

2. In the event of a disagreement between or amongst any **Insureds**, the **Named Insured** shall have exclusive authority to act on behalf of all other **Insureds** with respect to negotiation of settlements and the decision to appeal or not to appeal any judgment.





## Q. BANKRUPTCY

Bankruptcy or insolvency of any **Insured**, including any **Insured Person's** estate, does not relieve us of any of our obligations, rights or defenses under this **Policy**.

## R. STATE AMENDATORY INCONSISTENCY

If there is an inconsistency between any term or condition of this **Policy**, those terms and conditions which are more favorable to the **Insured's** coverage shall apply to the extent permitted by law.

Provided, however, that with respect to any time period relating to notice of cancellation provided under this **Policy**, we shall apply the applicable state law.

## S. TERRITORY

Coverage provided under this **Policy** shall extend to **Cyber Events** and **Wrongful Acts** occurring or discovered, **Claims** made, and **Losses** incurred anywhere in the world.

## T. HEADINGS

The titles, headings, and subheadings of certain paragraphs, sections, conditions, or provisions of this **Policy**, and any endorsements attached thereto, are intended solely for convenience and reference and form no part of the terms and conditions of coverage under this **Policy**.



HSB.
A Munich Re company

This endorsement is attached to, forms part of, and modifies:

**Policy** number:　　　6613789-01
**Named Insured**:　　　Cici Enterprises, LP

# Terrorism Risk Insurance Act Disclosure

Includes copyrighted material of National Association of Insurance Commissioners with its permission

This endorsement is attached to and made part of this **Policy** in response to the disclosure requirements of the Terrorism Risk Insurance Act, as amended.

NOTICE OF TERRORISM INSURANCE COVERAGE

### Applicable Premium

The portion of annual premium that is attributable to coverage for acts of terrorism is $0, and does not include any charges for the portion of losses covered by the United States government under the Act.

### Informational Notice

The following notice does not change coverage under this **Policy** but is provided in compliance with the Terrorism Risk Insurance Act, as amended.

Coverage for acts of terrorism is included in this **Policy**. This provides notification that the Terrorism Risk Insurance Act, as amended in 2019, defines an act of terrorism in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Under this coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, this Policy may contain other exclusions which might affect coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, coverage may be reduced.

All other conditions, limitations and terms of this **Policy** shall remain unchanged.

**HSB_000046**

Appx. 000048

at bay

HSB.
A Munich Re company

This endorsement is attached to, forms part of, and modifies:

**Policy** number:        6613789-01
**Named Insured**:        Cici Enterprises, LP

# Service of Process Endorsement

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

This **Policy** is subject to the following:

1) The following provision applies to Alabama, Alaska, Arizona, Arkansas, Colorado, Delaware, Florida, Georgia, Hawaii, Idaho, Kentucky, Louisiana, Mississippi, Missouri, Nevada, New Mexico, North Carolina, Oklahoma, Oregon, Puerto Rico, South Dakota, Tennessee, Texas, Washington, and West Virginia only:

   We designate the Superintendent of Insurance, Insurance Commissioner, Director of Insurance, or other officer specified by law, pursuant to the laws of the State where this **Policy** is delivered, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted in the State in which this **Policy** is delivered, by, or on behalf of, the **Named Insured** or any beneficiary hereunder arising out of this **Policy**.  We designate the Corporate Secretary of HSB Specialty Insurance Company, One State Street, Hartford, CT 06102 as the person whom the said officer is authorized to mail such process or true copy thereof.

2) The following provision applies to California only:

   A surplus lines insurer shall be sued, upon any cause of action arising in the State under any contract issued by it as a surplus lines contract pursuant to the laws the state of California. A surplus lines insurer issuing such **Policy** is deemed to have authorized service of process against it in the manner and to the effect as provided in the laws of the state of California. Service of legal process against the insurer may be made in any such action by service upon the designated agent.  The designated agent for service of process is:  Sarah Espinosa, The Hartford Steam Boiler Inspection and Insurance Company, 2300 Clayton Road, Suite 1350, Concord, California 94520.

3) The following provision applies to Illinois only:

   We designate the Director of the Illinois Department of Insurance and his successor or successors in office, at 320 W. Washington, Bicentennial Building, Springfield, IL 62727, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by, or on behalf of, the **Insured** or any beneficiary hereunder arising out of this contract of insurance.  We designate the Corporate Secretary of HSB Specialty Insurance Company, One State Street, Hartford, CT 06102 as the person to whom the said officer is authorized to mail such process or true copy thereof.

4) The following provision applies to Iowa only:

AB-CYB-029  08/2018  ©2018

An eligible surplus lines insurer may be sued upon a cause of action arising in Iowa under a surplus lines insurance **Policy** or contract placed by the insurer or upon evidence of insurance placed by the insurer and issued or delivered in Iowa by a surplus lines insurance producer.  We designate the Corporate Secretary of HSB Specialty Insurance Company, One State Street, Harford, CT 06102 as the person upon whom service of process can be made.

5)   The following provision applies to Maine only:

An unauthorized insurer shall be sued, upon any cause of action arising in the State under any contract issued by it as a surplus lines contract pursuant to the laws of the state of Maine.  An unauthorized insurer issuing such **Policy** is deemed to have authorized service of process against it in the manner and to the effect as provided in the laws of the state of Maine.  Service of legal process against the insurer may be made in any such action by service of two copies upon the designated agent.  The designated agent for service of process is: Charles C. Soltan, Esq., 96 State Street, 2nd Floor, Augusta, Maine 04330.

6)   The following provision applies to New York only:

The Superintendent of the New York State Department of Financial Services and his/her successors is appointed by the excess lines insurer issuing this **Policy** to be its true and lawful attorney upon whom may be served all lawful process in any proceeding instituted by or on behalf of an **Insured** or beneficiary arising out of this insurance **Policy** and the excess lines insurer signifies its agreement that service of process in such manner is of the same legal force and validity as personal service of process in New York State upon the insurer.

7)   The following provision applies to Pennsylvania only:

It is agreed that in the event we fail to pay any amount claimed to be due under this **Policy** we will submit, at the **Insured's** request, to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such court jurisdiction.  All matters arising hereunder shall be determined in accordance with the law and practice of such court.  It is further agreed that in any such action instituted against any **Insured** under this contract, we will abide by the final decision of such court or of any appellate court in the event of an appeal.

Service of process shall be made pursuant to the procedures provided by 42 Pa. C.S. Chapter 53 Subchapter B (relating to interstate and international procedure).  When making service of process by mail, such process shall be mailed to the Corporate Secretary of HSB Specialty Insurance Company, One State Street, Hartford, CT 06102.  The above named is authorized and directed to accept service of process on our behalf for any action or upon any request of the **Insured** to give a written undertaking to the **Insured** that they will enter a general appearance for us in the event such an action shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States of America, which makes provisions therefore, we hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute or his successor or successors in office, as the true and lawful attorney upon whom any lawful process may be served in any action, suit or proceeding instituted by, or on behalf of, the **Insured** or any beneficiary hereunder arising out of this contract of insurance, and hereby designate the above named as the person on whom such process or a true copy thereof shall be served.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

HSB_000048

Appx. 000050





This endorsement is attached to, forms part of, and modifies:

**Policy** number:           6613789-01
**Named Insured**:         Cici Enterprises, LP

# Reputational Harm Insuring Agreement

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1)  The following is added to ITEM 6 of the Declarations:

| Insuring Agreement: | Inclusion: | Sub-Limit of Insurance: | **Retention**: |
|---|---|---|---|
| G. Reputational Harm | | | |
| G.1. Reputational Harm | Included | $3,000,000. | $50,000. |

2)  The following is added to the Declarations:

**Reputational Harm Indemnity Period**:           180 days.

3)  The following is added to section I. Insuring Agreements:

**G. REPUTATIONAL HARM**

1.  Reputational Harm

We shall pay the **Insured Organization** for **Reputational Harm Loss** and **Public Relations Loss** incurred by the **Insured Organization** as a direct result of a **Reputational Harm Event** which first occurs during the **Policy Period**.

4)  The following are added to section V. Definitions:

a)  **Adverse Publication** means a publication, report, communication, opinion, or media of any other form which:

i)   disseminates any previously non-public information:

ii)  specifically states or references an **Insured Organization** or **Covered Brand**; and

iii) is disseminated or publicized to the general public via any electronic or non-electronic medium or media channel including, but not limited to, television, print media, radio or electronic networks, the internet, or electronic mail.

**at bay**

HSB.
A Munich Re company

b) **Covered Brand** means any brand owned exclusively by, or licensed exclusively to, an **Insured Organization**.

c) **Reputational Harm Event** means the first appearance of a publicly available **Adverse Publication** which:

   i) directly states or alleges that an **Insured Organization** has experienced an **Information Privacy Event** or **Network Security Event**, regardless of the factual accuracy of any statement(s) contained therein;

   ii) is reasonably expected to cause, or has already caused, material damage, harm, or tarnish to the public perception and reputation of an **Insured Organization**, including, but not limited to, damage to such **Insured Organization's** goodwill amongst its customers, suppliers, or community with whom such **Insured Organization** habitually deals with in the course of its business; and

   iii) is reasonably expected to lead, or has already led, to an **Insured Organization's** provable loss of income.

d) **Reputational Harm Indemnity Period** means the continuous period of time that:

   i) begins with the date the **Reputational Harm Event** first occurred; and

   ii) ends on the date when the number of days stated in the Declarations as the **Reputational Harm Indemnity Period** have elapsed.

   The **Reputational Harm Indemnity Period** shall not be cut short or reduced by the intervening expiration of the **Policy Period**, if applicable.

e) **Reputational Harm Loss** means the following amounts incurred by an **Insured Organization** during the **Reputational Harm Indemnity Period**:

   i) net profit before income taxes that would have been earned had no **Reputational Harm Event** occurred;

   ii) net loss before income taxes that would have been avoided had no **Reputational Harm Event** occurred; and

   iii) costs to retain the services of a third party forensic accounting firm to determine the amounts of **Reputational Harm Loss** described in paragraphs 4)e)ii) and 4)e)ii) above, subject to our prior consent.

   The amount of **Reputational Harm Loss** will be determined and calculated in accordance with section VII. Conditions, Loss Calculation for Reputational Harm Loss, as detailed in item 10) of this endorsement.

5) The following is added to section V. Definitions, 15. **Cyber Event**:

   **Cyber Event** also means a **Reputational Harm Event**.

6) The following is added to section V. Definitions, 24. **First Party Coverage**:

   **First Party Coverage** also means Insuring Agreement I.G.1., Reputational Harm.

---

HSB_000050

Appx. 000052

**at bay**

HSB.
A Munich Re company

7) The following is added to section V. Definitions, 37. **Loss**:

**Loss** also means **Reputational Harm Loss**.

For the purposes of this endorsement and solely with respect to Insuring Agreement I.G.1., Reputational Harm, **Loss** shall not include:

a) variable costs, including the cost of raw materials and other costs, that would have been incurred by the **Insured Organization** during the applicable **Reputational Harm Indemnity Period** but were saved as a result of the **Reputational Harm Event**.

8) Section V. Definitions, 37. **Loss**, paragraph c., is deleted and replaced with the following:

c. an **Insured Organization's** internal operating costs, expenses, or fees, except to the extent covered under Insuring Agreement(s) I.C.1., I.C.2., and I.G.1.;

9) The following is added to section VI. Exclusions, B., Exclusions Applicable to Particular Insuring Agreements:

Exclusively with respect to Insuring Agreement I.G.1., Reputational Harm:

based upon or resulting from an **Adverse Publication** which:

a) does not specifically state or refer to an **Insured Organization** or a **Covered Brand**;

b) does not specifically state or refer to an alleged or actual **Information Privacy Event** or **Network Security Event** experienced by an **Insured Organization**; or

c) is disseminated and directed to an **Insured** and is not available to the general public.

10) The following is added to section VII. Conditions:

LOSS CALCULATION FOR REPUTATIONAL HARM LOSS

In determining and calculating the amount of **Reputational Harm Loss** covered under this **Policy**, we shall use reasonable projections and give due consideration to:

1. the experience of the **Insured Organization's** business prior to the first occurrence of the **Reputational Harm Event**;

2. the public and market perception of the **Insured Organization** prior to the first occurrence of the **Reputational Harm Event**; and

3. the **Insured Organization's** net profit or net loss during the twelve (12) months immediately preceding the date of the **Reputational Harm Event's** first occurrence; and

4. market and industry trends, variations, and circumstances, including, but not limited to, seasonable influences and economic conditions, which would have affected the **Insured Organization's** business and operations regardless of the occurrence of the **Reputational Harm Event**.

We shall determine and calculate the amount of **Reputational Harm Loss** at our sole discretion, in good faith, and as we deem reasonable and necessary. Any disputes between us and the **Insured** over such

at —bay



determination and calculation shall be subject to the terms set forth in section VII., P., Disputes & Resolutions.

11) The following is added to section VII. Conditions, E. Notice, 1.:

Solely with respect to a **Reputational Harm Event**, and notwithstanding all other terms set forth in section VII.E.1., an **Insured** shall:

a) give us written notice of any discovered **Reputational Harm Event** during the applicable **Reputational Harm Indemnity Period** following the first occurrence of such **Reputational Harm Event**.

Any notice of a **Reputational Harm Event** described in paragraph 11)a) above must include details and clear evidence that:

b) such **Reputational Harm Event** is reasonably expected to lead, or already has led, to **Reputational Harm Loss**; and

c) such **Reputational Harm Loss** is directly attributable to such **Reputational Harm Event**.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

# at bay



This endorsement is attached to, forms part of, and modifies:

**Policy** number:          6613789-01
**Named Insured**:          Cici Enterprises, LP

---

# AmWINS Amendatory Endorsement

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1) Section I. Insuring Agreements, A. Information Privacy, item 3. Event Response and Management, is deleted and replaced with the following:

   3.   Event Response and Management

        We shall pay the **Insured Organization** for, or pay on behalf of the **Insured Organization**, all **Technical Response Loss**, **Legal Services Loss**, **Public Relations Loss**, **Notification Loss**, **Reward Expense Loss**, and **Credit Monitoring Loss** incurred by the **Insured Organization** as a result of an **Information Privacy Event** first discovered during the **Policy Period**.

2) Section I. Insuring Agreements, A. Information Privacy, item 4. PCI-DSS Liability, is deleted and replaced with the following:

   4.   PCI-DSS Liability

        We shall pay the **Insured Organization** for, or pay on behalf of the **Insured Organization**, all **PCI-DSS Penalties**, **PCI-DSS Response Expenses**, and **Claim Expenses** resulting from a **PCI-DSS Claim** first made against the **Insured Organization** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for an **Information Privacy Wrongful Act**.

3) Section I. Insuring Agreements, B. Network Security, item 2. Event Response and Recovery, is deleted and replaced with the following:

   2.   Event Response and Recovery

        We shall pay the **Insured Organization** for, or pay on behalf of the **Insured Organization**, all **Technical Response Loss**, **Public Relations Loss**, **Data Recovery Loss**, **Reward Expense Loss**, and **System Restoration Loss** incurred by the **Insured Organization** as a result of a **Network Security Event** first discovered during the **Policy Period**.

4) Section I. Insuring Agreements, D. Cyber Extortion, item 1. Cyber Extortion, is deleted and replaced with the following:

   1.   Cyber Extortion

---

HSB_000053

Appx. 000055



We shall pay the **Insured Organization** for, or pay on behalf of the **Insured Organization**, all **Extortion Loss**, **Reward Expense Loss**, and **Public Relations Loss** incurred by the **Insured Organization** as a direct result of an **Extortion Threat** first discovered during the **Policy Period**.

5)  Section I. Insuring Agreements, F. Media Content, item 2. Media Event Response, is deleted and replaced with the following:

2.  Media Event Response

We shall pay the **Insured Organization** for, or pay on behalf of the **Insured Organization**, all **Public Relations Loss** and **Reward Expense Loss** incurred by the **Insured Organization** as a result of a **Media Wrongful Act** first discovered during the **Policy Period**.

6)  Section IV. Defense & Settlement of Claims, B. Settlement, item 1.b., is deleted and replaced with the following:

b.  we shall pay and maintain responsibility for ninety percent (90%) of all **Claim Expenses** and **Damages** that are in excess of the amount referenced in paragraph IV.B.1.a. above.

7)  The following is added to section V. Definitions, 2. **Application**:

Solely to the extent that the **Named Insured** is not a publicly held company:

The applications, attachments, information, and materials which form part of the **Application**, as defined above within this section V.2., shall only be considered to be part of the **Application** to the extent such applications, attachments, information, and materials were submitted to us:

a)  within the twelve (12) month period immediately preceding the **Policy Period** Effective Date; and

b)  in connection with the underwriting of this **Policy**.

8)  The following is added to section V. Definitions, 6. **Claim**:

solely with respect to Insuring Agreements I.A.1. Information Privacy Liability, and I.B.1. Network Security Liability, **Claim** also includes an **Insured Organization's** obligation under a written contract to indemnify a third party for **Third Party Event Response Expenses**.

9)  Section V. Definitions, 14. **Credit Monitoring Loss**, the last paragraph, is deleted and replaced with the following:

**Credit Monitoring Loss** includes costs and expenses incurred in order to comply with applicable **Privacy Regulations** and shall follow the law of the applicable jurisdiction which most favors coverage for such costs and expenses. Those costs and expenses not required to comply with **Privacy Regulations** shall be subject to, and require, our prior consent if the total amount of such costs and expenses exceeds $100,000.

10) Section V. Definitions, 17. **Damages**, paragraph f., is deleted and replaced with the following:

f.  with respect to a **Regulatory Claim** under Insuring Agreement I.A.2., any:

i.  **Regulatory Penalties**;

at bay

HSB.
A Munich Re company

    ii.   **GDPR Penalties**; and

    iii.  **Regulatory Assessments and Expenses**, including any **HIPAA/HITECH Betterment Expenses**.

11) The following is added to section V. Definitions, 17. **Damages**:

**Damages** also include:

a) solely with respect to Insuring Agreements I.A.1. Information Privacy Liability, and I.B.1. Network Security Liability, indemnity amounts for **Third Party Event Response Expenses** obligated under a written contract; and

b) **CCPA Penalties** to the same extent that **Damages** include **Regulatory Penalties**, but solely with respect to, subject to, and notwithstanding the terms and conditions set forth in paragraph V.17.f..

12) The following is added to section V. Definitions, 27. **Funds or Securities**:

**Funds or Securities** also means any tangible, physical, or other assets which maintain a fungible, market, or transferrable monetary value.

**Funds or Securities** includes **Funds or Securities** that are owned by, or under the care, custody or control of, the **Insured Organization**.

13) The following is added to section V. Definitions, 30. **Information Privacy Event**:

**Information Privacy Event**, paragraph V.30.c., also includes, but is not limited to, any violation of the California Consumer Privacy Act, as amended, including any violation of requirements therein which govern the **Insured Organization's** use, sale, processing, profiling, acquisition, sharing, maintenance, and retention of **Protected Personal Information**.

14) The following is added to section V. Definitions, 31. **Information Privacy Wrongful Act**:

**Information Privacy Wrongful Act** includes an **Insured Organization's** obligation under a written contract to indemnify a third party for **Third Party Event Response Expenses** resulting from an **Information Privacy Event**, but only to the extent that:

a) the **Information Privacy Event** is based upon or arises out of an actual or alleged act, error, or omission by an **Insured**; and

b) the **Third Party Event Response Expenses** do not arise solely out of any act, error, or omission by the third party whom the **Insured Organization** is obligated to indemnify.

15) The following is added to section V. Definitions, 38. **Malicious Code**:

**Malicious Code** includes **Bricking** that is functionally equivalent to **Malicious Code** described in paragraphs V.38.a. and V.38.b..

16) The following is added to section V. Definitions, 43. **Network Security Wrongful Act**:

HSB_000055

Appx. 000057

**at bay**

HSB.
A Munich Re company

**Network Security Wrongful Act** includes an **Insured Organization's** obligation under a written contract to indemnify a third party for **Third Party Event Response Expenses** resulting from a **Network Security Event**, but only to the extent that:

a)   the **Network Security Event** is based upon or arises out of an actual or alleged act, error, or omission by an **Insured**; and

b)   the **Third Party Event Response Expenses** do not arise solely out of any act, error, or omission by the third party whom the **Insured Organization** is obligated to indemnify.

17) Section V. Definitions, 44. **Notification Loss**, the last paragraph, is deleted and replaced with the following:

**Notification Loss** includes costs and expenses incurred in order to comply with applicable **Privacy Regulations** and shall follow the law of the applicable jurisdiction which most favors coverage for such costs and expenses. Those voluntary costs and expenses not required to comply with any applicable **Privacy Regulations** shall be subject to, and require, our prior consent if the total amount of such costs and expenses exceeds $100,000.

18) Section V. Definitions, 49. **Period of Restoration**, the last paragraph, is deleted and replaced with the following:

A **Period of Restoration** shall not exceed two hundred ten (210) days from the date the applicable **System Disruption** first occurred; provided, however, that the end of the **Policy Period** shall not cut short the **Period of Restoration**.

19) The following is added to section V. Definitions, 54. **Privacy Regulations**:

**Privacy Regulations** include the California Consumer Privacy Act, as amended.

20) The following is added to section V. Definitions, 58. **Regulatory Assessments and Expenses**:

**Regulatory Assessments and Expenses** includes **HIPAA/HITECH Better Expenses**, if applicable; provided, however, that:

a)   our maximum liability under this **Policy** and the most we shall pay for **HIPAA/HITECH Betterment Expenses** shall be $25,000;

b)   the amount set forth in paragraph V.58.a) above is part of and not in addition to:

   i)   the **Aggregate Limit of Insurance**; and

   ii)  the amount stated as the Sub-Limit of Insurance for Insuring Agreement I.A.2. in ITEM 6. of the Declarations; and

c)   **HIPAA/HITECH Betterment Expenses** shall only be considered **Damages** covered under this **Policy** to the extent such **HIPAA/HITECH Betterment Expenses** are deemed insurable under the applicable laws of any jurisdiction which most favors coverage and which has a substantial relationship to an **Insured**, us, this **Policy**, or the **Regulatory Claim** which gave rise to such **HIPAA/HITECH Betterment Expenses**.

21) The following is added to section V. Definitions, 59. **Regulatory Claim**:

HSB_000056

Appx. 000058

at bay

HSB.
A Munich Re company

**Regulatory Claim** includes any **Claim** brought by, or on behalf of, any supervisory authority enforcing the California Consumer Privacy Act, as amended.

22) The following is added to section V. Definitions, 60. **Regulatory Penalties**:

**Regulatory Penalties** includes **CCPA Penalties**, but only to the extent such **CCPA Penalties** are civil fines or penalties imposed against an **Insured**:

    a) by any supervisory authority enforcing the California Consumer Privacy Act, as amended; and

    b) as a direct result of an otherwise covered **Regulatory Claim**.

23) The following is added to section V. Definitions, 65. **System Disruption**:

Subject to our prior consent, which will not be unreasonably withheld, **System Disruption** includes a measurable interruption, suspension, degradation, or failure in the service of:

    a) with respect to Insuring Agreement I.C.1. Direct Business Interruption, **Insured Computer Systems**; and

    b) with respect to Insuring Agreement I.C.2. Contingent Business Interruption, **External Computer Systems**:

directly caused by a **Voluntary Shutdown**.

24) Section V. Definitions, 66. **System Restoration Loss**, paragraph a., is deleted and replaced with the following:

    a. restore **Computer Systems** to their level of functionality immediately prior to the applicable **Network Security Event**, including:

        i. replacing or reinstalling software programs contained therein; and

        ii. replacing or reinstalling computer hardware contained therein; provided, however, that this paragraph V.66.a.ii. is subject to:

            (a) section V. Definitions, 37. **Loss**, paragraph f.ii.; and

            (b) our determination that the replacement or reinstallation of computer hardware is essential to or will reduce the cost of the restoration effort of **Computer Systems** described in paragraph V.66.a. above;

25) Section V. Definitions, 67. **Technical Response Loss**, item d., is deleted and replaced with the following:

    d. identify, catalog, and notify those organizations whose **Corporate Information** was wrongfully disclosed, accessed, acquired, or otherwise compromised or impacted as a result of an applicable **Network Security Event**; and

26) The following is added to section V. Definitions:

**Bricking** means any software or computer program which is purposefully designed to adversely affect and render any computer hardware or "IoT" device, including any critical computer hardware, components, or software program contained therein, as useless, inaccessible, damaged, or non-functional to an extent which is beyond reasonable repair or restoration.

HSB_000057

Appx. 000059

**at bay**

HSB
A Munich Re company

27) The following is added to section V. Definitions:

**CCPA Penalties** means **Regulatory Penalties** an **Insured** becomes legally obligated to pay as a result of a **Regulatory Claim** for such **Insured's** actual, alleged, or reasonably suspected non-compliance with the California Consumer Privacy Act, as amended.

28) The following is added to section V. Definitions:

For the purposes of this endorsement and subject to the conditions, limitations, and other terms contained herein:

a)  **Cyber Terrorism** means the premeditated use of disruptive activities, or the threat to use disruptive activities, against a **Computer System**, including any associated network and data stored thereon, with the intention to cause harm, to further social, ideological, religious, political, or similar objectives, or to intimidate any person in furtherance of such objectives.

Provided further, however, that such activities set forth in item 28)a) directly above shall not be considered **Cyber Terrorism** when such activities are committed by, or at the express direction of, a government simultaneously engaged in an active conflict involving physical combat by one or more military forces of, or operating at the direction of, nation states or factions in the case of a civil war.

29) The following is added to section V. Definitions:

**HIPAA/HITECH Betterment Expenses** means reasonable and necessary costs and expenses the **Insured Organization** becomes legally obligated to pay as a direct result of, and as part of, a final settlement or adjudication of a **Regulatory Claim** to:

a)  create, iterate, or improve the **Insured Organization's** internal policies or practices in order to establish or re-establish the **Insured Organization's** compliance with the following **Privacy Regulations**:

    i)   the U.S. Health Insurance Portability and Accountability Act (HIPAA), as amended; and/or

    ii)  the Health Information Technology for Economic and Clinical Health Act (HITECH), as amended.

    **HIPAA/HITECH Betterment Expenses** are part of and not in addition to **Regulatory Assessments and Expenses**.

30) The following is added to section V. Definitions:

**Third Party Event Response Expenses** means:

a)  solely with respect to Insuring Agreement I.A.1., Information Privacy Liability:

    i)   **Technical Response Loss**, **Legal Services Loss**, **Public Relations Loss**, **Notification Loss**, and **Credit Monitoring Loss** incurred by a third party as a result of an **Information Privacy Event**, but only to the same extent that would have been otherwise covered under Insuring Agreement I.A.3. Event Response and Management if incurred by an **Insured Organization**.

b)  solely with respect to Insuring Agreement I.B.1., Network Security Liability:

HSB_000058

Appx. 000060

at
bay

HSB.
A Munich Re company

    i)   **Technical Response Loss** and **Public Relations Loss** incurred by a third party as a result of a **Network Security Event**, but only to the same extent that would have been otherwise covered under Insuring Agreement I.B.2. Event Response and Recovery if incurred by an **Insured Organization**.

31) The following is added to section V. Definitions:

    **Voluntary Shutdown** means an **Insured's** voluntary, intentional, and reasonably necessary shutdown of:

    a)  with respect to Insuring Agreement I.C.1. Direct Business Interruption, **Insured Computer Systems** in response to a credible or actual threat of an **Information Privacy Event**, a **Network Security Event**, or, if attached as an endorsement to this **Policy**, a **System Failure** expressly directed against such **Insured Computer Systems**, but only to the extent that:

        i)   a **System Disruption** may reasonably be expected in the absence of such shutdown; and

        ii)  such shutdown serves to mitigate, reduce, or avoid **Business Interruption Loss**; and

    b)  with respect to Insuring Agreement I.C.2. Contingent Business Interruption, the **Insured's** connectivity or access to **External Computer Systems** in response to an actual **Information Privacy Event**, **Network Security Event**, or, if attached as an endorsement to this **Policy**, a **System Failure** against such **External Computer Systems**, but only to the extent that:

        i)   a **System Disruption** may reasonably be expected in the absence of such shutdown; and

        ii)  such shutdown serves to mitigate, reduce, or avoid **Contingent Business Interruption Loss**.

32) Section VI. Exclusions, A. Exclusions Applicable to All Insuring Agreements, item 2. Contract, paragraph b., is deleted and replaced with the following:

    b.  an **Insured's** contractual obligation to maintain the confidentiality or security of **Protected Personal Information** or **Corporate Information**;

33) The following is added to section VI. Exclusions, A. Exclusions Applicable to All Insuring Agreements, item 2. Contract:

    However, this exclusion shall also not apply to:

    solely with respect to Insuring Agreements I.A.1. Information Privacy Liability, and I.B.1. Network Security Liability, an otherwise covered **Claim** for **Third Party Event Response Expenses** obligated under a written contract.

34) The following is added to section VI. Exclusions, A. Exclusions Applicable to All Insuring Agreements, item 4. Property Damage:

    However, this exclusion shall not apply to:

    a)  solely with respect to Insuring Agreements I.A.1., I.A.2., I.A.3., I.A.4., I.B.1., and I.B.2., an **Information Privacy Event** or **Network Security Event** resulting from damage to or destruction of tangible property; or

    b)  solely with respect to Insuring Agreement I.B.2., replacing or reinstalling computer hardware for an otherwise covered **System Restoration Loss** resulting from **Bricking**.

HSB_000059

at bay



35) The following is added to section VI. Exclusions, A. Exclusions Applicable to All Insuring Agreements, item 8. Pollution:

However, this exclusion shall not apply to:

a)  solely with respect to Insuring Agreement I.A.1., Information Privacy Liability:

i)  **Claim Expenses** and **Damages** resulting from an otherwise covered **Claim** for an **Information Privacy Wrongful Act**;

b)  solely with respect to Insuring Agreement I.A.2., Regulatory Liability:

i)  **Claim Expenses** resulting from an otherwise covered **Regulatory Claim** for an **Information Privacy Wrongful Act**; or

c)  solely with respect to Insuring Agreement I.B.1., Network Security Liability:

i)  **Claim Expenses** and **Damages** resulting from an otherwise covered **Claim** for a **Network Security Wrongful Act**.

36) Section VI. Exclusions, A. Exclusions Applicable to All Insuring Agreements, item 9. War, is deleted and replaced with the following:

9.  War

alleging, based upon, arising out of, or attributable to war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war is declared or not), strike, lock-out, riot, civil war, rebellion, revolution, insurrection, or civil commotion assuming the proportions of, or amounting to, an uprising, or military or usurped power.

However, this exclusion shall not apply to **Cyber Terrorism**.

37) The following is added to section VI. Exclusions, A. Exclusions Applicable to All Insuring Agreements, item 11. Natural Disaster:

However, this exclusion shall not apply to:

a)  solely with respect to Insuring Agreements I.A.1., I.A.2., I.A.3., I.A.4., I.B.1., and I.B.2., an **Information Privacy Event** or **Network Security Event** resulting from fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God, nature or any other related physical event.

38) The following is added to section VI. Exclusions, A. Exclusions Applicable to All Insuring Agreements, item 14. Unsolicited Communications:

However, this exclusion shall also not apply to:

solely with respect to Insuring Agreement I.B.1. Network Security Liability, an otherwise covered **Claim** for communications originating from **Insured Computer Systems**, but only to the extent that such communications result directly from unauthorized access to or use of **Insured Computer Systems** by a person who is not an **Insured Person**.

---

at
— bay

HSB
A Munich Re company

39) Section VI. Exclusions, B. Exclusions Applicable to Particular Insuring Agreements, item 2. Insured vs. Insured, paragraph b., is deleted and replaced with the following:

b.   entity, if fifteen percent (15%) or more of its equity is owned, controlled, operated, or managed, directly or indirectly, by any **Insured** at the time the **Wrongful Act** is committed or **Claim** is made; or

40) The following is added to section VI. Exclusions, C. Exclusions Applicable to Financial Fraud Insuring Agreements, item 3. Forged or Altered Instruments:

However, this exclusion shall not apply with respect to Insuring Agreement I.E.1., Social Engineering.

41) Section VII. Conditions, B., 2. Subsidiary Acquisition or Creation, is deleted and replaced with the following:

2.   Subsidiary Acquisition or Creation

If, during the **Policy Period**, an **Insured Organization** acquires or creates another entity whose gross revenues exceed thirty five percent (35%) of the consolidated gross revenues of the **Insured Organization**, as of the most recent fiscal year prior to the effective date of this **Policy**, and such that the acquired or created entity becomes a **Subsidiary**, then such **Subsidiary** shall only be considered an **Insured Organization** for a period of ninety (90) days following its acquisition or formation unless:

a.   the **Named Insured** provides us written notice within ninety (90) days of the full particulars of such entity and agrees to any additional premium and amendments to this **Policy** relating to such entity; and

b.   we have ratified our acceptance of such entity as a **Subsidiary** by endorsement to this **Policy**.

42) Section VII. Conditions, D., 1. Automatic Discovery Reporting Period, is deleted and replaced with the following:

1.   Automatic Discovery Reporting Period

If this **Policy** does not renew or otherwise terminates for a reason other than failure to pay premium, then following the effective date of such event the **Named Insured** shall have the right, for a period of ninety (90) days following such event, to give us written notice of **Claims** made against any **Insured** during such ninety (90) day period for any **Wrongful Acts** committed prior to the effective date of such **Policy** termination or end of the **Policy Period**, whichever is applicable.

43) The following is added to section VII. Conditions, D., 2. Extended Reporting Period, paragraph c:

or;

iii)   three (3) years for one hundred seventy five percent (175%);

44) The following is added to section VII. Conditions, E., 3. Notice Delivery:

Notwithstanding anything in section VII.E.2., Notice of Circumstances, to the contrary:

a)   In the event an **Insured** receives a request from a law enforcement authority to keep confidential certain information about an actual, possible, or reasonably suspected **Cyber Event** or **Wrongful Act**, then the

notice of such **Cyber Event** or **Wrongful Act**, including any **Claim** relating to or arising out of such **Cyber Event** or **Wrongful Act**, shall be considered timely under this **Policy**, provided the **Insured**:

i)   requests permission from such law enforcement authority to share such information with us as soon as practicable following the receipt of such a request;

ii)  only withholds from us that portion of the information that the law enforcement authority has instructed such **Insured** not share with us; and

iii) provides us with a full notice of such **Cyber Event**, **Wrongful Act**, or **Claim** as soon as legally possible after the law enforcement authority permits such **Insured** to share with us the full notice.

b)  Furthermore, with respect to any failure or delay by the **Insured** in providing information to us following receipt of a law enforcement authority request as set forth in part 44)a) of this endorsement:

i)   the **Insured's** failure to provide documentation to us, or otherwise cooperate with us, will not be the basis for a denial of coverage for any **Cyber Event** or **Claim** under this **Policy**, but only to the extent the procedure set forth in part 44)a) of this endorsement is followed in connection with such authorized law enforcement request.

Notwithstanding the above, no coverage shall be afforded for any **Cyber Event** or **Claim** if the information withheld relating to such **Cyber Event** or **Claim** is subject to exclusion under section VI.A.6., Prior Knowledge, section VI.A.7., Pending or Prior Proceedings, or any other limitation in this **Policy** relating to any misrepresentations provided in the **Application**.

45) Section VII. Conditions, G. Policy Termination, item 1., is deleted and replaced with the following:

1.  We may only cancel this **Policy** prior to the expiration date of the **Policy Period** if the **Named Insured** fails to pay premium prior to its due date. If such cancellation is being considered, we shall deliver a written notice of pending cancellation. Such notice shall be delivered at least thirty (30) days prior to the date that such cancellation is proposed to become effective. If the full premium due is remitted to us prior to the proposed cancellation effective date, then such cancellation shall not go into effect.

46) The following is added to section VII. Conditions, J. Other Insurance, item 1.:

Additionally, however, subject to and notwithstanding all other terms and conditions of this **Policy**:

a)  this **Policy** shall cover applicable **Loss** on a primary basis solely with respect to Insuring Agreement I.A.3., Event Response and Management, and Insuring Agreement I.B.2., Event Response and Recovery.

47) Wherever the term "**Corporate Data**" appears in the **Policy**, it is deleted and replaced with the term **Corporate Information**.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

Appx. 000064



This endorsement is attached to, forms part of, and modifies:

**Policy** number:        6613789-01
**Named Insured**:        Cici Enterprises, LP

# PCI-DSS Betterment Coverage ($25,000)

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1)    Section V. Definitions, 48. **PCI-DSS Response Expenses**, is deleted and replaced with the following:

48. **PCI-DSS Response Expenses** means reasonable and necessary costs and expenses to retain the services of:

a.    a third party forensic firm that is a qualified Payment Card Industry Forensic Investigator, to determine the cause and scope of the **Information Privacy Event** which led to a **PCI-DSS Claim**;

b.    a Qualified Security Assessor (QSA) to validate an **Insured Organization's** adherence to **PCI Data Security Standards** following a **PCI-DSS Claim**; and

c.    a **Cyber Response Firm** to improve the **Insured Organization's** computer systems or network security in order to establish or re-establish the **Insured Organization's** adherence to **PCI Data Security Standards** following a **PCI-DSS Claim**.

Our maximum liability under this **Policy** and the most we shall pay for costs and expenses described in paragraph V.48.c. above shall be $25,000.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

at
—
bay

HSB
A Munich Re company

This endorsement is attached to, forms part of, and modifies:

**Policy** number:          6613789-01
**Named Insured**:          Cici Enterprises, LP

# Contingent Bodily Injury Coverage [Sub-Limit]

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1)    The following is added to section II. Limits of Insurance :

Solely with respect to the coverage afforded under part 2) of this endorsement, the most we shall pay, and our maximum liability, for all **Damages** and **Claims Expenses** resulting from any **Claim** alleging, based upon, arising out of, or attributable to **Bodily Injury** shall be:

a)    $250,000.

Furthermore, the amount set forth directly above, in item 1)a) of this endorsement, will in no way serve to increase our liability under this **Policy** and shall be part of, and not in addition to, the Sub-Limit of Insurance for Insuring Agreement I.B.1. and the **Aggregate Limit of Insurance**.

2)    The following is added to section VI. Exclusions, A. Exclusions Applicable to All Insuring Agreements, item 3. Bodily Injury:

However, this exclusion shall not apply to:

a)    solely with respect to Insuring Agreement I.B.1., any **Claim** for **Bodily Injury** directly caused by, or directly resulting from, an otherwise covered **Network Security Wrongful Act**.

3)    The following is added to section VII. Conditions, J. Other Insurance:

As a condition precedent to the coverage provided under this endorsement, it is understood and agreed that:

a)    the **Insured** must maintain a valid and collectible commercial general liability insurance policy, effective throughout the **Policy Period** of this **Policy**, for its business activities and operations; and

b)    the coverage provided under this endorsement shall only apply to the extent no similar coverage is provided under any other insurance policy available to the **Insured** or, if applicable, any Additional Insureds for which coverage applies pursuant to section VII.A.2. Additional Insureds.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

HSB_000064

Appx. 000066



HSB

This endorsement is attached to, forms part of, and modifies:

**Policy** number:          6613789-01
**Named Insured**:          Cici Enterprises, LP

# Invoice Manipulation Coverage

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1)  The following is added to section II. Limits of Insurance:

    The following provisions shall apply solely with respect to coverage provided under Insuring Agreement I.E.2., Computer Fraud, in addition and subject to the provisions of section II. Limits of Insurance, and notwithstanding anything in the **Policy** to the contrary.

    a)  Solely with respect to coverage provided and applied under Insuring Agreement I.E.2., Computer Fraud, as a direct result of **Computer Crimes** caused by **Invoice Manipulation**:

        i)  our maximum liability under this **Policy** and the most we shall pay for any resulting **Computer Crimes Loss** incurred by the **Insured Organization** shall be the lesser of:

            (1)  the amount stated as the Sub-Limit of Insurance for Insuring Agreement I.E.2., Computer Fraud, in ITEM 6. of the Declarations; or

            (2)  $1,000,000; and

        ii)  the applicable amount of covered **Computer Crimes Loss**, pursuant to paragraph 1)a)i)(1) or paragraph 1)a)i)(2) above, shall be part of and not in addition to:

            (1)  the **Aggregate Limit of Insurance**; and

            (2)  the amount stated as the Sub-Limit of Insurance stated for Insuring Agreements I.E.2., Computer Fraud, in ITEM 6. of the Declarations.

2)  Section V. Definitions, 8. **Computer Crimes**, is deleted and replaced with the following:

    8.  **Computer Crimes** means intentional, fraudulent, or unauthorized input, destruction, or modification of electronic data or computer instructions into **Computer Systems** by any entity which is not an **Insured Organization** or person who is not an **Insured Person**, provided that such **Computer Crimes** cause:

        a.  **Funds or Securities** to be transferred, paid, or delivered;

        b.  an account of the **Insured Organization**, or of its customer, to be added, deleted, debited, or credited; or

        c.  **Invoice Manipulation**.

3)  Section V. Definitions, 9. **Computer Crimes Loss**, is deleted and replaced with the following:

HSB_000065

Appx. 000067

at
— bay



9. **Computer Crimes Loss** means:

    a.   with respect to **Computer Crimes** which did not cause **Invoice Manipulation**, the **Insured Organization's** loss of **Funds or Securities**; or

    b.   with respect to **Computer Crimes** which cause **Invoice Manipulation**, any **Invoice Costs** incurred by the **Insured Organization**.

4)   The following are added to section V. Definitions:

    a)   **Invoice Manipulation** means the release or distribution of any fraudulent invoice or payment instruction to a third party which results in an **Uncollectable Invoice**.

    b)   **Uncollectable Invoice** means the **Insured Organization's** inability to collect payment of **Funds or Securities** from a third party, for goods, products or services that it has transferred or provided to such third party, as a result of the intentional, fraudulent, or unauthorized input, destruction, or modification of electronic data or computer instructions into **Computer Systems** by any entity which is not an **Insured Organization** or person who is not an **Insured Person**.

    c)   **Invoice Costs** means the direct net cost incurred by the **Insured Organization** to provide or transfer goods, products or services to a third party.

       **Invoice Costs** shall not include any profit the **Insured Organization** expected to realize, as a result of transferring or providing such goods, products or services to such third party, had there been no **Computer Crimes** causing **Invoice Manipulation**.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

HSB_000066

Appx. 000068



HSB

A Munich Re company

This endorsement is attached to, forms part of, and modifies:

**Policy** number:      6613789-01
**Named Insured**:      Cici Enterprises, LP

# Funds Transfer Fraud Coverage

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1) Section I. Insuring Agreements, E. Financial Fraud, 1. Social Engineering, is deleted and replaced with the following:

   1. Social Engineering

      We shall pay the **Insured Organization** for **Fraudulent Inducement Loss** and **Reward Expense Loss** incurred by the **Insured Organization** as a direct result of:

      a. **Fraudulent Inducement Instructions** it receives and accepts, and which are first discovered, during the **Policy Period**; or

      b. **Fraudulent Inducement Instructions** a **Financial Institution** receives and accepts, and which are first discovered, during the **Policy Period**.

2) The following is added to section V. Definitions, 25. **Fraudulent Inducement Instructions**:

   Solely with respect to Insuring Agreement I.E.1., Social Engineering, part b., **Fraudulent Inducement Instructions** means a fraudulent electronic, telegraphic, cable, teletype, facsimile, telephone, or written instruction issued to a **Financial Institution**, without any **Insured's** knowledge, participation, or consent, which:

   a) directs such **Financial Institution** to transfer, pay, or deliver **Funds or Securities** from a **Bank Account**;

   b) directly causes **Funds or Securities** to be transferred, paid, or delivered from a **Bank Account**;

   c) is purportedly issued to such **Financial Institution** by an **Insured**; and

   d) is issued to such **Financial Institution** by any entity which is not an **Insured Organization** or by any person who is not an **Insured Person**.

   **Fraudulent Inducement Instructions** covered under Insuring Agreement I.E.1., Social Engineering, part b., does not mean or include **Computer Fraud** otherwise covered under Insuring Agreement I.E.2., Computer Fraud.

3) The following is added to section V. Definitions, 37. **Loss**:

   Solely with respect to Insuring Agreement I.E.1., Social Engineering, part b., **Loss** shall not include any:

at
— bay



a) amounts for which a **Financial Institution** has agreed to indemnify or reimburse the **Insured Organization** following such **Financial Institution's** receipt and acceptance of **Fraudulent Inducement Instructions**;

b) amounts of income lost or not realized by the **Insured Organization** or by any third party whose **Funds or Securities** are under the care, custody, or control of the **Insured Organization**;-

c) amounts lost as a result of any actual or alleged use of credit, debit, charge, access, convenience, or other cards or the information or data contained within, or on, such cards;

d) amounts lost as a result of the extension of any loan, credit, or similar promise to pay; or

e) amounts incurred by any **Insured** to prove or establish the existence of **Fraudulent Inducement Instructions**.

4) The following is added to section V. Definitions:

**Bank Account** means any account:

a) that is maintained by an **Insured Organization** at a **Financial Institution**; and

b) from which the **Insured Organization** can initiate the transfer, payment, or delivery of **Funds or Securities**.

5) The following is added to section V. Definitions:

**Financial Institution** means any financial or banking institution at which the **Insured Organization** maintains **Funds or Securities** in a **Bank Account**.

**Financial Institution** does not include any organization, entity, or institution which is an **Insured Organization**.

6) The following is added to section VII. Conditions, J. Other Insurance:

Solely with respect to Insuring Agreement I.E.1., Social Engineering:

If any **Insured** or any other party at interest in any **Fraudulent Inducement Loss** covered under this **Policy** has any other crime insurance, including but not limited to any other crime or fidelity bond, indemnity, or similar insurance, which would cover amounts of such loss in whole or in part in the absence of this **Policy**, then this **Policy** shall be null and void to the extent of the amount received or recoverable under such other crime insurance; provided further, however, that this **Policy** shall cover any otherwise covered **Fraudulent Inducement Loss** to the extent the amount of such **Fraudulent Inducement Loss** is in excess of the amount recoverable or received under the other crime insurance.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

HSB_000068

Appx. 000070



HSB.
A Munich Re company

This endorsement is attached to, forms part of, and modifies:

**Policy** number:          6613789-01
**Named Insured**:          Cici Enterprises, LP

# CryptoJacking & Utility Coverage [Full Limits]

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1)   The following is added to section I. Insuring Agreements, B. Network Security, item 2. Event Response and Recovery:

Solely with respect to the coverage provided under this endorsement, Insuring Agreement I.B.2., Event Response and Recovery, also includes the following:

We shall pay the **Insured Organization** for, or pay on behalf of the **Insured Organization**, all **Utility Loss** incurred by the **Insured Organization** as a result of a **Network Security Event** first discovered during the **Policy Period**.

2)   The following is added to section V. Definitions:

**Crypto-Currency** means a digital currency or asset which is electronically stored and transferred, is operated independently of any central bank or other central authority, and requires cryptographic techniques to verify and regulate its transfer and generation.

3)   The following is added to section V. Definitions:

**CryptoJacking** means the gaining of access to, or use of, an **Insured Computer System** by:

a)   an unauthorized person; or

b)   an authorized person for purposes not authorized by an **Insured Organization**;

to mine for **Crypto-Currency**.

4)   The following is added to section V. Definitions:

**Telephone Fraud** means the gaining of access to, or use of, an **Insured Computer System** by:

a)   an unauthorized person; or

b)   an authorized person for purposes not authorized by an **Insured Organization**;

to fraudulently infiltrate and manipulate telecommunications or telephone system(s) from a remote location.

HSB_000069

Appx. 000071

at
—
bay

HSB.
A Munich re company

5)  The following is added to section V. Definitions:

**Utility Loss** means additional amounts incurred by the **Insured Organization** for its use of, or access to, any of the following utility services or resources:

a)  electricity, natural gas, oil, water, or sewage;

b)  television or internet; or

c)  telecommunication or telephone toll, line, or long distance communication.

Provided further, however, that such **Utility Loss** includes only those additional amounts which:

d)  are charged to the **Insured Organization** by the provider of the respective utility resource or service:

  i)  in a periodic billing statement due for payment during the **Policy Period**;

  ii)  pursuant to a written contract between the **Insured Organization** and such utility resource or service provider that was executed before the **CryptoJacking** or **Telephone Fraud** first occurred; and

  iii)  in excess of any amount(s) which the **Insured Organization** would have incurred had no **CryptoJacking** or **Telephone Fraud** occurred;

e)  are not charged to the **Insured Organization** at a flat fee that does not scale with the rate or use of the respective utility resource or service.

6)  The following is added to section V. Definitions, 37. **Loss**:

Solely with respect to Insuring Agreement I.B.2., Event Response and Recovery:

**Loss** also means **Utility Loss**, but solely to the extent such **Utility Loss** is incurred by the **Insured Organization** as a direct result of **CryptoJacking** or **Telephone Fraud**.

7)  The following is added to section V. Definitions, 42. **Network Security Event**.

Solely with respect to Insuring Agreement I.B.2., Event Response and Recovery:

**Network Security Event** also means any actual or reasonably suspected **CryptoJacking** or **Telephone Fraud**, but solely to the extent such **CryptoJacking** or **Telephone Fraud** results directly in **Utility Loss** incurred by the **Insured Organization**.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

HSB_000070

Appx. 000072





This endorsement is attached to, forms part of, and modifies:

**Policy** number:    6613789-01
**Named Insured**:    Cici Enterprises, LP

# Breach Costs Outside [Additional Limit]

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1) The following is added to the **Policy**:

| | Value |
|---|---|
| **Additional Breach Costs Limit**: | $1,000,000. |

Provided further, however, that if the amount stated in ITEM 6 of the Declarations as the Sub-Limit of Insurance applicable to Insuring Agreement I.A.3. is less than $1,000,000, then the amount of **Additional Breach Costs Limit** provided under this endorsement shall not be $1,000,000 but instead shall be an amount equal to the Sub-Limit of Insurance applicable to Insuring Agreement I.A.3..

2) The following is added to section II. Limits of Insurance:

## C. BREACH COSTS OUTSIDE [ADDITIONAL LIMIT]

The conditions, limitations, and other terms of this section II.C. shall apply solely with respect to coverage provided under Insuring Agreement I.A.3., Event Response and Management.

(1) **Loss** incurred by the **Insured Organization** as a result of an **Information Privacy Event** first discovered during the **Policy Period** under Insuring Agreement I.A.3. shall first apply to, and reduce, the **Additional Breach Costs Limit**.

(2) The **Additional Breach Costs Limit** shall be:

a) one single additional limit of insurance applicable solely to **Loss** incurred under, and pursuant to, Insuring Agreement I.A.3., regardless of the number of **Information Privacy Events** discovered during the **Policy Period**; and

b) in addition to, and not part of, the Sub-Limit of Insurance applicable to Insuring Agreement I.A.3. and the **Aggregate Limit of Insurance**.

(3) Payment of the **Additional Breach Costs Limit** by us shall reduce, and may exhaust, the **Additional Breach Costs Limit**. If the **Additional Breach Costs Limit** is exhausted by our payment of **Loss**, we shall have no further obligations with respect to the **Additional Breach Costs Limit** coverage provided under this endorsement.

HSB_000071

Appx. 000073

at
bay



(4) Upon exhaustion of the **Additional Breach Costs Limit**, any further payment by us of **Loss** incurred by the **Insured Organization** as a result of an **Information Privacy Event** first discovered during the **Policy Period** under Insuring Agreement I.A.3. shall:

    a)   be part of, and not in addition to, the Sub-Limit of Insurance applicable to Insuring Agreement I.A.3. and the **Aggregate Limit of Insurance**; and

    b)   reduce, and may exhaust, the Sub-Limit of Insurance applicable to Insuring Agreement I.A.3. and the **Aggregate Limit of Insurance**.

3)   The following is added to section II. Limits of Insurance, A. Aggregate Limit of Insurance:

This section II.A., Aggregate Limit of Insurance, shall apply subject to section II.C., which is set forth in part 2) of this endorsement.

4)   The following is added to section II. Limits of Insurance, B. Sub-Limits of Insurance:

This section II.B., Sub-Limits of Insurance, shall apply subject to section II.C., which is set forth in part 2) of this endorsement.

5)   The following is added to section V. Definitions:

**Additional Breach Costs Limit** means the amount set forth in part 1) of this endorsement.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

HSB_000072

Appx. 000074

# at bay

**HSB.**
A Munich Re company

This endorsement is attached to, forms part of, and modifies:

**Policy** number:       6613789-01
**Named Insured**:       Cici Enterprises, LP

## OFAC Exclusion Endorsement

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1)   The following is added to section VI. Exclusions, A. Exclusions Applicable to All Insuring Agreements:

alleging, based upon, arising out of, or attributable to the violation of, or the exposure of any **Insured** or us to, any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws, regulations of the United States Treasury Department's Office of Foreign Assets Control ("OFAC").

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

**HSB_000073**

Appx. 000075



**HSB.**
A Munich Re company

This endorsement is attached to, forms part of, and modifies:

**Policy** number:          6613789-01
**Named Insured**:          Cici Enterprises, LP

# Government Action & Licensing Exclusion

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1)  Section VI. Exclusions, B. Exclusions Applicable to Particular Insuring Agreements, item 8. Licensing is deleted in its entirety.

2)  The following is added to section VI. Exclusions, A. Exclusions Applicable to All Insuring Agreements:

    alleging, based upon, arising out of, or attributable to any governmental investigation or enforcement of any federal, state, or local regulation or any action brought by or on behalf of the Federal Trade Commission, the Federal Communications Commission, or any other federal, state, or local government agency, or ASCAP, SESAC, BMI or other licensing or rights entities in such entity's regulatory, quasi-regulatory, or official capacity, function or duty.

    However, this exclusion shall not apply to:

    a.  an otherwise covered **Regulatory Claim** under Insuring Agreement I.A.2. of this **Policy**.


All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

HSB_000074

Appx. 000076

at
bay



This endorsement is attached to, forms part of, and modifies:

**Policy** number:     6613789-01
**Named Insured**:     Cici Enterprises, LP

# Amendment to Pollution and Nuclear, Biological, and Chemical Contamination Exclusions Endorsement

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1) Section V. Definitions, 52. **Pollution**, is deleted and replaced with the following:

52. **Pollution** means any liquid, gaseous, solid or thermal irritant or contaminant, including vapor, smoke, fumes, acids, chemicals, microorganisms, mold, mildew, fungus, spores, bacteria, disease, virus, and materials to be recycled, reconditioned or reclaimed.

2) Section VI. Exclusions, A. Exclusions Applicable to All Insuring Agreements, item 8. Pollution, is deleted and replaced with the following:

8. Pollution

alleging, based upon, arising out of, or attributable to:

a. the presence or actual, alleged or threatened discharge, release, seepage, migration, or disposal of **Pollution**;

b. any request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize **Pollution**, including any voluntary decision to do so; or

c. any request or requirement brought by or on behalf of any governmental authority relating to testing, monitoring, cleaning, removing, containing, treating, neutralizing, or in any way responding to or assessing the effects of **Pollution**.

3) Section VI. Exclusions, A. Exclusions Applicable to All Insuring Agreements: 10. Nuclear, Biological, and Chemical Contamination is deleted and replaced with the following:





10.  Nuclear, Biological, and Chemical Contamination:

alleging, based upon, arising out of, or attributable to any planning, construction, maintenance, or use of any nuclear reactor, nuclear storage, disposal, waste or radiation site, or any other nuclear facility or site, the transportation of nuclear material, or any nuclear reaction or radiation, or radioactive, biological, including, but not limited to, mold, mildew, fungus, spores, disease, virus or microorganism of any type, nature or description, or chemical contamination, regardless of its cause.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

HSB_000076

Appx. 000078

at
—bay

HSB.
A Munich Re company

This endorsement is attached to, forms part of, and modifies:

**Policy** number:          6613789-01
**Named Insured**:          Cici Enterprises, LP

# Biometric Privacy Violation Exclusion

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1)   The following is added to section VI. Exclusions, A. Exclusions Applicable to All Insuring Agreements:

Biometric Privacy Violation

alleging, based upon, arising out of, or attributable to any violation of the Biometric Information Privacy Act (BIPA) or any similar federal, state, common, or foreign law.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

HSB_000077

Appx. 000079

 

This endorsement is attached to, forms part of, and modifies:

**Policy** number:          6613789-01
**Named Insured**:        Cici Enterprises, LP

# Business Interruption Waiting Period Endorsement

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1) The following is added to the **Policy**:

The applicable and respective value of **Business Interruption Waiting Period** is stated in the following table:

| | Value |
|---|---|
| **Business Interruption Waiting Period**: | 10 hours. |

2) The following is added to Section III. Retention:

In addition and subject to all other provisions of Section III. Retention and solely with respect to coverage provided under Insuring Agreements I.C.1. and I.C.2., if a **System Disruption** of **Computer Systems** directly results from a **Network Security Event** or **Information Privacy Event** then:

   a)  for each such **System Disruption**:

      i)  our liability shall apply only after the **Business Interruption Waiting Period** has elapsed; and

      ii)  only to that portion of **Loss** incurred by the **Insured Organization** after such **Business Interruption Waiting Period** has elapsed; and

   b)  if the applicable **System Disruption** is covered under both Insuring Agreements I.C.1. and I.C.2.:

      i)  the sum of the **Business Interruption Waiting Periods** shall not exceed the largest applicable **Business Interruption Waiting Period**.

3) Section V. Definitions, 49. **Period of Restoration**, is deleted and replaced with the following:

49. **Period of Restoration** means the continuous period of time that:

   a.  begins with the expiration of the **Business Interruption Waiting Period**; and

   b.  ends on the date when **Insured Computer Systems** or **External Computer Systems** are, or could have been, repaired or restored with reasonable speed to the same functionality and level of service which existed prior to the **System Disruption**.





A **Period of Restoration** shall not exceed one hundred eighty (180) days from the date the applicable **System Disruption** first occurred; provided, however, that the end of the **Policy Period** shall not cut short the **Period of Restoration**.

4) The following are added to section V. Definitions:

a) **Business Interruption Waiting Period** means the number of hours stated as the value of **Business Interruption Waiting Period** within the table under part 1) of this endorsement.

The **Business Interruption Waiting Period** begins at the date and time the actual **System Disruption** starts, and ends after the number of **Business Interruption Waiting Period** hours have elapsed.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

HSB_000079

Appx. 000081

 

This endorsement is attached to, forms part of, and modifies:

**Policy** number:                6613789-01
**Named Insured**:            Cici Enterprises, LP

# Contingent and Direct System Failure (for use with Business Interruption Waiting Period Endorsement)

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1)  The following is added to the **Policy**:

    The applicable and respective values of **Direct System Failure Limit**, **Contingent System Failure Limit**, and **System Failure Waiting Period** are stated in the following table.

| | Value |
|---|---|
| **Direct System Failure Limit**: | $3,000,000. |
| **Contingent System Failure Limit**: | $3,000,000. |
| **System Failure Waiting Period**: | 10 hours. |

2)  The following is added to section II. Limits of Insurance:

    The following provisions shall apply solely with respect to coverage provided under Insuring Agreements I.C.1. and I.C.2., in addition and subject to the provisions of section II. Limits of Insurance, and notwithstanding anything in the **Policy** to the contrary.

    a)  With respect to coverage provided and applied under Insuring Agreements I.C.1., the **Direct System Failure Limit** is:

        i)  part of and not in addition to the **Aggregate Limit of Insurance** and the applicable Sub-Limit of Insurance stated in ITEM 6 of the Declarations for Insuring Agreements I.C.1..

    b)  With respect to coverage provided and applied under Insuring Agreements I.C.2., the **Contingent System Failure Limit** is:

        i)  part of and not in addition to the **Aggregate Limit of Insurance** and the applicable Sub-Limit of Insurance stated in ITEM 6 of the Declarations for Insuring Agreements I.C.2..

**HSB_000080**

Appx. 000082

**at bay**

HSB.
A Munich Re company

3)   The following is added to the section III. Retention:

In addition and subject to all other provisions of Section III. Retention and solely with respect to coverage provided under Insuring Agreements I.C.1. and I.C.2., if a **System Disruption** of **Computer Systems** directly results from a **System Failure** then:

a)   for each such **System Disruption**:

i)    our liability shall apply only after the **System Failure Waiting Period** has elapsed; and

ii)   only to that portion of **Loss** incurred by the **Insured Organization** after such **System Failure Waiting Period** has elapsed; and

b)   if the applicable **System Disruption** is covered under both Insuring Agreements I.C.1. and I.C.2.:

i)    the sum of the **System Failure Waiting Periods** shall not exceed the largest applicable **System Failure Waiting Period**; and

c)   if such **System Disruption** is also the direct result of a **Network Security Event** or **Information Privacy Event**:

i)    the **System Failure Waiting Period** shall apply only to that portion of the **System Disruption** which is a direct result of a **System Failure**.

4)   Section V. Definitions, 49. **Period of Restoration**, is deleted and replaced with the following:

49. **Period of Restoration** means the continuous period of time that:

a.   begins:

i.    with respect to a **System Disruption** that is directly caused by a **Network Security Event** or **Information Privacy Event**, with the expiration of the **Business Interruption Waiting Period**; or

ii.   with respect to a **System Disruption** that is directly caused by a **System Failure**, with the expiration of the **System Failure Waiting Period**; and

b.   ends on the date when **Insured Computer Systems** or **External Computer Systems** are, or could have been, repaired or restored with reasonable speed to the same functionality and level of service which existed prior to the **System Disruption**.

A **Period of Restoration** shall not exceed one hundred eighty (180) days from the date the applicable **System Disruption** first occurred; provided, however, that the end of the **Policy Period** shall not cut short the **Period of Restoration**.

5)   Section V. Definitions, 65. **System Disruption**, is deleted and replaced with the following:

65. **System Disruption** means the measurable interruption, suspension, degradation, or failure in the service of:

a.   with respect to Insuring Agreement I.C.1., **Insured Computer Systems**; and

b.   with respect to Insuring Agreement I.C.2., **External Computer Systems**;

**at bay**

HSB.
A Munich Re company

directly caused by a **Network Security Event**, **Information Privacy Event**, or **System Failure**.

6)    The following are added to section V. Definitions:

a)   **Contingent System Failure Limit** means, solely with respect to coverage provided under Insuring Agreements I.C.2., the amount stated as the value of **Contingent System Failure Limit** within the table under part 1) of this endorsement.

The **Contingent System Failure Limit** is the most we shall pay, and represents our maximum liability, for all **Contingent Business Interruption Loss**, **Extra Expense**, **Public Relations Loss**, and **Reward Expense Loss**, combined, resulting from a **System Disruption** of **External Computer Systems** directly caused by a **System Failure**.

b)   **Direct System Failure Limit** means, solely with respect to coverage provided under Insuring Agreements I.C.1., the amount stated as the value of **Direct System Failure Limit** within the table under part 1) of this endorsement.

The **Direct System Failure Limit** is the most we shall pay, and represents our maximum liability, for all **Business Interruption Loss**, **Extra Expense**, **Public Relations Loss**, and **Reward Expense Loss**, combined, resulting from a **System Disruption** of **Insured Computer Systems** directly caused by a **System Failure**.

c)   **Human Error or Omission** means an operating error or omission by:

    i)    an **Employee**; or

    ii)   an entity which is not an **Insured Organization**, or a person who is not an **Insured Person**, in their provision, fulfillment or delivery of services to an **Insured Organization**.

**Human Error or Omission** includes, but is not limited to, errors or omissions in the selection, utilization, choice, or incorrect or inappropriate intervention of computer programs, software and parameters.

d)   **Infrastructure Power Failure** means a failure, surge or capacity reduction of an electrical system, network or infrastructure under the direct operational control of the **Insured Organization**.

e)   **Programming Error** means an error that occurs during the programming, development or encoding of any computer software, program, application, firmware, or operating system that results in an interruption of the **Insured Organization's** operations or the malfunction or inoperability of **Computer Systems**.

f)   **System Failure** means any unplanned and measurable interruption, suspension, degradation, or failure in the service of **Computer Systems** which is not directly caused by a **Network Security Event** or **Information Privacy Event**.

**System Failure** includes, but is not limited to, an unplanned:

    i)    **Human Error or Omission**;

    ii)   **Programming Error**; or

    iii)   **Infrastructure Power Failure**.

HSB_000082

Appx. 000084

**at**
**bay**

HSB.
A Munich Re company

g)  **System Failure Waiting Period** means the number of hours stated as the value of **System Failure Waiting Period** within the table under part 1) of this endorsement.

The **System Failure Waiting Period** begins at the date and time the actual **System Disruption** starts, and ends after the number of **System Failure Waiting Period** hours have elapsed.

7)  The following is added to section VI. Exclusions, B.:

Exclusively with respect to Insuring Agreement I.C.1., this **Policy** shall not apply to any **Loss** resulting from a **System Disruption** directly caused by a **System Failure**:

a)  if such **System Failure** is attributable to a **Programming Error** made to **Insured Computer Systems**.

However, this exclusion shall not apply if:

b)  the **Insured Organization** can provide us evidence that the applicable **Programming Error** arises from a computer software, program, application, firmware, or operating system (including previous versions thereof) that is, or previously was, fully developed and successfully tested in its operational environment for twenty five (25) or more days.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

HSB_000083

Appx. 000085



HSB
A Munich Re company

This endorsement is attached to, forms part of, and modifies:

**Policy** number:       6613789-01
**Named Insured**:       Cici Enterprises, LP

# Ransomware Event Sub-Limit Endorsement

Insurance coverage underwritten by HSB Specialty Insurance Company | One State Street | Hartford, CT 06102-5024

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1) The following is added to section II. Limits of Insurance:

   Solely with respect to the coverage afforded under this endorsement, our maximum liability, and the most we shall pay for all **Loss**, **Damages**, and **Claims Expenses** incurred by the **Insured Organization** resulting from any single **Ransomware Event** shall be:

   a)  250000.

   Furthermore, the amount set forth directly above, in item 1)a) of this endorsement, will in no way serve to increase our liability under this **Policy** and shall be part of, and not in addition to, the **Aggregate Limit of Insurance**.

2) The following is added to section V. Definitions:

   **Ransomware Event** means the **Insured Organization's** receipt of a credible threat or series of related threats first discovered during the **Policy Period**, and such threats are made by a third party through the use of any malicious software or computer code, which threatens to take any of the following actions unless an **Insured** pays such third party the funds demanded, or meet some other non-monetary demand, in exchange for the mitigation or removal of such threat:

   a)  cause an **Information Privacy Event** or **Network Security Event**;

   b)  alter, corrupt, damage, manipulate, misappropriate, encrypt, delete, or destroy any **Computer System**, **Corporate Data**, or **Protected Personal Information**;

   c)  restrict or inhibit access to a **Computer System**; or

   d)  any action connected to the continuation or furthering of any already commenced action referenced in paragraphs 2)a)-c) above.

   **Ransomware Event** includes any related **Information Privacy Event**, **Information Privacy Wrongful Act**, **Network Security Event**, **Network Security Wrongful Act**, or **System Disruption** resulting from such threat or series of threats described above. However, **Ransomware Event** shall not include and this endorsement shall not apply to any **Ransomware Event** that originates solely from a malicious attack against a third party owner or operator of **External Computer Systems**.

HSB_000084

Appx. 000086

at
— bay



3)  Section V. Definitions. 15. **Cyber Event**, is deleted and replaced with the following:

**Cyber Event** means an **Information Privacy Event**, **Network Security Event**, **Extortion Threat**, **Fraudulent Inducement Instructions**, **Computer Crimes**, **System Disruption**, **Ransomware Event**, and, with respect to Insuring Agreement I.F.2. only, a **Media Wrongful Act**.

All other terms, conditions, and exclusions of the **Policy** shall remain unchanged.

HSB_000085

Appx. 000087