# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **CICI ENTERPRISES, LP,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Civil Action No. 3:23-CV-2155-L** |
| | § | |
| **HSB SPECIALTY INSURANCE** | § | |
| **COMPANY,** | § | |
| | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are Defendant HSB Specialty Insurance Company ("HSB")'s Motion for Summary Judgment (Doc. 38), filed May 16, 2025; and Plaintiff CiCi Enterprises, LP ("CiCi")'s Motion for Partial Summary Judgment (Doc. 52), filed July 21, 2025.[1] After careful consideration of the motions, responses, replies, appendixes, record, and applicable law, the court **denies** HSB's Motion for Summary Judgment and **grants** CiCi's Motion for Partial Summary Judgment.

## I.    Procedural and Factual Background

This is an insurance dispute regarding whether CiCi's covered loss under a cyber insurance policy issued by HSB is subject to a sub-limit endorsement, which caps HSB's maximum liability at $250,000.[2] An understanding of the malware attack giving rise to CiCi's claim for coverage,

---

[1] Although Plaintiff CiCi Enterprises, LP titles its motion as a "Motion for Summary Judgment," it is a motion for *partial* summary judgment, as Plaintiff is only moving for summary judgment on its request for declaratory relief, but not on its remaining claims. Accordingly, the court will refer to the motion as CiCi's "Motion for Partial Summary Judgment." HSB, on the other hand, is moving for summary judgment as to all of CiCi's claims.

[2] The court draws its factual account from the summary judgment evidence and briefing, and it sets forth the facts in accordance with the standard in Section II of this opinion. The facts are undisputed except as otherwise noted.

HSB's coverage decision, and the relevant provisions of the cyber insurance policy are required to resolve the pending Motions.

### A. The Malware Attack, the Losses, and the Claim

On May 21, 2022, CiCi suffered a malware attack during which a threat actor encrypted CiCi's computer systems and threatened to publish exfiltrated data if its ransom demand was not paid. Doc. 40-4, Def.'s App. 96.[3] At the time, CiCi was insured under Cyber Insurance Policy No. 6613789-01 (the "Policy"), issued by HSB with effective dates of October 16, 2021, through October 16, 2022. Doc. 40-2, Def.'s App. 3-87.

Following the malware attack, Cici sent an e-mail to At-Bay Insurance Services, LLC ("At-Bay")—HSB's agent for receiving notice of claims—that advised, "We just had a major cyberattack and all our IT systems are offline. Appears to be a Ransomware attack." Doc. 40-5, Def.'s App. 98. With At-Bay's approval, CiCi engaged a law firm and Arete Advisors to provide incident response services (including a breach investigation), and to initiate negotiations with the threat actor, whom Arete Advisors later identified as LV. Doc. 40-8, Def.'s App. 103. Although the initial demand to release the encrypted files was $2,000,000, Arete Advisors reached an agreement with LV for a $400,000 payment. Doc. 40-8, Def.'s App. 103.

On June 10, 2022, HSB issued a coverage letter in which it acknowledged that "this matter triggers the initial scope of coverage under the Policy as outlined below." Doc. 40-8, Def.'s App. 102. HSB states that the Policy "provides an initial $3,000,000.00 annual aggregate for Information privacy, Network Security, Business Interruption, Cyber Extortion, Financial Fraud, Media Content, and Reputational Harm subject to a $50,000.00 retention." Doc. 40-8, Def.'s App.

---

[3] Citations to the record and briefs refer to the page numbers at the bottom of the appendices and briefs, rather than the CM/ECF page number at the top of each page. "Def.'s App." refers to the "Appendix in Support of Defendant HSB Specialty Insurance Company's Motion for Summary Judgment."

103. The coverage letter goes on to state that CiCi's claim triggered coverage under four separate "Insuring Agreements: A. Information Privacy, B. Network Security, C. Business Interruption, and D. Cyber Extortion." Doc. 40-8, Def.'s App. 103. With respect to Insuring Agreement D. Cyber Extortion, the coverage letter states: "This event also constitutes an **Extortion Threat** under Insuring Agreement D. Cyber Extortion. Accordingly, coverage is available for the **Extortion Loss** incurred by CiCi as a direct result of the **Extortion Threat** first discovered during the **Policy Period**." Doc. 40-8, Def.'s App. 104.

> HSB's cover letter, however, also stated:
>
> Here, based on the facts currently known, the **Cyber Event** suffered by CiCi specifically constitutes a **Ransomware Event**, as defined by the Policy's Ransomware Event Sub-Limit Endorsement, which includes any related **Information Privacy Event**, a related **Network Security Event**, and a related **System Disruption**. Pursuant to the Ransomware Event Sub-Limit Endorsement, our maximum liability, and the most we [s]hall pay for any **Loss**, **Damages**, and **Claims Expenses** incurred by the **Insured Organization** resulting from a single **Ransomware Event** shall be $250,000.00.

Doc. 40-8, Def.'s App. 105-06.

**B. The Relevant Policy Language**

Because the resolution of the instant dispute turns almost exclusively on the Policy's language, the court summarizes the Policy provisions in play. Like the parties, the court uses bold type for terms defined in the Policy.

The Declarations Page of the Policy includes an "Aggregate Limit of Insurance" in the amount of $3,000,000 (subject to a $50,000 retention) and, in Item 6, lists seven Insuring Agreements and the Sub-Limits of Insurance. Doc. 40-2, Def.'s App. 6-8. The seven Insuring Agreements are Information Privacy Liability; Network Security; Business Interruption; Cyber Extortion; Financial Fraud; Media Content; and Reputational Harm. Doc. 40-2, Def.'s App. 7-8. Per the Declarations Page, each Insuring Agreement has a sub-limit of insurance in the amount of

$3,000,000, with the exception of certain categories of Financial Fraud with a sub-limit of $250,000. Doc. 40-2, Def.'s App. 6-7.

Section I of the Policy, titled "Insuring Agreements," lists seven Insuring Agreements based on the type of loss experienced and the type of damages claimed, and provides, in pertinent part, that:

> Coverage is afforded pursuant to those Insuring Agreements included under this **Policy**, displayed as "Included" in ITEM 6 of the Declarations, and for **Claims** and **Cyber Events** reported to us pursuant to the terms of this **Policy**:

> A. INFORMATION PRIVACY

>> 1. Information Privacy Liability

>> We shall pay on behalf of the **Insured**, all **Claim Expenses** and **Damages** resulting from a **Claim** first made against any **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for an **Information Privacy Wrongful Act**.

>> . . . .

>> 3. Event Response and Management

>> We shall pay the **Insured Organization** for **Technical Response Loss**, **Legal Services Loss**, **Public Relations Loss**, **Notification Loss**, **Reward Expense Loss**, and **Credit Monitoring Loss** incurred by the **Insured Organization** as a result of an **Information Privacy Event** first discovered during the **Policy Period**.

>> . . . .

> B. NETWORK SECURITY

>> 1. Network Security Liability

>> We shall pay on behalf of the **Insured**, all **Claim Expenses** and **Damages** resulting from a **Claim** first made against any **Insured** during the **Policy Period** or, if exercised, the Extended Reporting Period, for a **Network Security Wrongful Act**.

>> 2. Event Response and Recovery

>> We shall pay the **Insured Organization** for **Technical Response Loss**, **Legal Services Loss**, **Public Relations Loss**, **Notification Loss**, **Reward Expense Loss**,

and **Credit Monitoring Loss** incurred by the **Insured Organization** as a result of a **Network Security Event** first discovered during the **Policy Period**.

. . . .

D. CYBER EXTORTION

1.  Cyber Extortion

We shall pay the **Insured Organization** for **Extortion Loss**, **Reward Expense Loss**, and **Public Relations Loss** incurred by the **Insured Organization** as a direct result of an **Extortion Threat** first discovered during the **Policy Period**.

Doc. 40-2, Def.'s App. 13-14.

Section II.A of the Policy, titled "Limits of Insurance" provides that the "**Aggregate Limit of Insurance** is our maximum liability under this **Policy** for the duration of the **Policy Period** or, if exercised, the Extended Reporting Period." Doc. 40-2, Def.'s App. 15. Section II.B of the Policy sets out the sub-limits of insurance, as follows:

B. SUB-LIMITS OF INSURANCE

1. The amounts stated as Sub-Limits of Insurance in ITEM 6 of the Declarations, which are part of and not in addition to the **Aggregate Limit of Insurance**, are the most we shall pay for all **Loss**, **Damages**, and **Claims Expenses** with respect to the Insuring Agreement to which each Sub-Limit of Insurance applies, and we shall not be responsible to pay any **Loss**, **Damages**, or **Claims Expenses** under such Insuring Agreement upon exhaustion of such Sub-Limit of Insurance.

Doc. 40-2, Def.'s App. 15.

Section V of the Policy, titled "Definitions," includes the following definitions, among others:

. . . .

15. **Cyber Event** means an **Information Privacy Event**, **Network Security Event**, **Extortion Threat**, **Fraudulent Inducement Instructions**, **Computer Crimes**, **System Disruption**, and, with respect to Insuring Agreement I.F.2. only, a **Media Wrongful Act**.

. . . .

21. **Extortion Loss** means reasonable and necessary costs and expenses incurred or paid by an **Insured Organization** to:

    a. make payment of any funds, digital currencies ("crypto-currencies"), marketable goods, services, or other assets to the person or group which is believed to be responsible for, and to have made, such **Extortion Threat**;

    b. reduce or mitigate the severity of **Extortion Loss** described in paragraph V.21.a. above; and

    c. retain the services of a **Cyber Response Firm** to provide consultative and professional services related to **Extortion Loss** described in paragraphs V.21.a. and V.21.b. above.

22. **Extortion Threat** means any credible threat or series of related threats made to an **Insured** by a third party person or group, or by a rogue **Employee** who is not a member of the **Control Group** and who is acting in a manner not authorized by the **Insured Organization**, which threatens to take any of the following actions unless an **Insured** pays such group or person the funds demanded, or meet some other non-monetary demand, in exchange for the mitigation or removal of such threat:

    a. cause an **Information Privacy Event** or **Network Security Event**;

    b. alter, corrupt, damage, manipulate, misappropriate, encrypt, delete, or destroy any **Computer System**, **Corporate Data**, or **Protected Personal Information**;

    c. restrict or inhibit access to a **Computer System**; or

    d. any action connected to the continuation or furthering of any already commenced action referenced in paragraphs V.22.a.-V.22.c. above.

Doc. 40-2, Def.'s App. 20-23.

The Policy also contains certain applicable endorsements, which change or modify the terms and conditions of the policy. For example, the Policy contains the Am Wins Amendatory Endorsement, which provides in relevant part:

    . . . .

    4) Section I. Insuring Agreements, D. Cyber Extortion, item 1. Cyber Extortion, is deleted and replaced with the following:

        1.  Cyber Extortion

We shall pay the **Insured Organization** for, or pay on behalf of the **Insured Organization**, all **Extortion Loss**, **Reward Expense Loss**, and **Public Relations Loss** incurred by the **Insured Organization** as a direct result of an **Extortion Threat** first discovered during the **Policy Period**.

. . . .

Doc. 40-2, Def.'s App. 55-56.

Finally, the Policy contains a Ransomware Event Sub-Limit Endorsement ("Ransomware Sub-Limit Endorsement" or "Endorsement"), which provides as follows:

Ransomware Event Sub-Limit Endorsement

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1) The following is added to section II. Limits of Insurance:

Solely with respect to the coverage afforded under this endorsement, our maximum liability, and the most we shall pay for all **Loss**, **Damages**, and **Claims Expenses** incurred by the **Insured Organization** resulting from any single **Ransomware Event** shall be:

a) 250000.

Furthermore, the amount set forth directly above, in item 1)a) of this endorsement, will in no way serve to increase our liability under this **Policy** and shall be part of, and not in addition to, the **Aggregate Limit of Insurance**.

2) The following is added to section V. Definitions:

**Ransomware Event** means the **Insured Organization's** receipt of a credible threat or series of related threats first discovered during the **Policy Period**, and such threats are made by a third party through the use of any malicious software or computer code, which threatens to take any of the following actions unless an **Insured** pays such third party the funds demanded, or meet some other non-monetary demand, in exchange for the mitigation or removal of such threat:

a)  cause an **Information Privacy Event** or **Network Security Event**;

b) alter, corrupt, damage, manipulate, misappropriate, encrypt, delete, or destroy any **Computer System**, **Corporate Data**, or **Protected Personal Information**;

c) restrict or inhibit access to a **Computer System**; or

d) any action connected to the continuation or furthering of any already commenced action referenced in paragraphs 2)a)-c) above.

**Ransomware Event** includes any related **Information Privacy Event**, **Information Privacy Wrongful Act**, **Network Security Event**, **Network Security Wrongful Act**, or **System Disruption** resulting from such threat or series of threats described above. However, **Ransomware Event** shall not include and this endorsement shall not apply to any **Ransomware Event** that originates solely from a malicious attack against a third party owner or operator of **External Computer Systems**.

3) Section V. Definitions. 15. **Cyber Event**, is deleted and replaced with the following:

**Cyber Event** means an **Information Privacy Event**, **Network Security Event**, **Extortion Threat**, **Fraudulent Inducement Instructions**, **Computer Crimes**, **System Disruption**, **Ransomware Event**, and, with respect to Insuring Agreement I.F.2. only, a **Media Wrongful Act**.

All other terms, conditions, and exclusions to the **Policy** shall remain unchanged.

Doc. 40-2, Def.'s App. 86-87.

### C. The Instant Litigation

Following HSB's coverage determination, CiCi filed this action. *See generally* Doc. 1, Orig. Compl. In the Second Amended Complaint, the live pleading, CiCi alleges that it incurred over $1,200,000 in losses as a result of the cyber event. Doc. 29, Sec. Am. Compl. ¶ 5.1. CiCi asserts the following claims against HSB: (1) a declaratory judgment claim, asking the court (a) to declare that the Ransomware Sub-Limit Endorsement does not modify coverage for "Cyber Extortion" or "Extortion Threat" and does not apply to CiCi's claims by the plain terms of the endorsement or, alternatively, (b) to declare that the Ransomware Sub-Limit Endorsement is ambiguous and should be construed in favor of coverage and in the light most favorable to CiCi; and (c) to declare that the $3,000,000 policy limits are available to cover its losses under either alternative;[4] (2) a breach-of-contract claim; (3) a claim for violations of various provisions of the

---

[4] The federal Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the

Texas Prompt Payment of Claims Act (TPPCA), Tex. Ins. Code § 542.001, *et seq.*; and (4) a claim for violations of various provisions of the Texas Unfair Competition and Unfair Practices Act, Tex. Ins. Code § 541.001, *et seq.* Doc. 29, Sec. Am. Compl. ¶¶ 8.1–8.8; 9.1–9.2; 10.1–10.6; 11.1–11.5.

In its Answer, HSB asserts that CiCi's claims are barred because it promptly, thoroughly, and fairly investigated, evaluated, and adjusted CiCi's claim in strict accordance with the Policy and applicable law. *See generally* Doc. 32, Def.'s Am. Ans. and Affirmative Defenses.

On May 16, 2026, HSB filed its Motion for Summary Judgment, seeking summary judgment as to all of CiCi's claims against it. *See* Doc. 38, Def.'s Mot. 1-2. On July 21, 2025, CiCi filed a Motion for Partial Summary Judgment, seeking summary judgment as to its declaratory judgment claim only. *See* Doc. 52, Pl.'s Mot. 1-2. CiCi's Motion, although not denominated as such, is, in effect, a cross-motion for partial summary judgment as to its declaratory judgment claim. The Motions have been fully briefed and are ripe for review.

## II.    Legal Standards

### A. Summary Judgment

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.

---

rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Fifth Circuit has held that, under *Erie* principles, the Texas Declaratory Judgment Act is procedural and thus not applicable in federal court. *See Utica Lloyd's of Tex. v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998); *Camacho v. Texas Workforce Comm'n*, 445 F.3d 407, 413 (5th Cir. 2006). Cici's claims are necessarily brought under the federal Declaratory Judgment Act.

**Memorandum Opinion and Order - Page 9**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). Mere conclusory allegations are not competent summary judgment evidence and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*,

136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

### B.  Interpretation of Insurance Policies under Texas Law

As CiCi has invoked the court's diversity jurisdiction, Texas law governs. *See Kinsale Ins. Co. v. Flyin' Diesel Performance & Offroad, L.L.C.*, 99 F.4th 821, 826 (5th Cir. 2024) ("Kinsale's declaratory action arises under our diversity jurisdiction, *see* 28 U.S.C. § 1332(a)(1), and Texas law provides the applicable rule of decision, *see* 28 U.S.C. § 1652."); *Empire Fire and Marine Ins. Co. v. Brantley Trucking, Inc.*, 220 F.3d 679, 680-81 (5th Cir. 2000) ("Before us is an appeal from a declaratory judgment action in which federal jurisdiction was based on the parties' diversity of citizenship, thus per *Erie*, Texas law applies.").

"Under Texas law, '[i]nsurance policies are controlled by rules of interpretation and construction which are applicable to contracts generally.'" *Kinsale Ins.*, 99 F.4th at 826 (quoting *National Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam) (original brackets)). "The goal of contract construction is to ascertain the parties' intent as expressed in the language of the agreement." *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 218 (Tex. 2022) (citation omitted). To that end, the court must "first determine

whether it is possible to enforce the contract as written, without resort to parole evidence." *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023) (internal quotation marks and citation omitted). "Thus, the 'analysis begins with the contract's express language.'" *Kinsale Ins.*, 99 F.4th at 826 (quoting *Burlington Res. Oil & Gas Co. v. Texas Crude Energy, LLC*, 573 S.W.3d 198, 203 (Tex. 2019) (citation omitted)).

"Two interpretative principles, routinely applied by Texas state courts, guide [the court's] analysis of a contract's express language[.]" *Id.* First, a contract's terms must be given "their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Burlington Res. Oil & Gas*, 573 S.W.3d at 203 (internal quotation marks and citation omitted). Second, the court must "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* (internal quotation marks and citation omitted).

If its express language "lends itself to a clear and definite legal meaning, the contract is not ambiguous and will be construed as a matter of law." *Mosaic*, 674 S.W.3d at 257 (internal quotation marks and citation omitted). "If, however, the language of a policy or contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, it is ambiguous." *Id.* (internal quotation marks and citation omitted).[5]

"Texas courts construe the meaning of an ambiguous insurance contract in favor of the insured." *Kinsale Ins.*, 99 F.4th at 827 (citing *National Union Fire Ins. Co. of Pittsburgh v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)). "In particular, exceptions or limitations on liability

---

[5] As recently noted by the Fifth Circuit, "'Concluding that a legal instrument is insolubly ambiguous must always come *after* a court has exhausted all the traditional tools of interpretation and still cannot reach a definitive conclusion about the meaning conveyed by the text.'" *Kinsale Ins. Co. v. Flyin' Diesel Performance & Offroad, L.L.C.*, 99 F.4th 821, 827 n.7 (5th Cir. 2024) (quoting *U.S. Polyco, Inc. v. Texas Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 389 n.1 (Tex. 2023) (original emphasis in *U.S. Polyco*)).

are strictly construed against the insurer and in favor of the insured." *Id.* (quoting *Hudson Energy*, 811 S.W.2d at 555 (citations omitted)). Thus, the court "must adopt the construction . . . urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Evanston Ins. Co. v. ATOFINA Petrochems., Inc.*, 256 S.W.3d 660, 668 (Tex. 2008) (citation omitted).

Under Texas law, in a suit to recover under a contract of insurance, the insured bears the initial burden of showing that there is coverage, while the insurer has the burden of proof as to any avoidance or affirmative defense. *See Guaranty Nat. Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998). The insured "bears the burden of proving that an exclusion or limitation applies." *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 114 (5th Cir. 2010) (citation omitted). "Where, as here, parties have filed cross-motions for summary judgment, each motion must be considered separately because each movant bears the burden of showing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law." *Playa Vista Conroe v. Insurance Co. of the W.*, 989 F.3d 411, 414 (5th Cir. 2021) (quotation marks and citation omitted).

## III. Defendant's Motion for Summary Judgment

HSB moves for summary judgment on all CiCi's claims. With respect to Cici's declaratory judgment and breach of contract claims, HSB contends it is entitled to summary judgment because (1) the Policy "unambiguously applies a $250,000 sub-limit to 'Loss, Damages, and Claims Expenses' arising out of a Ransomware Event," and (2) HSB "already paid CiCi $250,000 pursuant to the applicable sub[-]limit," and "has fulfill[ed] its contractual obligations to CiCi." Doc. 38, Def.'s Mot. 2. As to CiCi's claims alleging violations of the Texas Insurance Code, HSB argues it is entitled to summary judgment because the parties' disagreement over the application

of the Ransomware Sub-Limit Endorsement "represents a *bona fide* dispute, which does not rise to the level of actionable bad faith under Texas common law or the Texas Insurance Code. Doc. 38, Def.'s Mot. 2.

### A.  Effect of Insurance Code Provisions Governing Surplus Lines Insurance

As a threshold matter, prior to considering HSB's summary judgment motion, the court must address an argument raised by CiCi in its response to HSB's Motion. Specifically, CiCi contends that HSB failed to comply with certain Texas insurance regulations governing surplus lines insurance and, therefore, as an "unauthorized insurer," is required to post a bond before the court considers HSB's Motion or any other pleading it files. *See* Doc. 41, Pl.'s Resp. Br. 11-14.

Analysis of CiCi's argument requires a brief discussion of the nature of surplus lines insurance. "Chapter 981 of the Texas Insurance Code governs surplus lines insurance." *Atlantic Cas. Ins. Co. v. Primelending, A Plainscaptial Co.*, 2016 WL 1322235, at *4 (N.D. Tex. Apr. 5, 2016) (citing Tex. Ins. Code § 981.001). "Surplus lines insurance allows a person who seeks to insure a Texas risk but is unable to obtain that insurance from a Texas-licensed insurer to seek the insurance from an insurer who is not licensed in Texas but is an eligible surplus lines insurer." *444 Utopia Lane, LLC v. Peleus Ins. Co.*, 2021 WL 8442023, at *4 n.2 (W.D. Tex. Sept. 9, 2021) (citation omitted). "Because surplus lines insurance is a matter of public interest and a subject of concern, Chapter 981 sets forth standards and safeguards to regulate this area of the market." *Id.* at *4 (cleaned up) (citation omitted). The Texas Supreme Court has noted that "the State's effort to protect the public interest in this area is almost entirely dependent on monitoring licensed surplus lines agents." *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 88 (Tex. 2006). Relevant to the current dispute is section 981.004(a) of the Texas Insurance Code, which provides, in pertinent part, that an "eligible surplus lines insurer may provide surplus lines insurance only if:

(1) the full amount of required insurance cannot be obtained, after diligent effort, from an insurer authorized to write and actually writing that kind and class of insurance in" Texas. Tex. Ins. Code § 981.004(a).

CiCi asserts that HSB failed to comply with section 981.004(a) of the Texas Insurance Code and, therefore, was an unauthorized insurer, required to post a bond before filing any pleading pursuant to Texas Insurance Code § 101.353(a). *See* Doc. 42, Pl.'s Resp. Br. 11-13. Section 101.353(a) provides that before an unauthorized insurer may file a pleading in a court proceeding, the "insurer must deposit cash or securities or file a bond with good and sufficient sureties approved by the court in an amount determined by the court as sufficient to pay any final judgment that may be rendered in the proceeding." Tex. Ins. Code § 101.353(a). CiCi requests the court "deny HSB's Motion for Summary Judgment and require it to file a bond in accordance with § 101.353(a) before considering any further pleading by HSB." Doc. 41, Pl.'s Resp. Br. 14.

In reply, HSB contends that it is an "eligible surplus lines insurer" under the Texas Insurance Code and, therefore, section 101.353(a) is not applicable. *See* Doc. 44, Def.'s Reply 2-4. The court agrees. *See* https://www.sltx.org/insurers/eligible-insurer-list/eligible-insurers/ (last visited on Feb. 20, 2026) (listing HSB as an eligible surplus lines insurer).

 In any event, "[t]he insurance code provides that violations of chapter 981 do not affect the enforceability of insurance policies by the parties unless the violations are 'material and intentional.'" *Chandler Mgmt. Corp. v. First Specialty Ins. Corp., Vericlaim, Inc.*, 452 S.W.3d 887, 895 (Tex. App.—Dallas 2014, no pet.) (quoting Tex. Ins. Code § 981.005). CiCi fails to argue or show that HSB engaged in any "material or intentional" violation of section 981.004(a) of the Texas Insurance Code. Further, Chapter 981 provides that violations of the chapter may be punished with sanctions described under Chapter 82. *See* Tex. Ins. Code § 981.006. Chapter 82, in

turn, authorizes the commissioner of insurance "to impose an administrative penalty, direct the insurer to make restitution to a harmed Texas resident, or cancel or suspend an insurer's authorization to issue insurance in Texas. And nothing in the language of Chapter 981 reflects any intent to create a private right of action." *Atlantic Cas. Ins.*, 2016 WL 1322235, at *4 (internal citations and quotation marks omitted). Thus, any alleged non-compliance with Chapter 981 does not affect HSB's status as an eligible surplus lines insurer, nor does it prohibit HSB from enforcing the policy. *See Chandler Mgmt.*, 452 S.W.3d at 895.

For these reasons, the court rejects CiCi's argument that "HSB is not entitled to file its Motion for Summary Judgment without first posting a bond under Texas Insurance Code § 101.353(a)." Doc. 42, Pl.'s Resp. Br. 2. Alternatively, even if HSB was an unauthorized insurer (which CiCi has not shown) and section 101.353(a) applied (which it does not), the court agrees with HSB that, at this advanced stage in the litigation, CiCi is "precluded, estopped, or has otherwise waived its right to argue that HSB is required to post a bond at the outset of the pleadings, given the stage of litigation [in which] the parties now find themselves." Doc. 44, Def.'s Reply 6. Here, CiCi has litigated this matter for nearly two years, including filing joint motions with HSB (*see* Doc. 36), without raising this argument, and will not be heard to raise it now.

**B.  CiCi's Declaratory Judgment and Breach of Contract Claims**

HSB moves for summary judgment with respect to CiCi's claims for declaratory relief and for breach of contract based on the same arguments. CiCi opposes the Motion. The court first addresses the parties' respective arguments.

*1.  The Parties' Contentions*

HSB's argument is straightforward. Specifically, HSB contends that "[t]he Ransomware Event Sub-Limit Endorsement limits coverage for claims arising from a Ransomware Event to

$250,000. Because the endorsement unambiguously applies to Cici's claim, HSB is entitled to summary judgement on Cici's declaratory judgment and breach-of-contract claims." Doc. 39, Def.'s Summ. J. Br. 8. In further support, HSB states:

> While Cici's claim is covered by the Cyber Insurance Policy, the claim is subject to a $250,000 sublimit for losses arising from a "Ransomware Event" as defined by the Cyber Insurance Policy. The Cyber Insurance Policy clearly defines a "Ransomware Event" as a type or subset of "Extortion Threat." Specifically, if a threat actor is a third-party and utilizes a "malicious software or computer code" to threaten an insured, the threat qualifies as a "Ransomware Event" rather than an "Extortion Threat" or "Cyber Extortion." In this case, because it is undisputed that a third-party threat actor used malicious code to encrypt Cici's software and held it for ransom, HSB properly determined that Cici suffered a "Ransomware Event" and paid the $250,000 sublimit.

Doc. 38, Def.'s Mot. 1.

HSB also maintains that when the definition of Extortion Threat is compared with the definition of Ransomware Event, "it is clear that 'Ransomware Event' is a type (or a subset) of 'Extortion Threat'." Doc. 39, Def.'s Summ. J. Br. 10. HSB posits there are "two key differences between the two definitions." Doc. 39, Def.'s Summ. J. Br. 10. First, whereas, "a Ransomware Event requires that a third party use 'malicious software or computer code' to make a threat against the insured[,] . . . an Extortion Threat can be any threat (it need not involve malicious software or computer code)." Doc. 39, Def.'s Summ. J. Br. 10-11. Second, "an 'Extortion threat' can be made by a third-party or rogue employee; whereas, a 'Ransomware Event' can only be caused by a third-party." Doc. 39, Def.'s Summ. J. Br. 11. HSB further argues that allowing Cici to avoid the Ransomware Event Sub-Limit by characterizing its claim as a "Cyber Extortion" claim or as being the result of an "Extortion Threat" would "write the Ransomware Event Sub-Limit Endorsement completely out of the Policy." Doc. 39, Def.'s Summ. J. Br. 11.

In response, CiCi argues that the Ransomware Sub-Limit Endorsement "does not apply on its face under the endorsement's plain language." Doc. 42, Pl.'s Resp. Br. 16. In addition, CiCi

contends that "[a]s the drafter of the policy," if HSB intended for a "Ransomware Event" to be a considered a subset of "Extortion Threat," HSB, as the drafter of the Cyber Insurance Policy, "could have explicitly added such language in its definition of 'Ransomware Event' or 'Extortion Threat.' However, that is not the case in the Ransomware Endorsement." Doc. 42, Pl.'s Resp. Br. 29 (citations omitted). Alternatively, CiCi contends that, in the event the court finds the Ransomware Sub-Limit Endorsement to be ambiguous, the language "should be read in Plaintiff's favor." Doc. 42, Pl.'s Resp. Br. 23.

In reply, HSB contends, among other things, that:

[I]t is clear that under the Policy there was express intent for all covered Ransomware Events to be subject to the limit of liability referred to above of $250,000. Indeed, the Policy's intent is glaringly obvious and Plaintiff's main contention arguing to the contrary, seems to stem from the fact that the Policy so clearly states that the Endorsement applies to all insuring agreements. With Plaintiff's argument that the Policy should state specifically to which insuring agreement it applies being completely redundant when the terms of the endorsement make it clear where it applies -- that is across the Policy.

Doc. 44, Def.'s Reply 8-9.

### 2. Discussion

Like HSB, the court addresses HSB's Motion as to CiCi's declaratory judgment and breach of contract claims together, as the crux of this dispute is whether the Ransomware Sub-Limit Endorsement modifies coverage for CiCi's claim, thereby reducing HSB's potential liability from $3,000,000 to $250,000. The answer to this question dictates whether HSB's Motion should be granted on these two claims, which are inextricably intertwined. *See* Doc. 29, Sec. Am. Compl. ¶¶ 8.1–8.8 (seeking a declaratory judgment that the Ransomware Sub-Limit Endorsement does not modify coverage for CiCi's claim under the Policy); ¶¶ 9.1–9.2 (alleging that HSB breached the Policy by failing to adjust and pay Cici's full claim in an amount greater than $1,200,000 instead asserting that the claim is subject to the Ransomware Sub-Limit Endorsement).

**Memorandum Opinion and Order - Page 18**

For the reasons that follow, the court concludes that CiCi's interpretation of the Ransomware Sub-Limit Endorsement is supported by the Policy language and structure, that is, that the Endorsement is not applicable on its face to Insuring Agreement D. Cyber Extortion. Further, case law analysis, although minimal, supports this conclusion. The court, therefore, will **deny** HSB's Motion for Summary Judgment with respect to CiCi's declaratory judgment and breach of contract claim.

The court begins with the plain language of the Ransomware Sub-Limit Endorsement, which provides:

In consideration of the premium charged, it is agreed that the **Policy** is amended as follows:

1) The following is added to section II. Limits of Insurance:

> Solely with respect to the coverage afforded under this endorsement, our maximum liability, and the most we shall pay for all **Loss**, **Damages**, and **Claims Expenses** incurred by the **Insured Organization** resulting from any single **Ransomware Event** shall be:
>
> a) 250000.
>
> Furthermore, the amount set forth directly above, in item 1)a) of this endorsement, will in no way serve to increase our liability under this **Policy** and shall be part of, and not in addition to, the **Aggregate Limit of Insurance**.

2) The following is added to section V. Definitions:

> **Ransomware Event** means the **Insured Organization's** receipt of a credible threat or series of related threats first discovered during the **Policy Period**, and such threats are made by a third party through the use of any malicious software or computer code, which threatens to take any of the following actions unless an **Insured** pays such third party the funds demanded, or meet some other non-monetary demand, in exchange for the mitigation or removal of such threat:
>
> a) cause an **Information Privacy Event** or **Network Security Event**;
> b) alter, corrupt, damage, manipulate, misappropriate, encrypt, delete, or destroy any **Computer System**, **Corporate Data**, or **Protected Personal Information**;
>
> c) restrict or inhibit access to a **Computer System**; or

d) any action connected to the continuation or furthering of any already commenced action referenced in paragraphs 2)a)-c) above.

**Ransomware Event** includes any related **Information Privacy Event**, **Information Privacy Wrongful Act**, **Network Security Event**, **Network Security Wrongful Act**, or **System Disruption** resulting from such threat or series of threats described above. However, **Ransomware Event** shall not include and this endorsement shall not apply to any **Ransomware Event** that originates solely from a malicious attack against a third party owner or operator of **External Computer Systems**.

3) Section V. Definitions. 15. **Cyber Event**, is deleted and replaced with the following:

**Cyber Event** means an **Information Privacy Event**, **Network Security Event**, **Extortion Threat**, **Fraudulent Inducement Instructions**, **Computer Crimes**, **System Disruption**, **Ransomware Event**, and, with respect to Insuring Agreement I.F.2. only, a **Media Wrongful Act**.

All other terms, conditions, and exclusions to the **Policy** shall remain unchanged.

Doc. 40-2, Def.'s App. 86-87.

Applying Texas rules for contractual interpretation and reading the Policy as a whole in an effort to harmonize its provisions, the court rejects HSB's argument that the Ransomware Sub-Limit Endorsement unambiguously applies to CiCi's claim and limits coverage to $250,000.

First, the perfunctory composition of the Ransomware Sub-Limit Endorsement leaves no clear instruction as to how the sub-limit is to be applied. While HSB argues that the Endorsement unambiguously applies on its face based on the Policy's structure and definition, *see generally* Doc. 29, Def.'s Summ. J. Br. and Doc. 44, Def.'s Reply Br., the court is not persuaded. As CiCi correctly notes, *see* Doc. 41, Pl.'s Resp. Br. 16-17, the language of the Endorsement limits it to the provisions of the Endorsement itself. The Endorsement provides, "*Solely with respect to the coverage afforded under this endorsement*, our maximum liability, and the most we shall pay for all **Loss**, **Damages**, and **Claims Expenses** incurred by the **Insured Organization** resulting from any single **Ransomware Event**" shall be $250,000. Doc. 40-2, Def.'s App. 86 (emphasis added).

"Solely" means "to the exclusion of all else" or "without another." *See* https://www.merriam-webster.com/dictionary/solely (last visited Feb. 20, 2026). Synonyms include "only" and "exclusively." *Id.* Thus, on its face, the Endorsement only applies to limit the "coverage afforded" under the endorsement. Nowhere in the Ransomware Sub-Limit Endorsement, however, does it state what the "coverage afforded" is.

Second, notwithstanding HSB's contentions that the "Policy's intent is glaringly obvious" and "clearly states that the Endorsement applies to all insuring agreements[,]" Doc. 44, Def.'s Reply Br. 8, the Endorsement lacks any explicit language specifying that it applies to all the Section I Insuring Agreements. Instead, the Ransomware Sub-Limit Endorsement states that it is "added to section II. Limits of Insurance" without making any reference to modifying Section I. Insuring Agreements. Section II. Limits of Insurance, however, does not afford any coverage to CiCi, but merely establishes HSB's maximum liability "with respect to the Insuring Agreement to which each such Sub-Limit of Insurance applies…." Doc. 40-2, Def.'s App. 13.

Third, HSB knew the Policy had multiple Insuring Agreements and, in its coverage letter, stated that CiCi's claim triggered coverage under four separate "Insuring Agreements: A. Information Privacy, B. Network Security, C. Business Interruption, and D. Cyber Extortion." Doc. 40-8, Def.'s App. 103. The Ransomware Sub-Limit Endorsement does not state that it modifies or alters coverage under Insuring Agreement D. Cyber Extortion. It does not even include the words "Cyber Extortion," or "Extortion Loss" related to "Cyber Extortion." Instead, the Ransomware Sub-Limit Endorsement states that "[a]ll other terms, conditions, and exclusions of the Policy shall remain unchanged." Doc. 40-2, Def.'s App. 87.

Fourth, a comparison of other Policy endorsements demonstrates the use of express terms to modify a type of afforded coverage under the various Insuring Agreements in the Policy. For

example, HSB drafted two endorsements which explicitly state that they amend the coverage afforded under Section I. Insuring Agreements. First, HSB drafted the "CryptoJacking & Utility Coverage [Full Limits]" endorsement which explicitly states "[t]he following is added to *Section I. Insuring Agreements*, B. Network Security, item 2. Event Response and Recovery…" in modifying the coverage afforded for a "Network Security" claim. Doc. 40-2, Def.'s App. 78 (emphasis added). Second, Defendant drafted the "Funds Transfer Fraud Coverage" endorsement which states, "Section I. Insuring Agreements, E. Financial Fraud, 1. Social Engineering, is deleted and replaced with the following…" in modifying the coverage afforded for a "Financial Fraud." Doc. 40-2, Def.'s App. 69. Such explicit terms, however, are not present in the Ransomware Sub-Limit Endorsement. If HSB wanted the $250,000 sub-limit to apply across the board, regardless of the Insuring Agreement, then it was incumbent upon HSB to expressly and clearly state that. Having not done so, it cannot now complain.

Neither party has cited any court rulings interpreting the Ransomware Sub-Limit Endorsement. Further, after extensive research, the court has not located any case law interpreting the Endorsement or any similar provision. Although not "on all fours" with the instant case, the court finds guidance in the analysis employed by the Texas appellate court in *Hanover Casualty Company v. Seven Acres Jewish Care Services, Inc.*, a case upon which CiCi relies in opposing HSB's Motion. 654 S.W.3d 495 (Tex. App.—Houston [14th Dist.] 2022, pet. denied). *Hanover Casualty* involved a flood claim for building damage and income loss. The subject insurance policy included an endorsement providing a limit of $4.5 million in coverage for losses caused by flood. *Id.* at 497-98. Hanover issued the $4.5 million policy limit for flood damages pursuant to the endorsement but denied coverage for any payments beyond the flood endorsement limit and argued

that all payments—whether for building damage or income loss—were subject to the $4.5 million limit.

Following Hurricane Harvey, the insured made a claim for losses due to building damage and business-income losses. *Id.* at 498. The insurer subsequently paid the flood endorsement limits of liability but refused to make payments on the insured's business-income losses, asserting that those damages were subject to the flood endorsement limit. *Id.* at 497. The insured then filed suit seeking payment for its business-income claim. *Id.* at 498.

The *Hanover Casualty* court analyzed the policy's business income and extra expense coverage form which insured business-income losses "caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations." *Id.* at 500 (quoting policy). The court found that the flood endorsement limit "only address[ed] business-income coverage to clarify that the definition of 'period of restoration' for purposes of a business-income or extra-expense claim 'applies to each event.'" *Id.* (quoting the policy's flood endorsement limit). Because the flood endorsement did not otherwise address business-income coverage subject to the flood endorsement limit, however, the court held that the flood endorsement did not apply to business-income loss resulting from flood. *Id.* Important to the court's analysis was the fact that the flood endorsement did not "specifically explain how the Business Income Coverage Form [was] modified." *Id.* at 501. Ultimately, the court held that "[b]ecause we have no explicit language subjecting business-income claims to the flood limit in this policy, we must give effect to the policy language as written and not effectively read into the flood endorsement a broader exclusion that intended." *Id.* at 502. "If Hanover had intended to restrict business-income claims resulting from a flood event Hanover

should have included language in the flood endorsement to that effect as it has in other endorsements in the policy." *Id.*

Similarly, HSB drafted the Ransomware Sub-Limit Endorsement that contains no explicit language subjecting Insuring Agreement D. Cyber Extortion to the sub-limit of the Endorsement. The court agrees with CiCi that "if Defendant intended for the Ransomware Endorsement to modify 'Cyber Extortion' coverage, Defendant should have included language in the endorsement to that effect as it had to other endorsements in the policy." Doc. 42, Pl.'s Resp. Br. 21.

Finally, contrary to HSB's argument that "Ransomware Event" is a "type or subset" of "Extortion Threat," Doc. 38, Def.'s Mot. 1, the court agrees with CiCi that the definition of "Ransomware Event" does not state that it is a subset or subtype of "Extortion Threat." Rather, the definition provides its own distinct characterizations of what constitutes a "Ransomware Event." *See* Doc. 40-2, Def.'s App. 86. The Endorsement does not state that it is revising the term "Extortion Threat" to include "Ransomware Event" as a type of "Extortion Threat." In addition, the structure of the definition of "Cyber Event" reinforces that, under the Policy, these two terms are distinct and separate types of events. "Ransomware Event" was added as a type of "Cyber Event" and joined the other types of "Cyber Event," including Information Privacy Event, Network Security Event, and Extortion Threat. *See* Doc. 40-2, Def.'s App. 87 (amended definition of "Cyber Event"). Based on the amended definition of "Cyber Event," by its plain language, the court determines that the inclusion of "Ransomware Event" was meant to be treated as a separate event from the other types of "Cyber Event," including being separate and distinct from an "Extortion Threat." As the drafter of the Endorsement, if HSB intended for "Ransomware Event" as merely a subset of an "Extortion Threat," then it could have made that intent clear by stating so.

Instead, HSB added "Ransomware Event" as another type of "Cyber Event" where "Extortion Threat" is also included as a type of "Cyber Event." *See* Doc. 40-2, Def.'s App. 87.

For these reasons and having considered the Policy language and structure, as well as applicable rules of contractual interpretation, the court determines that the Ransomware Sub-Limit Endorsement is not applicable on its face to Insuring Agreement D. Cyber Extortion and, therefore, does not limit HSB's liability to $250,000. Accordingly, the court **denies** HSB's Motion for Summary Judgment with respect to CiCi's declaratory judgment and breach of contract claim.

### C.  CiCi's Claims for Violations of Texas Insurance Code §§ 541 and 542

CiCi alleges violations of Chapters 541 and 542 of the Texas Insurance Code. Doc. 29, Sec. Am. Compl. ¶¶ 10.1–11.5. HSB moves for summary judgment with respect to these extracontractual claims. Without discussing any of CiCi's specific claims or arguments, HSB contends that while the parties dispute the application of the Ransomware Event Sub-Limit Endorsement, "that disagreement quintessentially represents a *bona fide* dispute, which does not rise to the level of actionable bad faith under Texas common law or the Texas Insurance Code. Accordingly, HSB is entitled to summary judgment on Cici's Texas Insurance Code claims." Doc. 39, Def.'s Summ. J. Br. 12.

In response, CiCi argues that, "[w]hile this lawsuit does involve a coverage dispute," it has provided sufficient evidence to raise a genuine dispute of material fact that HSB's actions, and that of its managing general agent, At-Bay, rose "to the level of bad faith" in violation of various provisions of the Texas Insurance Code. Doc. 42, Pl.'s Summ. J. Resp. Br. 31.

#### 1.  *Texas Insurance Code § 541*

Texas Insurance Code § 541.003 provides that "[a] person may not engage in this state in a trade practice that is defined in this chapter as or determined under this chapter to be an unfair

method of competition or an unfair or deceptive act or practice in the business of insurance." Tex. Ins. Code § 541.003. The Insurance Code lists several "unfair method[s] of competition" and "unfair or deceptive act[s] or practice[s]," such as: "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement"; "failing within a reasonable time to . . . affirm or deny coverage of a claim to a policyholder"; and "refusing to pay a claim without conducting a reasonable investigation with respect to the claim." Tex. Ins. Code § 541.060(a). The "reasonable-basis test" applies to a cause of action against the insurer for bad faith under the Insurance Code. *See Henry v. Mutual of Omaha Ins. Co.*, 503 F.3d 425, 428-29 (5th Cir. 2007). The insurer "will not be faced with a tort suit for challenging a claim of coverage if there was any reasonable basis for denial of that coverage." *Id.* at 429 (citation and internal quotation marks omitted); *see also Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 459 (5th Cir. 1997) ("A cause of action for breach of the duty of good faith and fair dealing exists when the insurer has *no reasonable basis* for denying or delaying payment of a claim or when the insurer fails to determine or delays in determining whether there is any reasonable basis for denial.") (original emphasis) (citation omitted). "Evidence establishing only a bona fide coverage dispute does not demonstrate bad faith." *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998) (citations omitted).

Here, as previously stated, HSB only challenges CiCi's Chapter 541 claims on the basis that a bona fide dispute exists. As such, its argument misapprehends applicable law. For the bona fide dispute rule to apply, the extracontractual claim must share "the same predicate for recovery as bad faith causes of action in Texas." *Higginbotham*, 103 F.3d at 460. In other words, "the statutory claims must be based on the same theory [that] underlies the bad faith claim—namely, denial of policy benefits without a reasonable basis." *Kim v. Nationwide Mut. Ins. Co.*, 614 F.

Supp. 3d 475, 497 (N.D. Tex. 2022) (Fitzwater, J.) (internal punctuation and citation omitted). From HSB's cursory briefing concerning CiCi's extracontractual claim, the court is unable to decipher whether the bona fide dispute rule even applies. This alone provides sufficient basis to deny HSB's Motion, as HSB offers no evidence or argument that CiCi's claims under § 541 of the Texas Insurance Code share the same predicate for recovery as bad faith causes of action in Texas. *See Jajou v. Safeco Ins. Co. of Ind.*, 2022 WL 220391, at *12 (W.D. Tex. Jan. 24, 2022) (concluding that where insurer "failed to present any argument" on insured's §§ 541.060 and 542.058 claims, summary judgment was inappropriate); *Hall Arts Ctr. Off., LLC v. Hanover Ins. Co.*, 327 F. Supp. 3d 979, 1000 (N.D. Tex. 2018) ("Because [insurer] offers no evidence or argument that [the insured's] claim under § 541.060(a)(4)(A) shares the same predicate for recovery as [the insured's] bad faith action, the court declines to grant [the insurer's] motion for summary judgment on [that] claim.").

Second, CiCi has provided sufficient evidence to raise a genuine dispute of material fact from which a reasonable jury could find that HSB violated Chapter 541 of the Texas Insurance Code, notwithstanding that the parties dispute the application of the Endorsement. *See* Doc. 42, Pl.'s Resp. Br. 31-36. Specifically, CiCi has provided evidence that "HSB's actions and that of its managing general agent, At-Bay, rise to the level of bad faith due to misrepresentations and failures to disclose information to CiCi that was critical to the coverage CiCi sought and was afforded under the Cyber Insurance Policy." Doc. 42, Pl.'s Resp. Br. 31; *see* Doc. 43-1, Pl.'s App. 1-18; Doc. 43-2, Pl.'s App. 19-34; Doc. 43-3, Pl.'s App. 35-36.[6]

---

[6] "Pl.'s App." refers to the Appendix in Support of Plaintiff's Brief in Opposition to HSB Specialty Insurance Company's Motion for Summary Judgment.

As CiCi has provided evidence to raise a genuine dispute of material fact regarding these claims, the court **denies** HSB's Motion for Summary Judgment on CiCi's claims for violations of Texas Insurance Code § 541.

### 2. *Texas Insurance Code § 542*

CiCi also alleges that HSB violated Texas Insurance Code § 542 by, among other things, "delaying in the payment of CiCi's full claim after HSB received all items, statements, and forms reasonably requested and required[,]" in violation of Section 542.058. Doc. 29, Sec. Am. Comp. ¶ 10.3.

HSB contends that the court should grant summary judgment on CiCi's Chapter 542 claim because the parties' disagreement "represents a *bona fide* coverage dispute." Doc. 39, Def.'s Summ. J. Br. 11. The court disagrees.

Even if HSB is correct that there is a bona fide dispute with respect to whether the Ransomware Sub-Limit Endorsement applies to limit HSB's liability to $250,000, it is undisputed that HSB has only paid $250,000 toward CiCi's claim. If HSB is found liable for additional damages above the $250,000 sub-limit, it has violated the timely payment requirements of section 542 of the Texas Insurance Code. Moreover, HSB has provided no authority demonstrating that the bona fide dispute defense absolves an insurer from liability where fact issues exist concerning breach of contract and bad faith.

There is, accordingly, a genuine dispute of material fact with respect to HSB's compliance with section 542 of the Texas Insurance Code. Accordingly, the court **denies** HSB's Motion for Summary Judgment as to CiCi's claims for violations of Texas Insurance Code § 542.

IV.    **CiCi's Motion for Partial Summary Judgment**

CiCi has filed a Motion for Partial Summary Judgment which is, effectively, a cross-motion for partial summary judgment with respect to its declaratory judgment claim only. Specifically, CiCi requests that:

> [t]his court grant its Motion for [Partial] Summary Judgment on its declaratory judgment claim because the Ransomware Sub-Limit Endorsement does not apply on its face under the endorsement's plain language and the Ransomware Sub-Limit Endorsement must be construed against its drafter, HSB. Alternatively, the Ransomware Sub-Limit Endorsement is ambiguous because its language is susceptible to more than one reasonable interpretation.

Doc. 52, Pl.'s Mot. 2.

The court previously addressed the Ransomware Sub-Limit Endorsement at length in addressing Defendant's Motion for Summary Judgment, *supra*, agreed with CiCi's arguments that the Ransomware Sub-Limit Endorsement does not apply on its face under the Endorsement's plain language, and rejected HSB's argument that the Endorsement applies to limit its liability to $250,000. For this reason, the court denied HSB's Motion for Summary Judgment with respect to CiCi's declaratory judgment and breach of contract claims. CiCi's arguments in its Motion for Partial Summary Judgment overlap with those in its response to Defendant's Motion for Summary Judgment. Having determined that the Ransomware Sub-Limit Endorsement does not apply on its face under the Endorsement's plain language, the court **grants** CiCi's Motion for Partial Summary Judgment as to its declaratory judgment claim, as any other result would be repugnant to the determinations and rulings already made.

V.    **Conclusion**

For the reasons stated herein, the court **denies** Defendant HSB Specialty Insurance Company's Motion for Summary Judgment (Doc. 38) and **grants** Plaintiff CiCi Enterprises, LP's Motion for Partial Summary Judgment (Doc. 52).

Specifically, the court **denies** HSB's Motion as to CiCi's declaratory judgment claim and breach of contract claim based on its determination that the Ransomware Sub-Limit Endorsement does not modify coverage for "Cyber Extortion" or "Extortion Threat" and does not apply to CiCi's claims by the plain terms of the Endorsement. Further, the court **denies** HSB's Motion as to CiCi's claims under the Texas Insurance Code because CiCi has raised genuine disputes of material fact as to these claims.

Having granted CiCi's Motion for Partial Summary Judgment, which the court has construed as a cross-motion for partial summary judgment as to CiCi's declaratory judgment claim only, the court hereby **declares** that (1) the Ransomware Sub-Limit Endorsement does not modify coverage for "Cyber Extortion" or "Extortion Threat" and does not apply to CiCi's claims by the plain terms of the Endorsement; and (2) the Policy's $3,000,000 policy limits are available for the payment of CiCi's claim. Remaining for trial are CiCi's claims for breach of contract and for violations of Texas Insurance Code §§ 541 and 542.

As a final note, given the court's rulings herein—which have consumed an inordinate amount of scarce judicial resources—as well as the complexity of this case, the time it has been pending, and the time it will take to try if not resolved short of trial, the court **strongly encourages** the parties to consider resolution of the remaining claims. With respect to the remaining issues, this is not an open-and-shut case for either party. The court has no idea how a jury would rule on the remaining issues. In the meantime, however, through trial and possible appeal, the parties will

continue to incur handsome legal fees. It behooves the parties, as the outcome of the remaining claims is uncertain, to vigorously seek resolution of this action without further court involvement. In that vein, to eliminate the expenses of mediation, the court will make available a magistrate judge to conduct a settlement conference or mediation. If, after serious discussion (and potentially after mediation), the parties cannot resolve their differences, the court will set this matter for trial. The court **directs** the parties to inform it in writing no later than **March 6, 2026**, whether they are able to resolve the remaining claims in this action without further court involvement or desire to participate in a settlement conference or mediation with a magistrate judge at no cost. Moreover, as criminal trials take precedence over civil actions, it is likely this case cannot be tried until early or late Fall of 2026.

　　**It is so ordered** this 23rd day of February, 2026.

Sam A. Lindsay
United States District Judge